

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 17, 2020

**VIA ECF AND EMAIL**
The Honorable Cathy Seibel
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:  *United States v. Virginia Blanco*
           16 Cr. 408 (CS)

Dear Judge Seibel:

      The Government respectfully opposes the motion filed by Virginia Blanco for compassionate release from prison under Title 18, United States Code, Section 3582(c)(1)(A). The defendant has been diagnosed with and recovered from COVID-19. The defendant nonetheless moves for compassionate release based on her body mass index ("BMI") and the possibility of reinfection. To date, Blanco has served only approximately two and a half years of the 10-year prison sentence that this Court imposed for Blanco's role in a violent bank robbery at a Wells Fargo in Yonkers, where she served as a bank teller. Blanco's motion for release from prison now — which would constitute a nearly 75% reduction of her sentence — should be denied on the merits because early release would contradict the goals of sentencing set forth in Title 18, United States Code, Section 3553(a).

## BACKGROUND

**A. Blanco's Offense Conduct**

**1.  The Preparation**

      On or about October 29, 2013, the defendant and her then-boyfriend, Giovanny Marte ("Marte"), along with three other men, robbed a Wells Fargo in Yonkers, New York (the "Bank"). (PSR ¶ 14). Although the defendant, who was a bank teller at the Bank at the time of the robbery, was not present during the robbery, the evidence at trial made clear that she played an instrumental role in planning the robbery by providing Marte with crucial information about the Bank. (*Id.*). Specifically, in the months leading up to the robbery, the defendant provided Marte, among other things, with the location of the cash vault, instructions on how to access the vault, the timing of the Bank's cash deliveries, the identity of some of the employees at the Bank and how each would react during an armed robbery, the days that were busiest at the Bank, the fact that the money in the cash vault would not be traced, and the location of the silent alarms and cameras. (*Id.*). The defendant and Marte also discussed the timing of the robbery, and they ultimately decided on a

time when the defendant would not be at the Bank. (*Id.*). Notably, the defendant advised Marte that he should bring a gun to the Bank in the event he needed to fire a warning shot. (*Id.* ¶ 15).

### 2. The Robbery

The defendant departed the Bank about an hour before the robbery occurred and called Marte to provide him with real-time information about the number of employees at the Bank. (*Id.* ¶ 16). Then, at approximately 3:17 p.m., a Nissan Maxima (the "Nissan") driven by Andres Cruz ("Cruz") pulled up to the Bank and Marte, Rowy Vasquez ("Vasquez"), and Jeffrey Martinez ("Martinez") entered through the street-facing entrance. (*Id.* ¶ 17). Marte, Vasquez, and Martinez wore gloves and clothing that hid their faces. (*Id.*). While they were inside the Bank, Cruz drove away and then returned. (*Id.*). Upon entering the Bank, Marte, and Martinez each brandished a handgun, and Vazquez brandished a wood saw. (*Id.* ¶ 18). They immediately demanded that everyone lay on the ground. (*Id.*).

Marte then climbed over the teller counter, pointed his gun at one of the tellers, entered the vault room, and commanded that the manager assist him in opening the vault. (*Id.*). As the manager tried to open the vault, Marte fired two shots but no one was hit. (*Id.* ¶ 19). Ultimately, the manager opened the vault, at which point Marte filled a bag with cash. (*Id.*). At approximately 3:21 p.m., Marte, Vazquez, and Martinez exited the Bank and entered the Nissan. (*Id.* ¶ 20). Cruz then drove away from the Bank. (*Id.*).

### 3. The Aftermath

Marte called the defendant roughly an hour after the robbery to tell her it was a success. (*Id.* ¶ 22). Indeed, during the robbery, the robbers stole approximately $303,500 from the Bank. (*Id.* ¶ 21). In the days and weeks following the robbery, the defendant used her position at the Bank to learn information about the robbery, which she shared with Marte, including what the employees knew about the robbers, that the robbers had left some cash in smaller denominations behind, and that a manager had left the branch in the wake of the robbery. (*Id.*). A few weeks after the robbery, in December 2013, the defendant and Marte travelled to Aruba together using the proceeds from the bank robbery. (*Id.* ¶ 23). In addition to the trip to Aruba, the defendant received $17,000 of the robbery proceeds. (*Id.*). Shortly after the trip, the defendant and Marte broke up and he moved out of their shared apartment. (*Id.*).

### 4. The Defendant's 2015 Interview with the FBI

Approximately two years later, on September 15, 2015, the FBI interviewed the defendant about her role in the robbery. (*Id.* ¶ 24). During the interview, the defendant admitted that, given the way the robbery was executed, it had to have been "an inside job," but she denied any involvement in the robbery and attempted to distance herself from Marte. (*Id.*). To that end, the defendant denied being in a relationship with Marte during the time of the robbery or living in an apartment in the Bronx that the two shared. (*Id.*). She also claimed that she barely knew Marte and was intimate with him on one occasion, about seven years before the interview. (*Id.*). The defendant also denied going to Aruba with Marte after the robbery, denied ever seeing Marte's car (the car which was used in the robbery), and denied ever using the phone number that Marte

contacted her on in the hours before and after the robbery.  (*Id.*).  All of these denials were proven at trial to be lies.  (*See, e.g.,* GX 31-32, 60-A, 60-B, 61-63).

### B. Blanco's Trial

As relevant here, Superseding Indictment 4-16 Cr. 408 (CS) (the "Indictment") was filed on September 13, 2017, charging the defendant with conspiracy to commit bank robbery, in violation of Title 18, United States Code, Section 371 ("Count One"); bank robbery, in violation of Title 18, United States Code, Section 2113(a) and 2 ("Count Two"); and using and discharging, and aiding and abetting the use and discharge, of a firearm in furtherance of a violent crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and 2 ("Count Three").  Trial began on July 11, 2018, and, on July 16, 2018, the jury returned a guilty verdict as to all three counts in the Indictment.  At that time, the defendant was remanded.

### C. Blanco's Sentencing

On March 29, 2018, Your Honor sentenced Blanco.  With respect to the Guidelines, Your Honor determined that the Guideline range of imprisonment for the defendant was 63 to 78 months, to be followed by the consecutive term of 120 months' imprisonment (for Count Three), for an effective term of 183 to 198 months' imprisonment.  After considering the factors set forth in Title 18, United States Code, Section 3553(a), Your Honor sentenced Blanco to ten years' and a day imprisonment for her crimes.  The Section 3553(a) factors that drove that determination included the seriousness of the offense, the need for the sentence imposed to promote respect for the law, and the need to afford adequate deterrence for criminal conduct, among others.  (*See* Sent'g Tr. (Dkt. 164) at 51-54).

With respect to the seriousness of the offense, the Court stated:

> Anyone who sat through the trial is aware of how serious an offense this was. The robbers, the ones who entered the bank, were armed. The people in the bank were terrified. The gun -- and this is Mr. Marte -- the gun was put to the head of a bank employee. Shots were fired. I can only imagine how terrifying an experience it was for the people in the bank, and I am sure many of them are having a hard time forgetting.

(*Id.* at 51.).  The Court elaborated on the seriousness of the offense by noting that the defendant "set [] up" her "friends and colleagues and co-workers . . . to be terrorized by [Marte,] her no-goodnik boyfriend."  (*Id.*).

The Court then turned to the nature and characteristics of the defendant, finding that this factor is "almost all positive" for the defendant.  (*Id.*).  The Court explicitly responded to defense counsel's argument that Blanco had "lost the ability to see [her two children], to be with those children, and then add to that the fact that on February 8th she had to give birth in an incarcerated setting, and then four days later her baby taken from her."  (*Id.* at 47).  The Court stated, "[The defendant is] a devoted mother, which makes her risk-taking in this case all the more incomprehensible.  I am sure it was awful to have to give up the baby, and I'm sure we all wish

that Ms. Blanco had not gotten pregnant in the timeframe she did, which was going to mean that if she got convicted, she was giving birth in prison." (*Id.* at 52)

The Court then addressed the need for a sentence that promoted respect for the law and highlighted "the defendant's repeated and blatant lies to the FBI." (*Id.* at 54). The Court also addressed the need to afford adequate deterrence and explained that "[i]t's important that insiders in banks know that they are taking a humongous risk if they set up bank robberies the way this defendant did." (*Id.*). In discussing deterrence, Court further noted that that defendant "A, committed this crime; B, lied to the FBI about it; and C, continues to take some dubious positions – I'll put it that way -- such as, you know, she was afraid to tell the FBI that she was involved with Marte, [which] suggests a poor attitude."

After considering the remaining Section 3553(a) factors, the Court noted that notwithstanding the fact that the defendant "has not accepted responsibility," it would impose a below-Guidelines sentence of 120 months' imprisonment and one day. (*Id.* at 55-56). In varying downward from the Guidelines-recommended sentence of 183 to 198 months' imprisonment, the Court highlighted, among other things, (i) the effect of the sentence on the defendant's family, explaining that "I am not unaffected by the effect on the defendant's children . . . "; (ii) the defendant's "otherwise positive attributes; and (iii) the length of the mandatory minimum. (*Id.* at 56).

On June 5, 2020, the Second Circuit summarily affirmed the defendant's conviction. *United States v. Blanco*, 811 F. App"x 696 (2d Cir. 2020). Blanco has served approximately 31 months of her 10-year prison sentence. Blanco is presently incarcerated at the BOP's Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury").

## ARGUMENT

The Court should deny Blanco's motion for compassionate release — which amounts to a request for a nearly 75% reduction of her prison sentence for her role in a violent bank robbery – – on the basis of the sentencing factors set forth in Section 3553(a). The Government does not deny for present purposes that Blanco has proffered sufficient bases for the Court to find (a) that she has adequately exhausted available administrative remedies with the BOP, as required to bring the instant motion before the Court; (b) that she is at a heightened risk of suffering severe complications if she were to contract COVID-19 in prison; and as a result, (c) that Blanco has met the statutory criteria required to trigger the Court's authority to grant her motion if doing so were otherwise appropriate.[1] But the fact that Blanco has cleared those threshold procedural obstacles

---

[1] Because the Government concedes that defendant's medical condition satisfies the statutory criteria, it does not address whether the defendant's proffered family hardships also present an "extraordinary and compelling reason[]" under Section 3582(c)(1)(A). Nevertheless, the Government notes that Blanco does not represent that she is the only available caregiver for her children. Rather, because her children are currently being cared for by her mother, (Def. Mot. at 7), Blanco cannot establish extraordinary and compelling reasons warranting her immediate release because of family hardship. *See, e.g.*, *United States v. Myrick*, No. 12-CR-385 (ARR), 2020 WL 6128943, at *4–5 (E.D.N.Y. Oct. 19, 2020) (concluding that a defendant's need to care

to bringing her motion does not entitle her to be released from prison more than 7 years early for her central role in the robbery of the Yonkers Wells Fargo. After carefully considering all of the Section 3553(a) factors at Blanco's original sentencing, the Court appropriately determined that a sentence of 10 years in prison was necessary and warranted to meet the goals of sentencing enumerated in Section 3553(a) including that statute's requirements that Blanco's sentence be sufficient to provide just punishment for her role in the robbery and afford adequate deterrence to such criminal conduct. That sentence was and remains just. Given the Court's findings at Blanco's sentencing (Sent'g Tr. at 51-54), cutting Blanco's sentence from 10 years to 2.5 years in prison as she now requests would plainly be contrary to the statutorily recognized principles that prompted the Court to impose the already below-Guidelines sentence on her the first place.

## I.     The Applicable Section 3553(a) Factors Counsel Against Blanco's Release

The fact that an inmate has established "extraordinary and compelling reasons" allowing the Court to reduce the inmate's sentence if appropriate does not resolve the inmate's entitlement to a reduction in sentence. *See* 18 U.S.C. § 3582(c)(1)(A). The Court must also consider whether or not it is appropriate to release the inmate from prison in light of the factors set forth in Section 3553(a). Accordingly, the question presented by Blanco's motion is whether the "reason" that Blanco asserts for reducing her sentence — her vulnerability to severe complications from COVID-19 — "warrant such a reduction" after "considering the factors set forth in [S]ection 3553(a)." 18 U.S.C. § 3582(c)(1)(A). The answer is "no." The 10-year prison sentence that this Court imposed for Blanco's role in the 2013 bank robbery was and remains just. Releasing Blanco from prison now, after she has served barely a quarter of that sentence, would contradict Section 3553(a)'s requirements that her sentence be sufficient to provide just punishment for her role in the violent robbery. Further, granting Blanco — whom the Court acknowledged was the mastermind behind a robbery (*see* Sent'g Tr. at 51) — a sentence reduction simply because of her medical condition would be tantamount to reading the Court's discretion and consideration of the Section 3553(a) factors out of the statute that she relies upon.

### A. Applicable Law

Under Title 18, United States Code, Section 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). A motion under this provision may be made by either by the Bureau of Prisons or by a defendant, but in the latter case only "after the defendant has fully

---

for his children with special needs, one of whom was diagnosed with autism, was not an extraordinary and compelling reason warranting compassionate release when there may be other family members available to care for the children); *United States v. Watts*, No. 17-CR-505 (VB) (S.D.N.Y. Jul. 20, 2020), Dkt. No. 429 (finding that a defendant's need to care for his son, who was being treated for kidney cancer, was not an extraordinary and compelling reason warranting compassionate release when the defendant's wife is asthmatic and therefore relies on others for assistance). Notably, the Court already contemplated the effect of its sentence on Blanco's children, citing them as a reason for its significant variance. (*See* Sent'g Tr. 56).

exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

Section 3582(c)(1)(A) provides that a district court may reduce a sentence if the court finds, "after considering the factors set forth in [S]ection 3553(a) [of Title 18 of the United States Code] to the extent they are applicable," that "extraordinary and compelling reasons warrant such a reduction" and that the reduction "is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). [2] The Sentencing Commission has determined that "extraordinary and compelling" circumstances exist to permit a court to grant a reduction when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A). One consideration is the extent to which the "condition can be treated within the context of a correctional facility." *United States* v. *Hidalgo*, No. 13 Cr. 413-2 (JGK), 2020 WL 2642133, at *2 (S.D.N.Y. May 26, 2020). In addition, in accordance with Sentencing Commission guidance, the court may not reduce a sentence unless it determines that the "defendant is not a danger to the safety of any other person or the community." *Id.* (quoting U.S.S.G. § 1B1.13(2)).

"The existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court *must* release the defendant." *See United States* v. *Madoff*, No. 09 Cr. 213, Dkt. 230 (Memorandum Decision) at 9 (S.D.N.Y. June 4, 2020) (Chin, J.) (Judge Chin's emphasis), citing *United States* v. *Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020) ("the existence *vel non* of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release"). "Rather, section 3582(c)(1)(A) provides that a court 'may' reduce a sentence if 'extraordinary and compelling circumstances' are shown, and thus a district court has the discretion to grant or deny a request for compassionate release even if a defendant is medically eligible." *See Madoff*, No. 09 Cr. 213, Dkt. 230 at 9 (citing authority). "If a defendant qualifies for a reduction, the court must decide whether to grant the reduction by weighing the factors set forth in section 3553(a), to the extent they are applicable." *See id.* (citing authority). The Section 3553(a) factors include the nature and circumstances of the defendant's offense; the defendant's history and characteristics; and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a).

"On a motion for compassionate release, the defendant bears the burden of showing that a reduction is warranted." *Madoff*, No. 09 Cr. 213, Dkt. 230 at 9 (collecting cases); *see also United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

---

[2] A district court may also reduce a sentence where a defendant is at least 70 years old and has served at least 30 years in prison. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). That provision is not applicable here, as Blanco is not 70 years old and has not served 30 years.

**B. Discussion**

The Section 3553(a) factors counsel heavily in favor of denying Blanco's motion. First, the seriousness of the offense warrants a sentence beyond 31 months' imprisonment. As the Court noted at sentencing, although the defendant was not present during the robbery, the evidence at trial made clear that she played an instrumental role in planning the heist by providing her then-boyfriend, Marte, with crucial information about the Bank. She shared with him important information about the Bank's procedures, operations, and security. And she did so knowing that he would commit a violent robbery using firearms. Far from a simple crime of greed, the defendant's callous actions put her colleagues—and the innocent customers in the Bank on that October day—in grave danger. In fact, during the robbery, the Bank's manager was pistol-whipped and two rounds, albeit warning shots, were fired at Bank employees. Despite this, the defendant returned to work after the robbery as if nothing occurred and worked at the Bank for two more years. (PSR ¶ 73). A sentence above 31 months' imprisonment is therefore necessary to provide just punishment to the defendant for her serious criminal conduct.

Second, the need to promote respect for the law weighs in favor of denying Blanco's motion. Indeed, the defendant's use of inside information about the Bank to the robbers' benefit manifested a deep disrespect for the law. By telling Marte the locations of the cash vault, the cameras, and the alarms, the defendant ensured that law enforcement would not be able to quickly respond in order to apprehend the robbers. The defendant's disregard for the law did not end there; when she was interviewed by the FBI in September 2015, she told numerous lies further hampering the Government's investigation. As described above, the defendant lied about being in a relationship with Marte, living with Marte, travelling to Aruba with Marte, and even speaking on the phone with Marte.

Third, the history and characteristics of the defendant support the imposed sentence and counsel strongly against early release. Unlike many other defendants who facilitate violent crimes, the defendant was provided with opportunities in life. She has had a supportive family and friends and she received an Associate Degree with honors. (PSR ¶ 69). Indeed, at the time of the robbery, the defendant had a respectable job at the Bank and, by all accounts, was an able and dependable employee. These privileges, however, mask the defendant's darker criminal side. In addition to facilitating the robbery, the defendant helped Marte and others with their narcotics dealings over many years by storing a gun and drugs for Marte, transporting drugs on his behalf, executing drug transactions for him, and communicating messages to his drug associates. (*See* Docket No. 109). On numerous occasions, she also carried Marte's gun for him. (Tr. 154:3-22). The defendant's participation in the bank robbery was thus not the result of a momentary lapse in judgement; she has consistently broken the law to suit her own interests while presenting another face to the world.

Finally, the need for adequate deterrence counsels in favor of denying the defendant's motion. The Court's below-Guidelines sentence appropriately reflects the specific deterrence necessary for this defendant to appreciate the crime she committed and address her disrespect for the law. As noted above, the defendant participated in various crimes over a long period of time culminating in a high-risk armed robbery of her own employer. And as the Court noted at sentencing, a serious sentence was warranted to send a clear message "that insiders in banks know

that they are taking a humongous risk if they set up bank robberies the way this defendant did." (Sent'g Tr. at 54).

In sum, the Court's 120-month and a day sentence—itself a significant variance from the Guidelines range Blanco faced—was, and continues to be, necessary to serve the essential goals of sentencing. A sentence of 31 months' imprisonment would not reflect the seriousness of Blanco's crimes, provide just punishment, protect the public, promote respect for the law, or afford adequate deterrence. Blanco's family circumstances and the risks posed by COVID-19 do not warrant releasing her from prison when she has served approximately a quarter of her sentence for a serious bank robbery offense.

## II.   The BOP is Taking Reasonable Measures to Protect Blanco from COVID-19

Although the Government respectfully submits that Blanco's compassionate release motion should be denied on the merits for the reasons set forth above, the Government does not dispute for present purposes that Blanco has cleared the procedural obstacles required for her to bring the motion and for the Court to reach the merits of the motion pursuant to Title 18, United States Code, Section 3582(c)(1)(A). Specifically, the Government does not dispute for present purposes: (a) that Blanco has sufficiently exhausted available administrative remedies within the BOP as required by Section 3582(c)(1)(A), as the BOP has confirmed that Blanco submitted a compassionate release request in writing on May 6, 2020 to the Warden at FCI Danbury and 30 days have lapsed since the Warden denied the application on May 8, 2020; (b) that Blanco has alleged facts that are sufficient to show that she is at a heightened risk of suffering severe complications in the event that she were to contract the COVID-19 virus in light of having a BMI over 30,[3] which has been recognized by the Centers for Disease Control and Prevention ("CDC") as creating increased vulnerability to severe complications from COVID-19; and (c) that during the current COVID-19 pandemic, prison inmates like Blanco who suffer from a CDC risk factor present sufficient "extraordinary and compelling reasons" under Section 3582(c)(1)(A) to authorize the Court to exercise its discretion to reduce the inmate's sentence if doing so is otherwise appropriate.[4] While the Government does not dispute for present purposes that Blanco

---

[3] As of January 28, 2021, Blanco's BMI appears to be 36.7. *See* Ex. A at 89. The Government respectfully requests permission to file the defendant's medical records under seal, as they contain extensive personal information about the defendant.

[4] Apart from her BMI, Blanco also claims to be suffering from depression and high cholesterol. (*See* Def. Mem. at 2). With respect to her depression, a review of Blanco's BOP medical records shows that the BOP has prescribed her medications to treat this condition (including with Prozac and Zoloft). (Ex. A at 11, 34). The defendant also appears to be exaggerating her cholesterol issues as the only mention of cholesterol in her BOP medical records reflects that her level is 196, which is average or borderline, at most. *See* Ex. A at 191; *see also* WebMD: What is Borderline Cholesterol? ("The average American has a total cholesterol level of 200, which is in the borderline range."), https://www.webmd.com/cholesterol-management/guide/what-is-borderline-cholesterol. In any event, neither of those conditions is recognized by the CDC as creating a heightened risk of severe complications from COVID-19. (*See* CDC Website, Coronavirus Disease 2019 (COVID-19), People Who Need Extra Precautions, available at

is at a heightened risk of severe complications if she were to contract the COVID-19 virus at FCI Danbury, where she is currently incarcerated, several observations that mitigate that risk are relevant to the Court's ultimate decision on her motion.

*First*, while FCI Danbury was hit harder by the COVID-19 pandemic than many other BOP facilities, it bears noting that the BOP has been making significant efforts at FCI Danbury to protect the health of inmates there such as Blanco. *United States v. Batista*, No. 18 Cr. 319(LTS), 2020 WL 6132239, at *4 (S.D.N.Y. Oct. 19, 2020) (denying compassionate release for Danbury inmate with a BMI of 34.6 because of "the applicable section 3553(a) factors, [the defendant]'s medical conditions, as well as the surrounding circumstances at the facility in which she is currently in custody" and observing that while the defendant "correctly notes that FCI Danbury was once the scene of a substantial number of COVID-19 infections the facility appears to have since gained control of the virus").

FCI Danbury has implemented the BOP's national Action Plan for COVID-19. (*See* Declaration of FCI Danbury Warden Diane Easter at ¶¶ 8-22 filed in *Dianthe Martinez-Brooks et al.* v. *D. Easter et al.*, No. 20 Civ. 569 (MPS), Dkt. 24-2 at 3-20 (D. Conn. May 5, 2020) ("Easter Decl.")).[5] Phase One of that plan, which was implemented in January 2020, involved developing strategies and soliciting guidance for managing the virus response in BOP facilities. (*See id.* at ¶¶ 8-11, 22). Phase Two, which began on March 13, 2020, suspended virtually all legal and social visitation and started new entry screenings for staff and prisoners. (*See id.* at ¶¶ 8-15, 22). In addition, prison officials put into place "modified operations," such as staggered meal and recreation times, in order to maximize social distancing among staff and prisoners. (*See id.*). Phase Three, which took effect on March 18, 2020, required inventories of cleaning, sanitation, and medical supplies, among other steps. (*See id.* at ¶¶ 8-11, 16-17, 22). Phase Four, which began

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited February 14, 2021)).

[5] Warden Easter's declaration was filed on May 5, 2020 by the United States Attorney's Office for the District of Connecticut in opposition to an application filed in that district by representatives of a putative class of FCI Danbury inmates seeking a temporary restraining order and preliminary injunction to address alleged deficiencies in FCI Danbury's response to the COVID-19 pandemic. (*See Dianthe Martinez-Brooks et al.* v. *D. Easter et al.*, No. 20 Civ. 569 (MPS), Dkts. 24-1 and 24-2 (D. Conn. May 5, 2020)). On August 11, 2020, the Court certified, for settlement purposes, a class of persons incarcerated at FCI Danbury who "possess one or more medical conditions which, according to current [CDC] guidance, either (i) places [him or her] at increased risk of severe illness from COVID-19; or (ii) might place [him or her] at an increased risk of severe illness from COVID-19," as to whom FCI Danbury would perform—to the extent it had not done so—an individualized review of each inmate for possible release to home confinement. *Whitted v. Easter*, 20 Civ. 569 (MPS), 2020 WL 4605224, at *4-6 (D. Conn. Aug. 11, 2020). The August 11, 2020 Order also indicates that "[o]n July 27, 2020, the parties reached a Settlement Agreement that resolves this lawsuit." *Id.* at *5. (D. Conn. Aug. 11, 2020).

Case 7:16-cr-00408-CS Document 188 Filed 02/17/21 Page 10 of 12

Page 10


on March 26, 2020, strengthened quarantine and isolation procedures to require all newly admitted inmates to the BOP, whether in areas of sustained community transmission of COVID-19 or not, to be assessed using a screening tool and temperature check. (*See id.* at ¶¶ 8-11, 18, 22). Phase Five, which took effect on April 1, 2020, mandated facility-wide lockdowns in every BOP institution for a 14-day period. (*See id.* at ¶¶ 8-11, 19, 22). During lockdown, inmates are to be secured in their assigned prison cells or quarters where possible, with limited exceptions for essential activities. (*See id.*). For example, during Phase Five at FCI Danbury, services including meals, commissary items, laundry, recreation materials, and psychology services were delivered directly to inmates' housing units, and inmates were released from their cells in small groups to engage in activities such as shows, exercise, phone calls and email access subject to directives that the inmates maintain appropriate physical distancing. (*See id.* at ¶ 20).

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement." (BOP Update on COVID-19 and Home Confinement, available at https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp). In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." *Id.* It bears noting that transferring qualified inmates to home confinement is meant to benefit not only those inmates, but also to reduce the remaining inmate population at such prisons in a matter that would facilitate social distancing and other measures within those prisons to mitigate the spread of COVID-19 among the remaining inmate population at such prisons.

Based on the foregoing, it is clear that FCI Danbury, has taken the threat posed by COVID-19 seriously and is continuing to take significant measures to protect inmates such as Blanco from COVID-19. *Cf. United States v. Francis*, No. 17 Cr. 753 (CS), 2020 WL 7247180, at *1 (S.D.N.Y. Dec. 9, 2020) (denying release for Danbury inmate who presented a sufficient "extraordinary and compelling reason[]" due to his obesity, despite "an outbreak at FCI Danbury [that] does not seem to have peaked" because the Section 3553(a) factors counseled against release). These efforts have proven beneficial: as of February 15, 2021, there was only 1 inmate and 1 staff member with current active cases, despite surges being reported throughout the country.[6]

*Second*, Blanco already contracted COVID-19 in December 2020 and experienced relatively mild symptoms. Specifically, it appears that the defendant was diagnosed with COVID-19 on or about December 8, 2020. (*See* Ex. A at 173). In the ensuing days, the defendant reported a loss of taste and smell and body aches, but no other symptoms. (*See id.* at 98, 100).[7] By December 18, 2021, the defendant denied having a loss of taste or smell, body aches, or any other symptoms and the case was listed as resolved by early January 2021. (*See id*. at 138, 52).

---

[6] *See* https://www.bop.gov/coronavirus/ (last visited on February 15, 2021).

[7] Indeed, it appears that Blanco may have exaggerated her reactions to COVID-19 in her submission. While she claims that she "experienced fever" (Def. Mem. at 4), her medical records reflect that she denied having a fever on two separate occasions during the time she had COVID-19 and nothing in the records corroborates a fever. (Ex. A at 138).

Accordingly, the defendant's bout with COVID-19 appears to have passed without serious complication. That successful recovery weighs against granting compassionate release. *See, e.g.*, *United States v. Delorbe-Luna*, 18 Cr. 384 (VEC), 2020 WL 7231060, at *2 (S.D.N.Y. Dec. 7, 2020); *United States v. McCallum*, 14 Cr. 476 (CS), 2020 WL 7647198, at *1 (S.D.N.Y. Dec. 23, 2020) ("Now that [the defendant] has weathered the disease, a sentence reduction based on the risk of contracting it no longer makes sense.").

*Third*, although the defendant raises the possibility of reinfection, that possibility appears remote. CDC guidance reports that although "[c]ases of reinfection with COVID-19 have been reported, [they] remain rare."[8] This Court and others have found similarly. *See United States v. Adames et al.*, 18 Cr. 776 (CS), Dkt. No. 157 (the defendant "in all likelihood has at least some immunity for some period of time, making it unlikely he will be reinfected soon or have a severe case if he is reinfected"); *United States v. McCallum*, No. 14 Cr. 476 (CS), 2020 WL 7647198, at *1 (S.D.N.Y. Dec. 23, 2020) (observing that reinfections are "vanishingly rare" and prior infections appear to confer protection); *United States v. Rodriguez-Francisco*, No. 13 Cr. 233-1 (VB), 2021 WL 326974, at *2 (S.D.N.Y. Feb. 1, 2021) ("because [the defendant] has already had (and fortunately recovered from) the disease, his risk of reinfection is extremely low"); *United States v. Adams,* No. 10 Cr. 82 (RS), 2020 WL 4505621 (S.D.N.Y. Aug. 4, 2020) (denying release to inmate with severe underlying conditions who had apparently recovered from Covid-19; "Instead, the Court focuses on the impact of COVID-19 on [defendant] and his ability to 'provide self-care' within the correctional facility in light of his diagnosis.")). Nor is Blanco immune from re-infection if she is released to Manhattan, as she proposes, where COVID-19 remains a serious threat.

Accordingly, given the steps taken by FCI Danbury to protect Blanco and her fellow inmates from COVID-19, the defendant's mild reaction to the virus in December 2020, and the reduced risk that she will be re-infected, the Government submits that there are significant mitigating factors that weigh heavily against granting the defendant's motion.

---

[8] *See CDC, People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 1, 2021).

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that defendant Virginia Blanco's motion for compassionate release should be denied.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: \_\_/s/_____
Samuel Adelsberg
Jamie Bagliebter
Assistant United States Attorneys
(212) 637-2494

Cc: Virginia Blanco, Reg. No. 79564-054
FCI Danbury
Federal Correctional Institution
Route 37
Danbury, CT 06811