UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

UNITED STATES OF AMERICA            :

                                     :

         - v. -                    :           16 Cr. 408 (CS)

                                     :

VIRGINIA BLANCO,                   :

                                     :

           Defendant.              :

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN OPPOSITION TO VIRGINIA BLANCO'S PETITION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT HER SENTENCE


                                     DAMIAN WILLIAMS
                                     United States Attorney for the
                                     Southern District of New York

SAMUEL ADELSBERG
JAMIE BAGLIEBTER
Assistant United States Attorneys
      - Of Counsel -

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in opposition to the *pro se* petition filed by Virginia Blanco ("Blanco" or the "defendant") to vacate, set aside, or correct her sentence pursuant to Title 28, United States Code, Section 2255. Blanco was convicted following a jury trial of conspiracy to commit bank robbery, bank robbery, and using and discharging a firearm in furtherance of a crime of violence. The Court sentenced the defendant principally to a term of 120 months' incarceration.

In support of Blanco's motion, Blanco raises several points, arguing principally that she received ineffective assistance of counsel because her trial attorney purportedly failed (i) to effectively cross-examine witnesses; (ii) to interview or call certain additional witnesses; (iii) to object to a particular line of questioning during the direct examination of one of the Government's cooperating witnesses; and (iv) to argue that the defendant withdrew from the conspiracy. The Petition should be denied in its entirety without a hearing because the defendant's claims are without merit.[1]

**BACKGROUND**

I.     **The Pretrial Proceedings**

Superseding Indictment 4-16 Cr. 408 (CS) (the "Indictment") was filed on September 13, 2017, charging Blanco with conspiracy to commit bank robbery, in violation of Title 18, United States Code, Section 371; bank robbery, in violation of Title 18, United States Code, Section 2113(a) and 2; and using and discharging, and aiding and abetting the use and discharge, of a

---

[1] The Court can decide Blanco's motion solely on the motion papers and record because they "conclusively show" that the ineffective assistance claim fails. 18 U.S.C. § 2255(b); *see also, United States v. Dukes*, 727 F.2d 34, 41 & n.6 (2d Cir. 1984) (noting that counsel should be heard if the claim is "serious enough to require an evidentiary hearing" or if the Court plans to "mak[e] any determination that counsel was incompetent.").

firearm in furtherance of a violent crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and 2. The charges stemmed from an armed robbery on October 29, 2013 of a Wells Fargo bank branch located at 500 Odell Avenue in Yonkers, New York (the "Bank"). The defendant was arrested on September 19, 2017.

## II.    The Government's Case at Trial

The Government's proof at trial overwhelmingly established that on October 29, 2013, the defendant and Giovanny Marte ("Marte"), along with three other men, robbed a Wells Fargo in Yonkers, New York (the "Bank"). Although the defendant, who was a bank teller at the Bank at the time of the robbery, was not present during the robbery, the evidence at trial made clear that she played an instrumental role in planning the robbery by providing Marte with crucial information about the Bank. Much of the evidence at trial can be divided into two categories: (1) evidence that the robbery conspiracy included an insider at the Bank, and (2) evidence that the defendant was the insider.

### a.    Evidence of an Insider

The Government presented various forms of evidence to establish that the bank robbers were assisted by an insider. First, two cooperating witnesses—Marte and Jeffrey Martinez—testified to the existence of an insider. (Tr. 161:25-168:15, 338:18-21; 393:4-21). Second, surveillance footage from the Bank during the time of the robbery showed Marte jumping over the teller counter and entering the area adjacent to the cash vault less than eight seconds after he entered the bank. (GX 13). Combined with documentary evidence about the layout of the bank, (*see* GX 10-A), and testimony from a bank employee that there was no visibility into the cash vault from the customer areas (Tr. 66-67), it became clear that Marte relied on inside information to access the cash vault. Indeed, even the defendant noted during an interview with FBI that "because

of the vault you can't see it at all . . . the only person who can know about vaults like that is the people who work there." (GX 20).

The detailed nature of Marte's testimony about the Bank also made clear that there was an insider.  For example, Marte knew the locations of the alarms, the cameras, and the vaults.  (Tr. 163:15-21; 164:4-16; 164:17-21).  His testimony about these locations was then corroborated through the testimony of Indhira Urena, a bank employee, (*Id.* at 69:2-9), Patrick Doonan, a corporate security officer at Wells Fargo (*Id.* at 22:14-23), surveillance footage (GX 13) and a blueprint of the Bank's layout (GX 10-A).  For example, Urena corroborated Marte's testimony that there was an alarm in the break room, a fact he only could have learned from an insider who worked in the Bank.  (Tr. 69:2-9).  Urena's testimony also corroborated Marte's knowledge of information about the Bank after the robbery.  First, Urena, who counted the money after the robbery, noted that small denomination bills were left in the vault, a fact that Marte says he only learned from the defendant in the aftermath of the robbery.  (*Id.* at 54:3-5; 192:17-193:2).  Second, Urena corroborated that the branch manager stopped working at the branch shortly after the robbery, another piece of information that Marte only learned about from the defendant.  (*Id.* at 97:4-11; 193:3-5).

The testimony of Jeffrey Martinez ("Martinez"), one of Marte's co-coconspirators, also corroborated Marte's testimony that there was an insider.  Martinez testified that Marte told him that there had been an insider in the Bank, and that he believed Marte because Marte knew detailed information that he thought could only have come from someone who worked at the Bank, such as where the Bank's cash vault was, that a manager was needed to open it, and he knew that the employees were trained to comply.  (*Id.* at 338:18-21; 340:16-22; 345:12-21; 387:3-12).

**b.  Evidence that the Defendant was the Insider**

The Government also presented considerable evidence establishing that the defendant was the insider.

### i. Giovanny Marte's Testimony

The Government's principal witness, Giovanny Marte, testified that he and the defendant were in a romantic relationship together in October 2013 and that they lived together in an apartment in the Bronx (the "Bronx Apartment") during this time period. (Tr. 139:23-140:4). Marte also testified that they planned the robbery together. (Tr. 161:25-168:15). Specifically, Marte testified that the defendant provided him with essential information about the operations, layout, and security at the bank that he then used to plan and execute the robbery. (*Id.*). Finally, Marte testified that he shared some of the proceeds of the robbery with the defendant and that he took her on a trip to Aruba to compensate her for her assistance in planning the robbery. (Tr. 193).

### ii. Evidence Corroborating the Defendant and Marte's Relationship

The Government corroborated Marte's testimony about his relationship with the defendant and their shared apartment through, among other evidence, the following: (i) cell site evidence showing both of their phones in the vicinity of the Bronx Apartment on the day of the robbery (GX 75); (ii) photographs of the defendant and Marte kissing and playing around with their kids around the time of the robbery (GX 31-32); (iii) bank records showing the defendant's purchases in the vicinity of the Bronx Apartment (GX 42); (iv) a Cablevision bill showing that the defendant was paying for cable at the Bronx Apartment (GX 51-A, 51-B); (v) Marte's granular knowledge about the neighborhood surrounding the Bronx Apartment (Tr. 143:10-145-1); (vi) records of parking tickets received by both Marte and the defendant around the time of the robbery (GX 52-A, 53); (vii) the defendant's son's birth certificate confirming that Marte correctly identified his birthday in his testimony (GX 30); (viii) school records for the defendant's son from Our Lady Queen of

Martyrs Church corroborating Marte's testimony that he occasionally dropped the defendant's son off at this location (GX 34); and (ix) flight and customs records for a trip taken by Marte and the defendant to Aruba weeks after the robbery (GX 60-A, 60-B, 61-63).

### iii.   Evidence Corroborating the Defendant's Role in the Robbery

The Government's evidence did not merely establish that Marte and the defendant were in a relationship during the time of the robbery, but also corroborated Marte's claims about how the two of them planned the robbery together.  First, records were introduced into evidence proving that, at the time of the robbery and in the months preceding it, the defendant worked as a bank teller at the Bank.  (GX 41).  Bank records also showed that on the day of the robbery, the defendant left work just hours before the robbery.  (*Id.*)  The testimony of Indhira Urena demonstrated that, as a bank teller, the defendant would have had knowledge of the Bank's layout, operations and security measures.  In fact, evidence was also presented showing that the defendant had been trained in exactly how to respond in the event of a bank robbery (GX 43, 46), and therefore had exactly the kind of information that would be valuable to a group of bank robbers.

Further, phone records demonstrated that Marte and the defendant were in constant communication on the day of the robbery and the timing of the calls corroborated Marte's account. Marte testified about a call before and a call after the robbery (Tr. 180, 187), and this was reflected in the phone records (GX 75).  Cell site evidence on those calls also confirmed what Marte had testified to regarding each of their locations during the calls.

### iv.   The Defendant's Interview

The Government also presented evidence from an interview conducted by the FBI with the defendant in September 2015.  During that interview, the defendant denied ever being in a relationship with Marte, she denied living with Marte, and she even denied speaking on the phone

with Marte. (GX 20). She also claimed that her trip to Aruba in December 2013 was with her son. (GX 20). As described above, the Government presented a plethora of evidence establishing that each of these claims was false.

### III.   The Jury's Verdict

On July 16, 2018, the jury returned a guilty verdict and Blanco was convicted on all counts.

### IV.   Post- Trial Motions and Sentencing

On March 5, 2019, Blanco filed a motion seeking relief under Federal Rule of Criminal Procedure 29 and/or Federal Rule of Criminal Procedure 33, arguing, among other things, that the verdict  should be set aside due to alleged deficiencies in the performance of her trial counsel ("Trial Counsel"). (Dkt. No. 148). On April 4, 2019, the Government opposed Blanco's motion. (Dkt. No. 141). Following a reply memorandum filed by Blanco, the Court Government filed a sur-reply on May 13, 2019. (Dkt. Nos. 152, 153, 157).

On May 29, 2019, the Court denied Blanco's motion in a lengthy oral opinion delivered from the bench. (*See* Dkt. No. 164 ("Rule 29/33 Decision")). As relevant here, the Court discussed and rejected—in a section of its oral opinion spanning nearly 30 transcript pages—each of the many bases Blanco asserted in support of her ineffective assistance of counsel claim, noting that while there were certainly aspects of Trial Counsel's performance that were imperfect, Blanco had not demonstrated the ineffective assistance of Trial Counsel. (*See* Rule 29/33 Decision at 9-37).

The Court then sentenced Blanco to 120 months in prison and 3 years of supervised release.

### V.   The Defendant's Appeal

Blanco's conviction was affirmed on June 15, 2020. *United States v. Blanco*, 811 F. App'x 696 (2d Cir. 2020). In a summary order, the Second Circuit held, as relevant here, that this Court acted "well within its discretion in rejecting Blanco's Rule 33 motion" on ineffective assistance

grounds. *Id.* at 703. In particular, the Second Circuit rejected Blanco's arguments regarding Trial Counsel's purportedly deficient performance and resulting prejudice with respect to both his "cross-examination of the government's two cooperating witnesses" and his "decision not to contact, interview, or call certain individuals who may have been able to provide testimony to rebut the government's theory that an insider helped plan the robbery, and to cast doubt on the credibility and character of the government's witnesses." *Id.* at 702-03.

## VI.    The Defendant's Petition Pursuant to 28 U.S.C. § 2255

Blanco filed a timely Section 2255 petition on June 8, 2021 alleging four grounds of relief: (1) "ineffective assistance of counsel"; (2) "perjury by Giovanni Marte"; (3) "Prejudicial Testimony Admitted"; and, (4) "Allowing Perjured Testimony from Government Witness." (Dkt. No. 194 ("June Petition" or "June Pet.") at 5-10.). Blanco also sought until October 1, 2021 to provide "supplemental information . . . which will be used to substantiate the claims made in the 2255 petition." (Dkt. No. 195 at 2). The Government responded to this request on June 17, 2021, stating its view that Blanco could amend her pleading once as a matter of course, so long as that amendment was made before the expiration of the one-year statute of limitations, which was September 7, 2021. (Dkt. No. 197 at 3). The Government further stated that, "[t]o the extent that the defendant seeks to supplement her petition after September 7, 2021 but before October 1, 2021, the Government does not oppose the defendant's request so long as the supplemental petition relates back under Federal Rule of Civil Procedure 15(c) to her timely-filed petition." (*Id.*). In its response, the Government provided a lengthy discussion of the law on the timeliness of Section 2255 petitions and the relation back doctrine for the benefit of the defendant.

On June 17, 2021, the Court issued a text order, which it sent to Blanco. The order stated:

> Ms. Blanco has asked to supplement her Section 2255 petition by
> 10/1/21. As explained by the Government, she may do so any time

> up to 9/7/21, which is when her one-year limitations period runs. If she wants to supplement it on or before 10/1/21 but after 9/7/21, any issues raised in a post-9/7/21 supplement must relate back to the issues raised on or before 9/7/21. Because relation-back is a complex issue (for example, additional claims of ineffective assistance may not relate back to earlier ones), I strongly recommend that Ms. Blanco say whatever she wants to say on or before 9/7/21.

(Dkt. No. 198).

On October 4, 2021, the Court received and docketed an document titled: "Motion To Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255" (the "October Petition" or "Pet."[2]). The October Petition makes no reference to the June Petition.    The October Petition is 56 pages and attaches over 100 pages of supporting documentation.  The October Petition is signed by Blanco but is not dated.

On October 15, 2020, Blanco again asked by letter to supplement her petition.  (Dkt. No. 202).  This letter stated: "On October 4, 2021, I submitted a Pro Se 28 U.S.C. § 2255 motion."  (*Id.* at 1).   The letter also attached 12 pages of additional supporting documentation culled from material produced by the Government pursuant to 18 U.S.C. § 3500 (the "3500 Material").   The Court agreed to accept the exhibits but warned Blanco: "[N]o additional exhibits will be accepted. There are time limits for petitions under 28 USC 2255, and a petitioner cannot evade them by repeatedly adding things to the petition after the one-year limitations period has run . . .The law gives petitioners a year to assemble what they need to file their petitions and Ms. Blanco has had that time."  (Dkt. No. 203).

---

[2] Because most of Blanco's substantive claims were made in the October Petition, it is cited to throughout simply as "Pet."

## ARGUMENT

### I.   Applicable Law

#### a.   Timeliness and the Relation Back Doctrine

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, 1217, a petition for relief pursuant to Title 28, United States Code, Section 2255(f) is subject to a one-year statute of limitations:

> A 1-year period of limitations shall apply to a motion under this section. The limitation period shall run from the latest of— . . . (1) the date on which the judgment of conviction becomes final . . . .

28 U.S.C. § 2255(f).  Where, as here, a defendant appeals her conviction and the Court of Appeals affirms the judgment on the merits, "the judgment is not final until ninety days after the ruling." *Clay* v. *United States*, 537 U.S. 522, 527 (2003).  The rule is simple: where a petitioner "fail[s] to file his § 2255 motion until . . . more than one year after his conviction became final, his motion [i]s untimely."  *Moshier* v. *United States*, 402 F.3d 116, 118 (2d Cir. 2005) (affirming dismissal of Section 2255 petition as untimely).

A motion to amend or supplement a petition for habeas relief is governed by Federal Rule of Civil Procedure 15.  *See Littlejohn* v. *Artuz*, 271 F.3d 360, 363 (2d Cir. 2001).  If an amended or supplemented petition that contained otherwise untimely claims is permitted, the untimely claims must relate back to the timely-filed petition.  *See Ching* v. *United States*, 298 F.3d 174, 181 (2d Cir. 2002).  An amendment relates back to the date of the original pleading when "the amendment asserts a claim . . .  that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).  The Supreme Court has narrowly interpreted the "relation back" doctrine in the habeas context, permitting it when "the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims

10

depend upon events separate in both time and type from the originally raised episodes." *Mayle v. Felix*, 545 U.S. 644, 657 (2005) (holding that a Fifth Amendment claim challenging the admission of pre-trial statements did not relate back to the original claim which raised a Sixth Amendment Confrontation Clause issue since they were different in "type and time") (internal citation and quotation marks omitted).

Indeed, "[r]elation back under Rule 15(c) is not satisfied merely because proposed claims concern the same trial, or the same events presented or occurring therein, as existing claims." *Soler v. United States*, 05 Cr. 00165 (RJH), 2010 WL 5173858, at *4 (S.D.N.Y. Dec. 20, 2010) (citing *Mayle*, 545 U.S. at 662); *see also Reiter* v. *United States*, 371 F. Supp. 2d 417, 423 (S.D.N.Y. 2005) (noting that "it is not sufficient for an untimely amendment merely to assert the same general type of legal claim as in the original § 2255 motion").   Moreover, a successive ineffective assistance of counsel claim does not necessarily relate back to a timely-filed ineffective assistance of counsel claim merely because both claims are predicated on the same legal theory; rather, "[p]roposed amendments must satisfy the *Mayle* standard even where both the original claims and the new claims are for ineffective assistance of counsel." *Ozsusamlar* v. *United States*, 2013 WL 4623648, at *4 (S.D.N.Y. Aug. 29, 2013) (citing *Veal* v. *United States*, 2007 WL 3146925, at *5); *see also*, *e.g.*, *Billie* v. *Warden*, No. 3:01 Cv. 745, 2010 WL 3021517, at *5 (D. Conn. July 29, 2010) (holding that subsequently filed ineffective assistance of counsel claims based on facts different from those raised in the initial habeas petition that was also based on counsel deficiencies did not relate back).

### b. Bar on Raising in a Habeas Petition Claims that Could Have Been Raised on Direct Appeal

Under Title 18, United States Code, Section 2255, a petitioner can seek collateral review of a federal conviction or sentence.  However, "[b]ecause collateral challenges are in 'tension with

11

society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir.1995) abrogated on other grounds by *Mickens v. Taylor*, 535 U.S. 162 (2002)).

When a habeas petitioner fails to bring a claim on direct appeal that could have been raised, that petitioner is precluded from raising that claim in a subsequent Section 2255 habeas proceeding absent showing both cause for the failure and actual resulting prejudice. *See United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." (citations omitted)); *Amiel v. United States*, 209 F.3d 195, 198 (2d Cir. 2000); *Campino v. United States*, 968 F.2d 187, 189 (2d Cir. 1992) (defining the "cause and prejudice" standard in habeas petitions).  If an issue could have been raised on direct appeal and was not, a habeas petition is not a substitute remedy for raising that issue.  *See Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." (citations and internal quotation marks omitted)).

Irrespective of this general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice, failure to raise an ineffective assistance of counsel claim on direct appeal does not bar the claim from being brought in a latter, appropriate proceeding under Section 2255.  *Massaro v. United States*, 538 U.S. 500, 504, 509 (2003).

      c.  **Bar on Raising in a Habeas Petition Claims That Have Been Decided on Direct Appeal**

Another rule limiting the availability of collateral attack is the so-called "mandate rule," which bars re-litigation of issues already decided on direct appeal. *Id.; see also Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006). This rule applies, with some limitation, in the context of Section 2255 petitions alleging ineffective assistance of counsel. As explained in *Yick Man Mui*:

> In the context of Section 2255 proceedings involving claims of ineffective assistance of counsel, we have applied the mandate rule to bar claims raised and resolved on direct appeal. *See e.g.*, *United States v. Pitcher*, 559 F.3d 120, 124 (2d Cir. 2009); *Riascos–Prado v. United States*, 66 F.3d 30, 33 (2d Cir. 1995); *Douglas v. United States*, 13 F.3d 43, 46 (2d Cir.1993) (superseded by statute on other grounds); *Schwamborn v. United States*, 492 F.Supp.2d 155, 160– 62 (E.D.N.Y.2007). We have also applied the mandate rule to bar ineffective assistance claims in a Section 2255 proceeding when the factual predicates of those claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate. *See Pitcher*, 559 F.3d at 124 (rejecting petitioner's Section 2255 ineffective assistance claims because they were "premised on the same facts and rest on the same legal ground" as the argument made on direct appeal).

614 F.3d at 53-54. *Yick Man Mui*, however, also discusses a "limiting effect" that ineffective assistance of counsel claims have upon the operation of the mandate rule. *See Rodriguez v. United States*, 2017 WL 6404900, at *4. The Court continues:

> [A] defendant who raises on direct appeal ineffective assistance claims based on the strategies, actions, or inactions of counsel that can be, and are, adjudicated on the merits on the trial record, is precluded from raising new or repetitive claims based on the same strategies, actions, or inactions in a Section 2255 proceeding. However, such a defendant is not precluded from raising new ineffective assistance claims based on different strategies, actions, or inactions of counsel in a subsequent Section 2255 proceeding.

614 F.3d at 51; *see also Rodriguez*, 2017 WL 6406900, at *7-10 (summarizing the law regarding the application of the mandate rule to ineffective assistance of counsel claims brought on collateral attack).

13

### d.  Ineffective Assistance of Counsel

There are two factors to consider when determining whether counsel's assistance was so defective as to require reversal of a conviction or sentence. The defendant must show that (i) counsel's performance "fell below an objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove prejudice," that is, demonstrates that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 688, 687-88, 693-94 (1984). To succeed with this claim, the petitioner has the burden of establishing that both elements of the test have been satisfied. *Stickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). The defendant's burden is to show "'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Harrington* v. *Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 687). A defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate. *United States* v. *Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986). Counsel's reasonably prudent decisions concerning the "selective introduction of evidence, stipulations, objections, and pre-trial motions" are generally upheld as matters of trial strategy. *See United States* v. *Plitman,* 194 F.3d 59, 63–64 (2d Cir. 1999).

14

Under the second prong, a defendant must meet the "heavy burden" of showing "actual prejudice." *Strickland*, 466 U.S. at 692. To satisfy the prejudice prong, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 693-94; *see, e.g.*, *United States* v. *Levy*, 377 F.3d 259, 264 (2d Cir. 2004). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 693). "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Mayo* v. *Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 694). Moreover, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart* v. *Fretwell*, 506 U.S. 364, 369 (1993). Thus, "the prejudice component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at 372.

Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. When considering these two prongs, the Supreme Court has provided commonsense instructions, explaining that "[t]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Applying that teaching, the Second Circuit has often rejected ineffectiveness claims by determining that, in view of the strength of the prosecution's case, the

defendant is unable to establish prejudice. *See, e.g.*, *Rosario* v. *Ercole*, 601 F.3d 118, 136 (2d Cir. 2010) ("*Strickland* makes clear that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" (quoting *Strickland*, 466 U.S. at 696)).

## II.    Blanco's Claims That Do Not Relate Back to the June Petition Should be Dismissed Because They Are Not Timely

Blanco was instructed by this Court to amend her petition by September 7, 2021 and that any issues raised after September 7, 2021 must relate back to the issues raised by the September 7, 2021 deadline.  (Dkt. No. 198).  Given the complexities of the relation back doctrine, the Court "strongly recommend[ed]" that Blanco make her full submission by that September 7, 2021 deadline.  Blanco, however, did not heed the Court's instructions and instead filed her amended petition on October 4, 2021.  (*See* Dkt No. 200; *see also* Dkt No. 202 ("On October 4, 2021, I submitted a Pro Se 28 U.S.C. § 2255").  Moreover, in Blanco's October Petition and supplemental communications with the Court (*see* Dokt. No. 202), Blanco makes no reference at all to the June Petition.  As such, it seems that Blanco has abandoned the June Petition and intends to rely solely on the October Petition, which would be untimely as a whole.

Given the Court's mandate to construe Blanco's filings liberally, *see Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980), if the Court were to view her October Petition as an amendment to her June Petition, it should properly only consider the claims that relate back to the original petition. Blanco's June Petition includes several broad categories of arguments relating to her ineffective assistance claims, and therefore some of the issues raised in her October Petition may relate back to those claims.  For example, "Ground One" of her request for relief in the June Petition is for ineffective assistance of counsel and as supporting facts, Blanco lists that "Trial Counsel interviewed no witnesses" and that "Trial Counsel's cross examination of witness was

16

fundamentally flawed." (June Pet. 5). Other arguments, however, appear nowhere in the June Petition and should be dismissed as untimely. For example, Blanco's argument that Trial Counsel failed to argue that Blanco withdrew from the conspiracy does not relate back to the June Petition and should be dismissed. This argument along with any others that the Court may identify in the October Petition that do not relate back to the June Petition should be dismissed as untimely.

## III.   Blanco's Claims That Do Not Involve Ineffective Assistance of Counsel Are Procedurally Barred

The majority of Blanco's claims in both the June Petition and the October Petition are properly considered as arguments that Trial Counsel provided ineffective assistance; however, in some instances Blanco re-labels these claims as separate grounds for relief. In particular, in Blanco's June Petition, she lists four grounds for relief, only one of which is the ineffective assistance of counsel. The remaining three grounds for relief are: "Perjury by Giovanny Marte"; "Prejudicial Testimony Admitted" and "Allowing Perjured Testimony from Government Witness." (June Pet. 5-10). In the October Petition, Blanco readdresses these arguments but describes them in the context of Trial Counsel's failures with respect to those issues.

To the extent that Blanco is seeking to argue something purported based on the record and not relating to the assistance of Trial Counsel, Blanco could have raised those arguments on appeal. She did not, and has not even attempted to show cause and prejudice for such a failure; as such, Blanco is procedurally barred from making these claims. *See, e.g., Thorn*, 659 F.3d at 621.

## IV.   Trial Counsel Did Not Provide Constitutionally Ineffective Assistance of Counsel

Without a single case citation in either the June Petition or the October Petition, the defendant raises an array of alleged deficiencies in the performance of Trial Counsel in support of her ineffective assistance of counsel claim. These assertions, whether taken separately or together, fall far short of the high bar that she must meet in order to demonstrate that Trial Counsel was

constitutionally ineffective under *Strickland*.   Moreover, even when assuming for the sake of argument that Trial Counsel did commit the errors and lapses that the defendant claims, she fails to make an adequate showing that such errors resulted in the actual prejudice required under *Strickland*.

### a. Defense Counsel Was Not Constitutionally Ineffective in his Cross-Examination of Witnesses

The defendant claims that Trial Counsel was constitutionally ineffective in his approach to cross-examining the Government's witnesses.  For the reasons outlined below, these arguments fall far short of meeting the exacting standards of establishing ineffective assistance of counsel.

### i. Applicable Law

Courts accord "significant deference" to "a trial counsel's decision how to conduct cross examination" and "refus[e] to use perfect hindsight to criticize unsuccessful trial strategies." *Eze v. Senkowski,* 321 F.3d 110, 132 (2d Cir. 2003); *see also United States v. Corley*, No. 13-CR-48 (AJN), 2020 WL 4676650, at *12 (S.D.N.Y. Aug. 11, 2020), *appeal dismissed*, No. 20-2716, 2020 WL 6703344 (2d Cir. Sept. 8, 2020) (noting that "the Court must afford [defendant's] trial counsel 'significant difference' in how he conducted cross examination").  As the Second Circuit has stated "[d]ecisions about whether to engage in cross-examination, and if so, to what extent and in what manner are . . . strategic in nature and generally will not support an ineffective assistance of counsel claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002); *see also United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."); *see also Lavayen v. Duncan*, No. 02-cv-0305, 2007 WL 1695585, at *2 (E.D.N.Y. June 7, 2007), *aff'd*, 311 F. App'x 468 (2d Cir. 2009) ("[N]ot cross-examining the witness about every

inconsistency in the record by no means undermined the defense, nor did it suggest incompetence.").

### ii. Discussion

Blanco claims that Trial Counsel was constitutionally ineffective in his approach to cross-examining the Government's cooperating witnesses, Giovanni Marte and Jeffrey Martinez. Specifically, the defendant claims Trial Counsel should have cross examined the cooperators about the following: (1) Marte on purportedly inconsistent statements about whether the defendant told him to take money from the teller drawers during the robbery (Pet. 1-2); (2) Marte on purported inconsistencies about prior arrests (Pet. 2-3); (3) Marte on his claim that he paid for his post-robbery Aruba trip with the defendant in cash (Pet. 4-5); (4) Marte on his testimony about dropping off and picking up the defendant's son from school (Pet. 47-48); (5) Marte on alleged inconsistencies in his testimony regarding the robbery proceeds (Pet. 50-51); (6) Marte and Martinez on alleged inconsistencies on how the firearms for the robbery were obtained (Pet. 5-7); (7) Martinez on his claim that he never committed any crimes with Marte prior to the robbery (Pet. 3-4); (8) Martinez on his testimony that he was only arrested one time (Pet. 4); (9) Martinez on purported inconsistencies regarding whether he knew the defendant (Pet. 15, 28-32); and (10) Martinez on his statement that he saw Marte with the defendant's son in 2014 (Pet. 33-34). Blanco also argues that Trial Counsel was ineffective in his cross examination of a bank employee, Indira Maldonado.[3]

As an initial matter, the defendant's arguments here largely rehash variations of claims that have already been rejected by the Court in its detailed oral decision later affirmed by the Second Circuit. (*See* Rule 29/33 Decision at 30 (rejecting similar, and in some cases, identical arguments

---

[3] Indhira Maldonado was referred to at trial as Indhira Urena.

and noting that "the Sixth Amendment does not require defense counsel to think of every possible avenue of cross" and a "defendant is not entitled to a perfect defense, just an adequate one")); *Blanco*, 811 F. App'x at 703 ("Blanco highlights claimed inconsistencies in [Marte's and Martinez's] testimony, but the information she urges her counsel should have sought to elicit does not obviously contradict their statements and, in some cases, may have corroborated certain other aspects of the government's case . . . . . We thus think the district court acted well within its discretion in finding this basis did not support her ineffective assistance claim."). Arguments relating to Trial Counsel's failure to cross-examine Marte and Martinez based on "the same strategies, actions, or inactions of counsel" as raised on direct appeal are barred from being relitigated on collateral attack. *See Yick Man Mui*, 614 F.3d at 51.

Nevertheless, taking the defendant's arguments in turn, none of them contain merit. First, there is no inconsistency between Marte's testimony about foregoing the money from the teller drawers during the robbery and his proffer statements on the matter. In the former, Marte stated that the defendant told him not to waste time retrieving money from the teller drawers, while Marte's proffer notes regarding the latter memorialize the following statements: "I thought best not to take from drawers" and "[t]ook too much time to take drawers." (3502-R, 3502-U). Marte receiving advice from his insider—Blanco—not to waste time on the teller drawers and also thinking it "best" not to take from the drawers given the time sensitivities of the operation are fully consistent propositions. In any event, this is precisely the kind of inconsequential detail that the Court appropriately characterized "as minor collateral stuff [that] would not have affected the outcome." (Rule 29/33 Decision at 31). Moreover, Trial Counsel might have concluded that Marte's direct testimony on the matter was not credible or that, even if it was credible, it was not particularly probative on the central question in front of the jury: whether the defendant conspired

to commit an armed bank robbery.  Notably, the Court concluded that Trial Counsel cross-examined Marte on all of the essential points, including "his criminal history, the extent of his drug dealing and other crimes, his ripping off of his criminal cohort, his meetings with the government, how recently he had implicated [the defendant] in drug dealing, and his cooperation agreement, the time he faced, and his motives to lie." (*Id.*).  Given all this, Trial Counsel's decision not to cross-examine Marte on something that doesn't even appear to be inconsistent is hardly grounds for an ineffective assistance claim.

Similarly, it was entirely reasonable for Trial Counsel to forego cross-examining Marte on his arrest history.  Marte testified at length about his involvement in drug dealing, robberies, fights, shootouts, gun possession, and drug smuggling on direct examination.  (Tr. 109-133).  And Trial Counsel cross-examined Marte on his exhaustive criminal history at length.  (*See* Tr. 204-224).  Because Marte admitted to being involved in incredibly serious crimes—including shootings and international drug smuggling—Trial Counsel was not ineffective for failing to address a minor inconsistency in Marte's testimony about a purported arrest ten years earlier for which he apparently "served no time."  (3502-R).

The same is true with respect to the defendant's claim that Trial Counsel was ineffective for not cross-examining Marte on how the post-robbery tickets to Aruba were purchased, a claim raised on appeal by the defendant and rejected by the Second Circuit.  (*See* Blanco, 811 F. App'x at 703).  For one, whether Marte paid for the trip to Aruba with Blanco in cash (as he testified) or purchased the tickets online is both inconsequential and speculative.  Furthermore, given the damning nature of this Aruba trip to the defendant's case—recall, she travelled to Aruba with Marte shortly after he robbed the bank where she worked, and then she lied about the trip to the FBI—it was perfectly reasonable for defense counsel to elect to not further highlight it.  And

finally, any possible discrepancy about how Marte booked this trip is undoubtedly minor in light of all of the overwhelming evidence introduced at trial of the defendant's guilt.

The defendant's next argument—that Trial Counsel was ineffective for failing to cross-examine Marte with respect to whether he was authorized to drop off and pick up the defendant's son from school—similarly fails to move the needle. For one, the defendant's cherry-picked records would hardly have been a strong basis for cross-examination. The records (*see* Dkt. No. 200-1, Def. Ex. D) contain only five weeks' worth of drop-offs and pick-ups and do not come close to encompassing the time period that she and the defendant were in a relationship. (*See* Tr. 139 (Marte testifying that he and defendant started dating in 2012)); (*see* Tr. 201 (Marte testifying that he and defendant broke up in January 2014)). Moreover, the records are silent as to whether any of the individuals listed on the forms were accompanied by another person (*i.e.*, Marte) during the pick-up or drop-off, which is entirely consistent with Marte's testimony that he "used to take [the defendant's son] or [the defendant] to school and pick him up as well." (Tr. 145). In any event, Trial Counsel could have reasonably concluded that challenging whether Marte in fact dropped off and picked up the defendant's son from school was a losing strategy given Marte's knowledge of the name of the school (*see* Tr. 145), pictures of Marte and the defendant kissing and Marte laughing with the defendant's son during the same period (GX 31-32), the defendant's son's birth certificate confirming that Marte correctly identified his birthday in his testimony (GX 30), the frequency of Marte and the defendant's phone communications in the months before the robbery, parking tickets that both of them received close to the date of the robbery at their shared apartment (GX 52-A, 53), cell site data that placed both of them close to the Bronx apartment on the day of the robbery (GX 75), and flight and customs records for a trip taken by Marte and the defendant to Aruba weeks after the robbery (GX 60-A, 60-B, 61-63).

The defendant's final set of arguments with respect to Marte center on alleged inconsistences in his testimony regarding the robbery proceeds. (Pet. 50-51). The defendant first argues that Trial Counsel was ineffective for failing to cross-examine Marte on discrepancies regarding the total amount of money he gave to the defendant after the robbery. (Pet. 50). But the Court already flatly rejected this argument:

> [Marte] testified he had given the defendant $7,000 for her car and 10,000 more on top of that, but apparently, the proffer notes show that at one point he said he gave her 10,000 total. I don't really understand the significance, especially because there was a bill of sale for the car in the amount of 7,500 and change. This is another minor discrepancy on which Silveri could have cross-examined Marte, but he was not required to do so in order to be functioning as counsel. He is not required to catch every discrepancy and cross on it. And it's hardly prejudicial for Silveri to have omitted this one because, whether it was 10,000 or 17,000, either way, it shows Marte giving the defendant a large amount of cash shortly after the robbery.

(*See* Rule 29/33 Decision at 33).

Next, the defendant claims that the "timeline falls completely short of being believable" given the timing of when the defendant purchased her new car in relation to when Marte apparently provided her with the robbery proceeds. (Pet. 50). But there is nothing even remotely inconsistent between Marte's testimony that he provided the defendant with $17,000 in proceeds following the October 29, 2013 robbery and a Bill of Sale showing that Blanco purchased her car a few months later on January 31, 2014, especially since Marte testified that he never actually saw her buy the car. (*See* Tr. 193-94). Moreover, trying to use the Bill of Sale (which shows a car purchase for approximately $7,000) to cross-examine Marte would necessarily have corroborated Marte's testimony that he provided the defendant with $7,000 for a new car in the time period the robbery. The defendant has failed to demonstrate how this strategically sound decision clears the bar for an ineffective assistance claim.

The defendant's arguments about the deficiencies in Martinez's cross-examination similarly miss the mark.  As an initial matter, the District Court already noted that Martinez's testimony was limited in scope: he did not testify that the defendant was the insider at the bank only indirectly implicated her.  (*See* Rule 29/33 Decision at 28 ("And Martinez only indirectly implicated the defendant.  He did not identify her as the insider.  He corroborated Marte that there was an insider.  That's all.")).  Given the limited value of Martinez's testimony to the Government's case, it was entirely reasonable for Trial Counsel not to pursue an aggressive cross-examination of him or his prior criminal conduct.  In fact, the significance of Martinez's testimony mostly boiled down to the areas where he corroborated the testimony of Marte.  One such area of corroboration was their overlapping testimony about the fact that Martinez procured the guns for the crime.  By cross-examining Martinez—or Marte for that matter—about minor discrepancies regarding the timing of when Martinez obtained the guns, Trial Counsel would have only further focused the jury on a key point of corroboration, namely that Martinez was the one who obtained the guns for Marte for the robbery.  Trial Counsel reasonably might have wanted to avoid further cementing for the jury how Martinez's testimony overlaps with Marte's on this crucial point.  It is thus entirely sensible that Trial Counsel would take another approach in his cross-examination of both Marte and Martinez on this score.

The defendant's claim that Trial Counsel should have cross-examined Martinez on a purported crime that he committed with Marte prior to the robbery (Pet. 3-4) also falls short of demonstrating ineffectiveness.  For one, this episode—which involved Martinez trying to steal money from a drug customer and chasing him, before Marte (who was not part of the theft plan but happened to be on the same street) tackled the customer and then "just walk[ed] away" (Tr. 326)—does not demonstrate that the two previously committed a crime together.  Indeed, Marte

24

merely tackled an individual Martinez was chasing, hardly suggesting that he and Marte had a long and sordid criminal partnership that would form the basis of meaningful cross-examination on this point.  Moreover, Martinez had already testified about the incident during his direct-examination, further blunting the value of bringing it up again on cross-examination.

Similarly, it was reasonable for Trial Counsel to forego cross-examining Martinez on discrepancies in his arrest history given that (i) Martinez testified at length on direct examination about his involvement in drug dealing, robberies, fights, illegal gun possession, being a member of the Crips and the Trinitarios, and lying to law enforcement (Tr. 315-29); (ii) Trial Counsel focused on Martinez's criminal history during large swaths of the cross-examination (*see* Tr. 357-59, 364, 381-82), and (iii) as noted above, Martinez's importance to the Government's case was limited since he only indirectly implicated the defendant.  Put simply, "not cross-examining [Martinez] about every inconsistency in the record by no means undermined the defense, nor did it suggest incompetence."  *Lavayen*, 2007 WL 1695585, at *2.

Next, the decision to forgo certain cross examination of Martinez about whether he initially identified the defendant in a photo-array falls short of being a basis for an ineffective assistance claim.  Once again, Martinez did not testify that the defendant was the insider.  Thus, whether he initially identified the defendant in a photo array is collateral.  As the Court noted, Trial Counsel "is not required to catch every discrepancy and cross on it."  (*See* Rule 29/33 Decision at 33).  Moreover, after failing to identify the defendant in the first photo array, Martinez did identify her 10 days later, noting that he recognized "her as a friend of Gio's" and that he had seen "Gio babysitting [the defendant's] son." (3503-V).  Given Martinez's statements in the second proffer, cross-examining him on his failure to identify the defendant 10 days earlier would have limited value.

Trial Counsel was also not ineffective for not further cross-examining Martinez on his testimony that that he believed he saw Marte with Blanco's son in 2014 despite evidence in the record that the two broke up 2013.  For starters, Marte was not entirely clear on when his relationship with the defendant ended, at one point stating they broke up in January 2014.  (Tr. 201).  Thus, Martinez may have recalled seeing Marte with the defendant's son in the beginning of 2014, which would largely neutralize  this supposed inconsistency.  In any event, given that there can be no serious dispute that Marte and the defendant were together in December 2013 (when flight records show them traveling to Aruba together), it is hardly material that Martinez may have been a few months off in his recollection given the proximity of December 2013 to 2014. This is only reinforced by Martinez's non-committal answer to Trial Counsel's question on the matter: "2014, last time it could be like 2014, to my best of my memories."  (Tr. 371).  Altogether, this was decidedly not fruitful ground for cross-examination, especially in light of Martinez's limited role in the Government's case.  In any event, the defendant has not demonstrated that this plainly strategic decision—or any of the decisions regarding cross-examining the cooperating witnesses for that matter—prejudiced her in any way.

Finally, Trial Counsel was not ineffective in his cross examination of Indhira Maldonado. Blanco argues that Trial Counsel should have questioned Maldonado about the schedule of cash deliveries to the Bank and that this questioning would have exposed that Blanco was not working on the day that money was delivered.  (Pet. 25).  The Government did not argue, however, that Blanco worked on the date the money was delivered, but rather that the schedule of cash deliveries was available to bank tellers.  (Tr. 495).  Accordingly, nothing about Trial Counsel's performance was deficient and there could not have been any prejudice.

Blanco's arguments regarding cross examination of witnesses fail to meet the demanding bar of demonstrating that Trial Counsel was constitutionally ineffective.

### b. Trial Counsel Was Not Constitutionally Ineffective for Failing to Interview or Call Certain Witnesses

The defendant also claims that Trial Counsel was constitutionally ineffective in his failure to interview certain individuals or call them as witnesses at trial.  These arguments similarly fail to meet the *Strickland* standard.

### i. Applicable Law

"It is well-settled that the decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  *Coke v. Superintendent, Green Haven Corr. Facility*, 06 Civ. 811, 2010 WL 475274, at *7 (W.D.N.Y. Feb. 5, 2010) (alterations and internal quotation marks omitted) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)); *see also McNab v. New York*, 12 Civ. 3797, 2014 WL 1744114, at *11 (S.D.N.Y. Mar. 10, 2014) (same). "Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." *Woods v. Heath*, 12 Civ. 2175, 2013 WL 6092804, at *16 (E.D.N.Y. Nov. 19, 2013) (internal quotation marks omitted) (quoting *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir.2005)); *see also Lou v. Mantello*, 2001 WL 1152817, at *10 (E.D.N.Y. Sept. 25, 2001 ("Habeas claims based on complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified to are largely speculative." (brackets and quotation marks omitted))

### ii. Discussion

Blanco claims that Trial Counsel was constitutionally ineffective by failing to interview or call at trial the following individuals: (1) Andres Cruz (Pet. 7-15); (2) Saad Khalil (Pet. 15-19, 21-

22); (3) Georgette Rabadi (Pet. 19-21); (4) Carlos Raposo (Pet. 34-42); (5) Felix Pena; (6) Antonio

Parra (Pet. 53); (7) Kris Quindongo (Pet. 53); and (8) Ana and Jonah Marte (Pet. 48-49).

The defendant has previously raised to this Court and/or the Second Circuit substantially

similar arguments regarding Trial Counsel's failure to interview or call at trial each of these

witnesses.  In each instance, this Court and the Second Circuit has concluded that the defendant

failed to meet the onerous standard set forth in *Strickland*.  (See Rule 29/33 Decision at 12, 15, 23-

24, 33-34 and *Blanco*, 811 F. App'x at 703).  With respect to the potential witnesses discussed in

Blanco's direct appeal—Carlos Raposo, Felix Pena and Antonio Parra—Blanco's Section 2255

claims are barred under the mandate rule.  Blanco previously argued that Trial Counsel's inaction

with respect to these witnesses was ineffective assistance and the Second Circuit rejected these

arguments.  *See Blanco*, 811 F. App'x at 703 (concluding "Blanco has not shown that the outcome

of the trial would have been different had trial counsel contacted and interviewed the witnesses

she identifies.").  Accordingly, Blanco's arguments with respect to at least those witnesses are

barred pursuant to the mandate rule.  *See Yick Man Min*, 614 F.3d at 51 ("[A] defendant who raises

on direct appeal ineffective assistance claims based on the strategies, actions, or inactions of

counsel that can be, and are, adjudicated on the merits on the trial record, is precluded from raising

new or repetitive claims based on the same strategies, actions, or inactions in a Section 2255

proceeding.")

### 1.  Andres Cruz

The defendant argues that Trial Counsel was constitutionally ineffective for not

interviewing or calling Andres Cruz as a witness to rebut Marte's testimony that the defendant was

the insider.  (Pet. 7-15).  Primarily, the defendant claims that Cruz would have testified that Marte

and Martinez told him that they had been casing the Bank for a longer than the length of time that

the defendant worked at the Bank, and that this would have undercut the argument that the defendant was the insider.  (Pet. 7-8).  This argument was rejected in the Court's Rule 29/33 Decision.  (*See* Rule 29/33 Decision at 23-24).

The Court was correct in concluding that Trial Counsel was not ineffective in failing to interview or call Andres Cruz.  Cruz's potential testimony—assuming that it was consistent with what he previously told law enforcement and that the Court found it admissible—would have only established that Marte told Cruz that he had been casing the bank for a year before the robbery, not that it actually happened.  As this Court has stated, Cruz's testimony would merely "show[] that Marte and Martinez told Cruz that, which is no surprise given that they were trying to convince him how well prepared the operation was because they were attempting to recruit him at the last minute to be the driver for the robbery."  (Rule 29/33 Decision at 10).  Blanco now tries to claim that Marte and Cruz had a prior criminal relationship and had other communications on the day of the bank robbery, and speculates that this belies the notion that Cruz would not have known about the robbery until the day before it occurred, but this speculation has no basis in the record.  To the contrary, given Marte's testimony about his extensive criminal history, it is entirely believable that he would not always keep each of his criminal partners informed of all of his criminal ventures.  Accordingly, Blanco's new arguments about why Cruz should have been called as a witness do not give any reason to disturb the Court's commonsense conclusion that Cruz's testimony would have limited probative value.

Cruz's testimony about other aspects of the case would also have been highly inculpatory for Blanco.  Most notably, if called to testify, Cruz would have been yet another bank robber to testify about the existence of an insider.  Cruz previously told law enforcement that Marte told him that he had a female insider at the Bank.  Thus, it was entirely reasonable for defendant's counsel

to forego calling Cruz to keep that corroborating information from the jury. *Luciano,* 158 F.3d at 660 (noting that "[t]he decision not to call a witness is strategic, and it is rarely, if ever, the proper basis of an ineffective assistance of counsel claim"). Cruz—an admitted gang member, drug dealer, and bank robber—also told law enforcement that he knew Blanco, another fact that a prudent defense counsel might not want a jury to know about. For these reasons alone, Trial Counsel was reasonable in not calling Cruz to testify at trial.[4]

As the Court previously found, Trial Counsel's decision not to call Cruz was sound trial strategy and benefitted—rather than prejudiced—the defendant. (*See* Rule 29/33 Decision at 23-24).[5]

### 2.  Saad Khalil and Georgette Rabadi

Trial Counsel's reasonable decision not to interview or call at trial Saad Kahlil and Georgette Rabadi was also not constitutionally ineffective. Blanco claims that these individuals would have testified that Marte asked bank employees for information about the vault during the robbery and argues this would have discredited the Government's theory that there was an insider. (Pet. 19-21). Specifically, Blanco claims that Khalil would have testified that Marte told Khalil to take him to the vault, which would have discredited Marte's claim of having inside information about the location of the vault. (Pet. 15). The Petition is less specific as to how Rabadi's testimony

---

[4] The defendant states that Cruz told law enforcement that he did not know if there was an insider (Pet. 14) but ignores notes of a subsequent interview, which were turned over to the defense, in which Cruz corrects that prior misstatement and states that Marte told him that there was a female insider at the Bank.

[5] The defendant also makes an argument with respect to a robbery of a different Wells Fargo branch a year earlier, but the relevance of that discussion to her ineffective assistance claim is unclear.

would have impeached Marte but claims it similarly would have discredited Marte's claim of an insider.  (Pet. 19).

Trial Counsel's decision not to interview or call these witnesses was reasonable.  First, testimony that Marte asked a bank employee to take him to the vault does not necessarily impeach Marte's testimony that the defendant had previously told him where the vault was located.  Even having been told where the vault was located, in the chaos and rush of the bank robbery, it could still make sense for Marte to ask an employee to take him to it.  In addition, Marte acknowledged that while Blanco provided him with detailed information in advance of the robbery—including details about the location of the cash vault—Marte's nerves and adrenaline at the time of the robbery affected his ability to act in accordance with the plan he had set based on the defendant's information.  (Tr. 194) ("I knew we weren't going to be able to open it because Virginia told me we needed a manager, but I was so nervous, my adrenaline was going so fast . . .").

The probative value of Khalil and Rabadi's testimony would also have been limited given the number of different ways in which the Government demonstrated Marte's possession of inside information.  The Government presented evidence that Marte had inside information about the physical layout of the Bank, the employees of the Bank, the Bank's schedule, the Bank's internal policies and far more.  Moreover, much of this evidence was corroborated.  For example, the Government presented testimony that Marte had inside information about the location of alarms (Tr. 163:15-21) and cameras (Tr. 164:17-21) inside the Bank—information he would have no way of knowing without an insider.  His testimony about these locations was then corroborated through the testimony of Indhira Urena, a bank employee, (*Id.* at 69:2-9), Patrick Doonan, a corporate security officer at Wells Fargo (*Id.* at 22:14-23), surveillance footage (GX 13) and a blueprint of the Bank's layout (GX 10-A).  Additionally, Martinez's testimony also corroborated Marte's

testimony that there was an insider.  (Tr. 338:18-21; 340:16-22; 345:12-21; 387:3-12).  Not only did Marte tell Martinez that there was an insider, but Martinez independently concluded this had to be true based on the quality and accuracy of Marte's information.  (Tr. 393:4-13).  In short, the Government's proof of an insider went far beyond inside information about the location of the vault, so impeachment evidence regarding Marte's knowledge of the location of the vault based solely on comments he made to bank employees in the midst of the robbery would not have changed the overall picture of whether Marte had inside information going into the robbery.

Testimony from Rabadi and/or Khalil would also have presented significant risks.  Both individuals were victims of the robbery who were terrorized by the actions of the defendant and her co-conspirators.  It is certainly reasonable to conclude that subjecting the jury to additional testimony about the horrors of the crime would be unwise.  In addition, as employees of the Bank, the witnesses would likely have corroborated Marte as well.  For example, as detailed in 3500 material, Rabadi would have corroborated Marte's testimony that the robbers clearly knew their way around the Bank, that the robbers knew not to waste any time on the cash drawers, and that the tellers are trained not to reveal confidential information and to comply with the demands of robbers.  (*See* 3504-B, C).  Accordingly, Trial Counsel was reasonable in not calling Khalil or Rabadi at trial.

In addition, given the limited probative value of their testimony as described above, even if the Court were to find that failure to contact or interview these witnesses constituted constitutionally inadequate performance, Blanco has failed to demonstrate any prejudice.  In the face of the overwhelming evidence that the robbers had an insider, Blanco cannot demonstrate that testimony from these witnesses would have altered the result.

### 3.   Carlos Raposo and Felix Pena

With respect to Carlos Raposo and Felix Pena, Blanco's argument fails because it is both procedurally barred and it does not meet the *Strickland* standard on the merits.

As noted above, Blanco's argument regarding Carlos Raposo and Felix Pena is barred by the mandate rule because it was litigated, and rejected, on direct appeal.  The Second Circuit found that Blanco failed to show any prejudice because Pena and Raposo "could only have offered impeachment evidence as to collateral matters."  *United States v. Blanco*, 811 F. App'x 696, 703 (2d Cir. 2020) (citing *United States v. Vargas*, 920 F.2d 167, 170 (2d Cir. 1990) (declining to find counsel ineffective for calling defense witnesses whose proffered testimony related only to collateral matters).  Because the Petition raises complaints about the same inactions by Trial Counsel, the argument is barred.  *See Yick Man Min*, 614 F.3d at 51.

If the Court were to consider Blanco's arguments on the merits, the conclusion would be unchanged.  First, it was entirely reasonable not to call Raposo and Pena given that the probative value of their potential testimony is significantly limited (and their susceptibility to impeachment significantly enhanced) because Raposo is the father of the defendant's child and Pena is her cousin. (See Dkt No. 152, Ex. D ("Rule 29/33 Raposo Affidavit" ¶ 2; Tr. 112:15-16).  Moreover, both Raposo and Pena are convicted drug dealers, a fact that simultaneously harms their credibility and corroborates Marte's testimony that he had prior narcotics dealings with them. (*See, e.g.*, Tr. 111:5-15; 112:13-14). As for them denying ever dealing drugs with Marte, it is not surprising that these two witnesses–or any witness for that matter–would deny engaging in specific drug transactions.  In any event, their testimony at trial also would reveal that, in addition to Marte, two other drug dealers were well-acquainted with the defendant, another fact that a prudent defense

counsel might want to withhold from a jury.[6] Relatedly, Trial Counsel was also justified in not calling Raposo and Pena as doing so would only further highlight the defendant's drug dealing and could have potentially opened the door to more detailed accounts of the defendant's narcotics dealing, which the Court had previously limited.[7] (See Government's Response, Exhibit A ("Silveri Affirmation") ¶ 12). At the end of the day, "[t]he decision not to call a witness is strategic, and it is rarely, if ever, the proper basis of an ineffective assistance of counsel claim." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). And notably, even if such a decision did constitute deficient performance, the defendant's claim fails on the second Strickland prong—prejudice—in light of all the evidence corroborating Marte.

### 4. Antonio Parra

Similarly, Blanco's arguments relating to Parra—the superintendent of the Bronx apartment building where Blanco and Marte lived together—is also barred under the mandate rule. Blanco raised this argument in her Rule 29/33 motion and then again on direct appeal, and the Second Circuit denied it. *United States v. Blanco*, 811 F. App'x at 703. Again, Blanco's collateral attack now raises the same complaints about Trial Counsel's inaction. *Yick Man Min*, 614 F.3d at 51.

This Court's initial ruling in its Rule 29/33 Decision and the Second Circuit's affirmation of that ruling was correct. As this Court correctly concluded, it was reasonable for Trial Counsel not to call Parra because, among other things, the building has 83 units, making it unsurprising

---

[6] It is worth noting that in addition to Raposo and Pena, Marte also testified that the defendant delivered money, drugs, and messages to a third drug dealer. (*See* Tr. 112:17-113:9).

[7] The Court limited the scope of Marte's testimony on the nature and duration of the defendant's involvement in his drug dealing. For example, the Court precluded testimony about the defendant completing drug transactions for Marte, about her finding new drug customers for Marte and Raposo, and about her being compensated for her work. (*See* July 3, 2018 Conference Tr. 18:8-9 ("I do think that some of this [testimony] should come in, but not very much of it.")

that a superintendent would not recognize "someone who kept odd hours and only lived there for a year more than five years ago"; calling Parra "would have been a waste of time and indeed injurious to defense counsel's credibility given the overwhelming evidence that Marte was staying with [Blanco] at that building, including cell site data and parking tickets at all hours, among other things"; and whether Marte was living in the building was not material, given that it was "undeniable" that he and Blanco were in a relationship. (Rule 29/33 Decision at 15-16). Parra's testimony also would have demonstrated that the defendant lied when she previously stated in her September 2015 interview with the FBI that she was not living on Dekalb Avenue (the location of the Bronx apartment building) a month after the robbery. (Tr. 290, 506-07). Blanco has thus not made any showing that calling Parra would actually "have been useful for impeachment, in the sense of having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Fernandez*, 648 F. App'x 56, 61 (2d Cir. 2016).

### 5. Kris Quidongo

Finally, Trial Counsel was not ineffective in failing to interview or call Kris Quindongo as a character witness. The defendant claims that Quindongo would have testified that the defendant continued to work at the Bank after the robbery and was offered more money. (Pet. 54).

Whether to call character witnesses is an inherently tactical decision that courts rarely second-guess. *See, e.g.*, *United States v. Choudhry*, 649 F. App'x 60, 61 (2d Cir. 2016) (noting that the decision to call particular witnesses "is peculiarly a question of trial strategy which courts will practically never second-guess."); *United States v. DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003) (finding no ineffective assistance of counsel where "trial counsel's decision not to call a character witness was grounded in the strategy of preventing the prosecution from attacking [the defendant's] character"). Indeed, in *Strickland* itself, the Supreme Court held that counsel's

decision not to call character witnesses was a "strategy choice . . . well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699.

Here, Trial Counsel's strategic decision not to call Quindongo was more than reasonable. Trial Counsel was able to elicit substantially the same testimony that the defendant claims would have been provided by Quindongo from a Government witness. (Tr. 84:24-85:6; (Q: "As far as you know, she was still there until 2016; is that correct?"; A: "I am not sure when she left the branch. I know that she was promoted to be a lead teller at a different branch"; Q: "Fair enough. And do you know if she was still working with them in 2016 at Wells Fargo"; A: "Yes"). Not only is it reasonable for Trial Counsel not to call an additional witness for cumulative testimony on a collateral issue, but it is good strategy to elicit information from a Government witness rather than call a different witness and risk other potentially harmful testimony. As this Court previously observed with respect to a different proposed character witness, the Government could have elicited "unflattering information" from the witness to "corroborate its case," and any testimony regarding the defendant's "character for honesty might have backfired given her many lies to the FBI." (Rule 29/33 Decision at 18).

Accordingly, the defendant fails to establish either prong of the *Strickland* standard based on Trial Counsel's failure to call Quindongo as a witness.

### 6. Ana and Jonah Marte

Finally, Trial Counsel was not ineffective for not interviewing or calling Marte's siblings, Ana and Jonah. Blanco argues that Trial Counsel should have investigated inconsistencies in Marte's testimony about when he counted the stolen money and speculates that Marte's siblings could have had knowledge of the robbery. Trial Counsel's decision not to interview or call as witnesses Marte's siblings is eminently reasonable. First, Blanco's speculation aside, there is no reason to believe that Marte's siblings had any information that could have been helpful to her

case.  Her conjecture is not a sufficient basis for a finding of ineffective assistance.  *See Taylor v. Poole*, No. 07 Civ. 6318(RJH)(GWG), 2009 WL 2634724 (S.D.N.Y. Aug. 27, 2009) (citing cases) ("[A] petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation.").  Second, even if Blanco was able to show deficient performance, there can be no argument that she was prejudiced because this alleged inconsistency relates to a minor aspect of the aftermath of the robbery.

### c.   Trial Counsel Was Not Constitutionally Ineffective for Failing to Object to Questioning Regarding Her Association with Individuals Committing Crimes with Marte

Blanco also argues that Trial Counsel was constitutionally ineffective for failing to object to questions about the defendant's associations with individuals who engaged in criminal activity. (Pet. 42-44; at 44 ("There was no object made from Ms. Blanco's attorney to stop this picture being painted for the jury.")  Blanco is flatly wrong.  Trial Counsel did in fact object to the Government's questioning for the exact reason that Blanco discusses in her Petition.  (Tr. 124:22-25 (Trial Counsel arguing at sidebar against "repeated references to every criminal, somebody that him and my client grew up with, and I think in a way it suggests bad acts in a roundabout way.").  As a result, the Court instructed the Government that once an individual's relationship with Blanco is established, "it doesn't need to be repeated."  (Tr. 126:8-10).

Far from demonstrating ineffective assistance, Trial Counsel's exchange with the Court with respect to this testimony demonstrates that Trial Counsel was listening attentively, attuned to nuances that could harm his client, and effectively raising issues with the Court.

### d.   Trial Counsel Was Not Constitutionally Ineffective for Failing to Argue that Blanco Withdrew from the Conspiracy

Finally, Trial Counsel was not constitutionally ineffective for failing to argue that the defendant withdrew from the conspiracy.  Contrary to the defendant's contention, there is no legal basis or factual for the claim that the defendant withdrew from the conspiracy.  (*See* Pet. 45-47).

Withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof.  *United States v. Pizzonia*, 577 F.3d 455, 466 (2d Cir.2009).    To prove withdrawal, the defendant must "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators."  *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) (citations and internal quotation marks omitted). "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."  *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir.1999) (quoting *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir.1995)).

As a factual matter, Blanco never withdrew from the conspiracy.  She planned the robbery in the days leading up to the crime, kept in contact with Marte throughout the day of the robbery, and then she celebrated with Marte after the robbery was a success.  Blanco was a member of his conspiracy from beginning to end.  As a strategic matter, Trial Counsel was of course correct in not arguing withdrawal for a simple reason—an argument that Blanco withdrew from the conspiracy would have required a concession that she was at a time a member of that conspiracy.  Had the jury then not believed the withdrawal claim, Blanco would have effectively conceded her guilt.  Either way, a defense attorney's decisions concerning "which arguments to stress, which witnesses to call, which motions to make, and which lines of inquiry to pursue, fall squarely within the ambit of trial strategy and, if reasonably made, cannot support an ineffective assistance claim."

*Rodriguez v. United States*, 2017 WL 6404900, At \*25 (S.D.N.Y. Dec. 13, 2017) (quoting *Figueroa v. Ercole*, 800 F. Supp. 2d 559, 568 (S.D.N.Y. 2011).

### e.  Blanco's Additional Ineffective Assistance Arguments are Meritless

Blanco's June Petition also includes four other reasons in which Trial Counsel was purportedly ineffective: (1) "Trial Counsel was completely unprepared and lacked sufficient knowledge of Petitioner's case"; (2) "Trial Counsel's questions bolstered the testimony of Government witnesses, specifically Jeffrey Martinez"; (3) "Trial Counsel was unable to adequate discuss the defense of the case with Petitioner due to his complete unfamiliarity with the Discovery turned over to him by Petitioner's previous Counsel"; and (4) "Trial Counsel offered no strategy whatsoever in defending Petitioner's case.  Absolutely no evidence was introduced to either impeach witnesses nor to challenge any witnesses even when evidence existed or was easily accessible to Trial Counsel."  (June Pet. 5).   The June Petition does not include any other discussion of these purported failures and they are not specifically discussed in the October Petition.

Each of these arguments fail.  Blanco bears the burden of proof with respect to her claims, and she has failed to provide any argument or factual basis in either of her petitions to support them.  *See United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) ("The burden of establishing both constitutionally deficient performance and prejudice is on the defendant." (citing Strickland, 466 U.S. at 687)).  Instead, these claims are conclusory, self-serving and unsupported by the record.  *See Barnes v. United States*, No. 04 -CR-186 LAP, 2015 WL 5854030, at \*7 (S.D.N.Y. Aug. 31, 2015) ("[A] llegations relating to counsel's alleged errors in trial preparation and advocacy that are "vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source" are insufficient to establish an ineffective assistance claim).  Moreover, Blanco

raised variations of some of these claims in her counseled Rule 29/33 motion, and the Court easily rejected them.  (*See* Rule 29/33 Decision at 20 (concluding that Trial Counsel made a "smart strategic call" in acknowledging that Blanco was in a relationship with Marte); 21 (finding that it was not "substandard performance" to "simply hold[] the government to its burden of proof"); 27-28 (acknowledging that Trial Counsel's cross-examination of Martinez "could have bolstered Martinez's credibility, but concluding that this was not ineffective assistance)).

## CONCLUSION

For the foregoing reasons, the Court should deny the Petition in its entirety.

Dated:  December 3, 2021
      White Plains, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By:  **_____/s/_____**
SAMUEL ADELSBERG
JAMIE BAGLIEBTER
Assistant United States Attorneys

**AFFIRMATION OF SERVICE**

I, Jamie Bagliebter, affirm under penalty of perjury as follows:

1. I am an Assistant United States Attorney in the Southern District of New York.

2. On December 3, 2021, I caused a copy of the foregoing to be served on the petition by certified mail at the following address:

    Virginia Blanco
    FCI Danbury
    Federal Correctional Institution, Route 37
    Danbury, CT 06811

By: _____/s/_____
    JAMIE BAGLIEBTER
    Assistant United States Attorneys
