## MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

Proceeding pro se, movant Virginia Blanco, a federal prisoner, replies to the Government in this motion and respectfully moves this Court to vacate and correct her sentence pursuant to 28 U.S.C. § 2255.

The arguments set forth in this motion are violations of Virginia Blanco's sixth and fourteenth amendments.

1.  The complete misconception by the Government of Ms. Blanco providing Marte with knowledge of not wasting time on the teller drawers and also thinking it's "best" not to take from the drawers were not Ms. Blanco's words, in fact, they were from Marte himself. The Government was aware of his proffer meetings notes and testimony being different.

Marte testified: Because Virginia told us, Virginia told me not to, and she just told me to focus on the task at hand.

However, on March 29, 2018, on page three of Marte's 3502-U proffer notes, Marte stated he thought it was best not to take from drawers, it was not Ms. Blanco who told him. Samuel S. Adelsberg, Jamie E. Bagliebter were present for Giovanni Marte's 3502-U proffer meeting.

On April 10, 2018, 3502-W of Marte's proffer notes. Took too much time to take drawers, ATM, vault. That's not what Ms. Blanco told him. Samuel S. Adelsberg, Jamie E. Bagliebter were present for Giovanni Marte's 3502-W proffer meeting.

The Government's claim of Marte receiving advice from Ms. Blanco not to waste time on the teller drawers and also thinking it is best not to take from drawers were not supported by Ms. Blanco in any shape or form. The Government was aware or should have been aware of Marte's proffer notes and testimony, therefore the Governments theory holds no merit.

This is not precisely the kind of alleged inconsequential detail that the court appropriately characterized as minor collateral, that would not have affected the outcome due to the fact the court was not aware of this argument until Ms. Blanco brought it forth in her 28 U.S.C. § 2255.

The probative value is in Ms. Blanco's favor, Ms. Blanco was on trial and accused of providing Marte with inside information. This here is evidence which is sufficiently useful to prove something so crucial in a trial.

2. The Government's response referrers to Marte's perjury as inconsistencies. Marte testified to meeting with the prosecutors over ten times. The Government was aware or should have been aware that Marte's testimony in fact was perjured and should not be considered inconsistencies.



Testimony from Marte admitting he in fact did meet with the Government over ten times:

Q. Did you meet with prosecutors several times between that first date when you met with them and today?
A. Yes.
Q. Do you know how many times?
A. Over ten times.
Q. What did you tell the prosecutors during those meetings?
A. All the crimes that I have committed, crimes I have - - other people have committed, everything I know, everything I have seen.
Q. Does that include the bank robbery?
A. Yes.
Q. Does that include crimes where you never got caught?
Page 132 lines 13-25 Doc 142.
Q. Yes.
A. Does that include everything you just testified about such as drug dealing, the drug robberies, the fights, the shootouts, the gun possession and the drug smuggling?
A. Yes.
Page 133 Lines 1-5 Doc. 142.

Marte met with AUSA Douglas Zolkind, AUSA Samuel S. Adelsberg, AUSA Jamie E. Bagliebter, over ten times and the AUSAs still allowed Marte to commit perjury.

The Government was in possession of Marte's 3502-A rap sheet which Showed more than one arrest.

The Government was also in possession of Marte's 3502-J personal history of the defendant sheet. Prepared by Special Agent Brendan Kenney of the FBI. The AUSA assigned was Douglas Zolkind, giving AUSA Douglas Zolkind Knowledge of Marte's prior criminal history.

On January 17, 2020, in the Government's Appeal brief, on page twenty-one (21), AUSAs Sam Adelsberg, Jamie Bagliebter, Anna M. Skotko and Submitted by United States Attorney Geoffrey S. Berman quoted Judge Seibel:

Meanwhile, Judge Seibel concluded that Trial Counsel cross-examined Marte on all of the essential points, including "his criminal history, the extent of his drug dealing and other crimes, his ripping off his criminal cohort, his meetings with the government, how recently he had implicated [Blanco] in drug dealing, and his cooperation agreement, the time he faced, and his motives to lie." This is the same line of chatter the Government role plays in their 28 U.S.C. § 2255 response.

Marte was not cross-examined by Silveri on his criminal history or other crimes. Below is a list of crimes Marte committed that Silveri failed to bring forth to on cross examination.

On March 30, 2008, Marte was arrested for criminal possession of a weapon. See March 3, 2017, 3502-R proffer meeting with Marte. Douglas Zolkind was present.

On March 22, 2009, Marte was arrested for criminal sale of a controlled substance in the 3rd.
See March 3, 2017, 3502-R proffer meeting with Marte, Douglas Zolkind was present.

On January 10, 2015 and January 15, 2015, Marte was arrested for AVO in the 3rd.
See March 28, 2017, 3502-S proffer meeting with Marte, Douglas Zolkind was present.

Please see attached letters dated: October 6, 2021, November 2, 2021 and January 11, 2021.

Marte never disclosed the two arrests to the court.

Another crime Marte took part in but was never arrested for, was with his Co-Conspirator Jeffrey
Martinez. Please see Marte's 3502-N Proffer signed by AUSA Douglas Zolkind. Making AUSA Douglas
Zolkind aware that Marte tripped a black male who was running away from Martinez while Martinez and
others were trying to rob him.

The Government's rebuttal is questionable.

The defendant's claim that Trial Counsel should have cross-examined Martinez on a purported crime he
committed with Marte prior to the robbery (Pet. 3-4) also falls short of demonstrating ineffectiveness.
For one, this episode which involved Martinez trying to steal money from a drug customer and chasing
him, before Marte (who was not part of the theft plan but happened to be on the same street) tackled
the customer and then "just walked away" (Tr. 326) does not demonstrate that the two previously
committed a crime together. Indeed, Marte merely tackled an individual Martinez was chasing, hardly
suggesting that he and Marte had a long and sordid criminal partnership that would form the basis of
meaningful cross-examination on this point. Moreover, Martinez had already testified about the
incident during his direct-examination, further blunting the value of bringing it up again on cross-
examination.

The Government's theory that Marte played a minor role in a crime with Martinez before the bank
robbery is lowering the bar that one's part in a crime can be so minimal that it's not classified as taking
part in the crime. Just because Marte didn't plan the robbery and neither did Martinez doesn't mean he
didn't take part in the robbery. In fact, if it wasn't for Marte tripping the male that was running away
Martinez possibly would have never caught him. With that being said no matter how minor Marte's roll
was in the crime he still took part in it.

The actions above are similar to when The Honorable Cathy Seibel stated at Ms. Blanco's final pretrial
conference the following:

The court: Her role in the bank robbery isn't particularly sensational. She's not the one who charged him
with the gun. She's not the one who fired off the guns. She had a I don't want to say a passive role, but a
background role in the conspiracy, as you've alleged it.
(Page 15. Lines 2-7)

The Court: Well, you know what I mean. It was that she didn't physically pull off the bank robbery.
Her contribution was information.
(Page 15. Lines 13-15)

The Court: She's not the one who fired the gun. She's not the one who pistol-whipped somebody.
(Page 17. Lines 23-24)

Jeffrey Martinez testified that he never committed any crimes prior to the bank robbery with Giovanni Marte. Jeffrey Martinez testified that he committed a robbery with Giovanni Marte prior to the bank robbery.
(See Doc144. Page 69. Lines 21-25). (Please see Martinez 3503-X & Marte 3502-N).

On April 28, 2016, Douglas Zolkind was present for Jeffrey Martinez 3502-X proffer meeting with the Government.

On direct Ms. Bagliebter asked Jeffrey Martinez:

Q. You testified earlier that you committed the bank robbery with Giovanny Marte, Andres Cruz and Trouble.
When did you first meet Giovanny Marte?
A. I know of him since I was in junior high school.
Q. And what was your relationship with him?
A. At that time there was no relationship. Just what's up? Just "hi."
Q. Did you go to school with him?
A. Yes. We went to junior high school together.
Q. Are you the same age?
A. No. I believe I am older.
Q. How often did you see him growing up?
A. Maybe once a week or so, maybe once every two weeks.
Q. Prior to the bank robbery, did you ever commit any crimes with him?
A. No.
Doc144. Page 77. Lines 6-21.

Jeffrey Martinez testified that prior to the bank robbery he never committed a crime with Giovanni Marte. However, below is testimony from Martinez, that states he did commit a crime with Giovanni Marte before the bank robbery. The below testimony was heard by the court before Ms. Bagliebter asked Jeffrey Martinez if he had committed any crimes with Giovanni Marte prior to the bank robbery.

So, I am running after him, and while I am running after him, and people in my neighborhood start to look, and then I see Giovanny Marte. He sees me. He notices right away. He sees me. He just bolts, grabs the guy. He slams him, and he just walks away.
Doc144. Page 69. Lines 21-25.

While Martinez was testifying (see trial transcript page 69) Martinez testifies about the robbery and breaks down the robbery as it happened with Marte.

Later in Martinez testimony on page 77 (see trial transcript page 77) Martinez testified that he did not commit any crimes with Marte prior to the bank robbery.

When in fact Martinez informed the court while on direct with AUSA Ms. Bagliebter that he in fact did commit a robbery with Marte prior. (see trial transcript page 69)

3500 material as well corroborates Jeffrey Martinez and Giovanni Marte have committed a crime together prior to the bank robbery. Martinez and Marte took part in robbing a black male.
See Martinez 3503-X. and Marte 3502-N.

On April 28, 2016, Douglas Zolkind was present for Jeffrey Martinez 3502-X proffer meeting with the Government.

Giovanni Marte's proffer agreement was signed by Douglas Zolkind. On January 18, 2017 Giovanni Marte 3502-N.

If number five of Jon Silveri affirmation is true:

"I reviewed the discovery carefully"

Then he would have been able to effectively cross-examine Marte on all of the essential points including "his criminal history, the extent of his drug dealing and other crimes, ripping off of his criminal cohort, his meetings with the government, how recently he had implicated [Blanco] in drug dealing, his cooperation agreement, the time he faced, and his motives to lie."

Marte's 3502-J: shows the A.U.S.A assigned to the case was Douglas Zolkind. Douglas Zolkind was in each of Marte's proffer meetings. Douglas Zolkind also signed Marte's proffer agreement. Douglas Zolkind was aware or should have been aware of the perjured testimony.

The Government asserts in their reply that Marte testified in length about his criminal history on direct examination, Silveri cross examined Marte on his exhaustive criminal history at length. The Government completely misses the mark.

The Government claims:

Trial Counsel was not ineffective for failing to address a minor inconsistency in Marte's testimony about a purported arrest ten years earlier for which he apparently "served no time." (3502-R).

The Government claims that Marte's drug charge holds little to no value because it was ten years ago and Marte served no time. (3503-R).

Giovanni Marte testified to only being arrested one time. On March 3, 2017, Giovanni Marte's 3502-R proffer notes prove he was arrested more than once. Douglas Zolkind was present for Giovanni Marte's 3502-R proffer meeting with the Government.

On direct Mr. Adelsberg asked Giovanni Marte.

Q. Mr. Marte, other than selling drugs and robbing the bank, did you ever commit other crimes?
A. Please repeat that question?
Q. Sure. Other than selling drugs and robbing the bank, did you ever commit other crimes?
A. Yes
Q. I got into a few fist fights. I got into three shootouts, and robbed a few drug dealers.

Doc.142, Page.122

Q. You described your involvement in drug dealing, robberies, fights, shootouts, gun possession and drug smuggling. Were you ever arrested for these crimes?
A. Yes.

Q. How many times?
A. Once.
Q. What happened that time?
A. Got into a fist fight.
Q. When was that?
A. 2000, late 2014, early 2015.
Q. And what was the charge?
A. Assault
Q. What happened to those charges?
A. I plead guilty to disorderly conduct and assault.
Q. So other than that one arrest, were you ever arrested for any other activity that you described?
A. No
Doc.142, Pages 131-132.

On April 22, 2009 Giovanni Marte was arrested on Nagel & Dyckman with two others for criminal sale of a controlled substance in the 3rd to an undercover. (3502-R)

The Government refers to Marte's perjured testimony and narcotic arrest as a minor inconsistency in their reply. Moreover, the Government argues that the arrest is purported and happened ten years earlier for which he apparently "served no time."

On April 16, 2018, the Government brought forth 404 (b) firearm allegations. On June 29, 2018, the Government brought forth 404 (b) narcotic allegations. On both occasions the allegations were ten years old and not related to Ms. Blanco's charges. The Government could not support these allegations with one credible witness or one shred of evidence.

On July 3, 2018 final Pretrial:

Mr. Adelsberg: Yes. Obviously, if the trial went then, we wouldn't have known that information, but due to the additional prep that we've had, we learned information, and right as we learned it, we sent the 3500 over to the defense counsel, we researched it.

The question still remains of what research Mr. Adelsberg is referring to. Without any evidence or a credible witness to support these allegations. These allegations by Marte are over 10 years old.

Ms. Blanco on the other hand is able to show materiel to support that Marte was arrested more than one time.

Giovanny Marte RTCC Summary on page one (1) and two (2) show a total of four arrests.

On June 21, 2016, 3502-A for Giovanny Marte show a total of three (3) arraigned arrests. On the top of page one (1) To: Smyths for: Douglas Zolkind Case No: 2013R017969. Making AUSA Douglas Zolkind aware of the times Marte was arrests.

On May 23, 2016 personal history of defendant 3502-J Giovanny Marte prepared by Special Agent Kenney and AUSA assigned Zolkind. On page four makes both individuals aware that Marte was arrested more than one time.

A list of Giovanny Marte's arrests are:

1. March 30, 2008 CPW 4th
2. May 22, 2009 CSCS 3rd
3. January 10, 2015 AUOV 3rd
4. January 19, 2015 AUO 3rd

The Government could not establish a solid timeline or produce any evidence or a single witness to corroborate Marte's alleged drug operation outside of 90 Ellwood with Carlos Raposo.

Everyone that was implicate by Marte in that alleged drug operation and who Marte allegedly split proceeds with in the alleged drug operation was arrested except Marte. (See 3502-pp spot got raided so they shut it down) (See 3502-pp first fight over a spot Ellwood & 96).

It has been established that the Government nor Ms. Blanco's attorney Jon Silveri interviewed Carlos Raposo or anyone else to corroborate or discredited Marte's drug allegations.

On July 3, 2018 final Pretrial:

Mr. Adelsberg: Yes. Obviously, if the trial went then, we wouldn't have known that information, but due to the additional prep that we've had, we learned information, and right as we learned it, we sent the 3500 over to the defense counsel, we researched it, wrote a letter to the court that day, and tried to get this in front of your Honor as soon as possible.
(Page 3 lines 13 -19)

In Marte's 3502-R proffer on Page five (5) Marte alleges he had another drug operation in the year of 2014 until 2016:

Worked with Jonathan Santos from 2014-16 ish.
Shared product- pills, coke, weed.
Shared customers.
Ivan Brea aka Tito - also part of partner.
Everyone had own business, but helped everyone out.
Had weed spot on Ellwood, also pills, coke.
Had spot about 2014-16.
Hundreds of customers.

Marte's 3502-PP proffer notes states:

"Only spot that GM had"

The only spot referring to the spot with Raposo. Now another drug spot with Jonathan Santos and Ivan Brea.

In that time frame both Jonathan Santos and Ivan Brea were arrested for narcotics except Marte.

New York City Police Department Police Reports for Jonathan Santos states he was arrested on

February 3, 2016 for PL 220.16 01 criminal possession of a controlled substance with intent to sell 3rd degree, 2221.20 criminal possession of marijuana 3rd: 8oz.
(See attachment)

Department of Corrections and Community Supervision show.
Jonathan Santos D.O.B 06/16/86 aka Bodie with a Department Identification Number 16-R-2725.
(See attachment)

In a June 25, 2021 letter from the Government to the sentencing judge regarding Ivan Brea aka Tito:

In 2014, Brea was convicted of criminal sale of a controlled substance in the third degree and sentenced to 18 months imprisonment. PSR 41. He violated his parole a second time in 2016.
(See attachment)

Department of Corrections and Community Supervision show Ivan Brea D.O.B 02/13/91 aka Tito was incarcerated at Hale Creek Asactc. Department Identification Number 14-R-1707. With a CDR to parole 06/19/15.
(See attachment)

To reiterate Ms. Blanco's argument of Marte claiming he was in a drug distribution with Raposo, but wasn't arrested with others as he named, is the same uncorroborated allegation here.

Department of Corrections and Community Supervision Records for Carlos Raposo shows that Carlos Raposo had a DIN # (Department Identification Number) of 12–A-3783 and Anthony DeLeon had a 11-R-3508 DIN number.

Trial testimony inconsistencies from Marte on his drug dealing in the years of 2014-2016 stating he did not work with anyone in that time frame.

Q. And by the way, did you have anybody working for you in 2014 or were an independent?
A. No. I was always independent.
Page 212 lines 8-10 Doc 142.

Q. And you weren't working for anyone either, correct?
A. Which drug?
Q. Cocaine
A. No
Q. And you had no one working for you either, right?
A. No
Page 212, 213 lines 19-25, line 1 Doc 142

Q. Before you were arrested in May of 2016, while you were doing the Herbal Life you were still selling drugs, correct?
A. Yes, but not as much.
Q. And that drug at the time in 2016 was?
A. Cocaine, pills, marijuana.
Page 223 lines 8-13 Doc 142.
The question remains the same and unanswered by the government an Mr. Adelsberg:

On July 3, 2018: At final Pretrial what research was Mr. Adelsberg referring to?

Ms. Blanco has provided proof that discredits Marte and the Government's allegations. Marte nor the Government can produce one single piece of evidence or any witness to corroborate what Marte is alleging.

Furthermore, another allegation by Marte that went uncorroborated:

Marte's April 16, 2018 3502-Y proffer note states:

GM gave VB gun in '09 to have her keep it at Ellwood after nieces birthday party.

Ms. Blanco's sister Yokasta Blanco does not have a daughter. In fact, Yokasta Blanco does not have any kids at all. Therefore, Marte's alleged allegations that he gave Ms. Blanco a gun in 2009 and she kept a gun on Ellwood after her niece's birthday party falls short.

This testimony is relevant to all three counts in the indictment because (1) it demonstrates the extent of Marte and Martinez relationship prior to the bank robbery, including Martinez participation in criminal acts with Marte; (2) it explains how Martinez would get involved in a conspiracy as serious as the bank robbery; and (3) it further contradicts Martinez statements about his relationship with Marte made to AUSA Douglas Zolkind on April 28, 2016 during Martinez 3503-X meeting with the Government and is cooperated by Marte's 3502-N proffer signed by Douglas Zolkind signed on January 18, 2017.

Therefore, on direct when Mr. Adelsberg asked Giovanni Marte:

Q. So other than that one arrest, were you ever arrested for any other activity that you described?
A. No

Mr. Adelsberg was aware or should have been aware of how many time Marte was arrested.

A list of Giovanny Marte's arrests are:

1. March 30, 2008 CPW 4th
2. May 22, 2009 CSCS 3rd
3. January 10, 2015 AUOV 3rd
4. January 19, 2015 AUO 3rd

On several occasions in the Government's reply, the Government refers to Marte's testimony as examples of his truthfulness to why he shouldn't be discredited. The Government claims Marte testified at length about his involvement in drug dealing, robberies, fights, shootouts, gun possession, and drug smuggling on direct examination. However, Marte's testimony falls short of being in full detail on direct examination.

The Government's asserts in their reply that Marte admitted to being involved in incredibly serious crimes which includes shootings. Marte's proffer and testimony fails to be credible.

On June 29, 2018, during Marte's 3502-PP witness prep with the initials S.A and J.B in the top right corner standing for AUSA Sam Adelsberg and AUSA Jamie Bagliebter meaning both AUSA's were present during the time of this meeting.

Marte alleges:

Committed a shootout w/ Smiley B/C they broke his car window. (3502 -PP. page 1)

However, while testifying Marte states:

Q. You testified earlier that you were involved in three shootouts. When were these shootouts?
A. One was in 2008. One was in 2009. The last one was in 2013.
Q. And who was involved in these shootouts?
A. Just the Tito and some other guys that I grew up with.
A. Did you ever have a shootout against anyone other than the Trinitarios gang?
A. No
Lines 11-19-page 123 Doc.142.

On June 5, 2018, during Marte's 3502-MM witness prep with the initials S.A and J.B in the top right corner standing for AUSA Sam Adelsberg and AUSA Jamie Bagliebter meaning both AUSA's were present during the time of this meeting. Marte admits in the meeting to only being in:

3 shootouts w/ Trinitarios.
3502-MM

The Government is dancing around the fact that Marte testified to paying for the Aruba trip in cash and for a larger sum then the trip actually cost. Marte knowing the trip was purchased on priceline.com and that an online trip can only be paid for online. However, Marte testified to paying for the trip in cash.

The Government tries different ways to justify Marte's testimony. Each way fails.

The question asked at trial was how did you pay for the Aruba trip? Marte responds with cash. There were no other questions asking did you reimburse Ms. Blanco?

Ms. Blanco provided Silveri with an online receipt proving the trip was paid for online and Marte committed perjury. The Government has no proof that Marte paid for the Aruba trip in cash or reimbursed Ms. Blanco.

The Government and Marte also allege that Marte took Ms. Blanco to Aruba to compensate her for the robbery. The Government nor Marte have any evidence of that being true.

However, Anna Marte travelled to St. Thomas with Marte after her brother robbed the bank and counted the money where she lived and stashed the money in her house. Which Marte testified to. Silveri elected not to further highlight on this matter due to fact Silveri was un prepared for the trial.

The Government also refers to overwhelmingly evidence as an argument which also fails.

Saad Khalil a bank employee who was present during the robbery provided a signed statement turning the lights off on the Government's overwhelming evidence introduced at trial. The only reason the Government was able to introduce such evidence was Ms. Blanco's lawyer Jon Silveri failed to interview witnesses named to him by his client.

The Government also called an expert witness to testify on their behalf. This expert witness had all the paperwork from the trip instead of the method of payment. It makes one ponder on what type of expert witness does not know how an online trip is paid for but works for the company.

Furthermore, the trip was an online vacation package booking over the internet and a cash payment was therefore impossible. I provided Mr. Silveri with the Priceline.com vacation package confirmation, trip number 137-804-043-76, with full itinerary for a five-night stay at the Occidental Grand Aruba all-inclusive hotel, confirmation number 246151255942, reserved under Virginia Blanco, including round-trip flights for both Marte and Blanco, airline confirmation number ZVINDB, with a total package price of $3,206.89 inclusive of hotel, flights, taxes and fees. It strains credibility that the governments expert witness which introduced flight manifest, customs documents and photos of the hotel, did not also have this booking information which proved Marte's "cash" payment was a lie.

What the Government refers to as cherry picked evidence Ms. Blanco shows months of materiel that discredits Marte and the Government's alleged allegations of Marte picking up and dropping off Ms. Blanco's son at school.

The fact that Marte's signature is not on Ms. Blanco's son's sign-in time card for picking up or dropping him off at school and on a separate pre-registration form list of other family members does not authorize Marte to pick up or drop off Ms. Blanco's son. The other family member listed is Yolanda Blanco, Ms. Blanco's mother. The Government has no proof that Marte accompanied Ms. Blanco to pick up her son or drop off her son off at school. Until the Government can show proof that Marte accompanied Ms. Blanco to the school, the Government's argument fails and Ms. Blanco stands with merit. The Government's last hope to win the argument is Marte testimony of himself and Ms. Blanco started to date alleging from 2012 until January 2014 when they broke up.

At trial Marte testified:
Q. So I guess you broke up with her in December of 13, right?
A. Yes. After the trip from Aruba.
(page 241 line 8-10)

Next the Government argues photos of Ms. Blanco and Marte and their children as evidence. The Government claims these photos were taken during the time of the robbery. However, the Government fails to show a date or time on the photos to be able to come to that conclusion or who actually provided the photos to the Government.

Inconsistencies on how the Government obtained the pictures of Ms. Blanco and Marte and their children is an unanswered question. Who provided the pictures to the Government? Was it Jonah Marte or Marylin Marte?

Furthermore, the Government argues without a time stamp or a date stamp on the pictures that the pictures were during the time of the robbery. The only alleged authentic time frame comes from Marte himself during his testimony. Moreover, Marte's mother Marilyn Marte provided private investigator Kenny Davis a Dominican Republic identification card with another name besides hers listed on it (see attached) during an interview stating she gave the pictures to Marte's lawyer. On April 23, 2018, (See attached 3502-BB) in a proffer meeting Giovanni Marte states: There was a room with the files. On April 19, 2018, (see attached 3508-D) in a meeting with the Government Jonah Marte states: photo strip #1 Marte, VB, Adrian, Marte's son, #2 VB, Marte and #3 VB, Adrian, Nathaniel.

The Government must be able to provide a time frame when the pictures were taken, as well the Government has to make clear who provided the pictures to them.

Next the Government argues cell cite and parking tickets to the alleged shared apartment:

Mr. Parra statements contradicts Marte's trial testimony that he lived with Ms. Blanco at 3521 DeKalb Avenue. Mr. Parra's statement also revealed that he was previously interviewed by the FBI and he informed them that Marte did not live with Ms. Blanco.

Marte testified at trial that he lived with Ms. Blanco and her son at the DeKalb Avenue apartment "for over a year" from September 2012 until he moved on in "late December" 2013, and that he stayed in the apartment with the defendant "every night".

Although Ms. Blanco asked Silveri to contact and subpoena Mr. Parra, Silveri did neither because it "would have only reinforced [Marte's] direct testimony and was of limited value." This determination was made without Silveri ever attempting to contact the super of 3521 DeKalb Antonio Parra. (See Silveri's Affirmation) (See Parra Statements dated December 2, 2020)

The Governments May 13, 2019 rule 29 & 33 motion states:

In the weeks leading up to the trial, FBI Special Agent Brendan Kenney and Task Force Officer James Menton travelled to the apartment building in order to search for evidence that either the defendant or Marte lived there during the time of the robbery. During their visit they met with the superintendent of the building.

Government Claim One:

The superintendent did not speak English and neither of the agents speaks Spanish. Through mostly body motions, the agents showed the superintendent photos of both the defendant and Marte, at which point the superintendent indicated that he did not recognize either of the individuals.

Ms. Blanco asked Silveri to interview and subpoena the super of her building, Antonio Parra. Silveri disregarded Ms. Blanco's request and took no action. Silveri who is bilingual would have been able to communicate with Parra. In Parra's statement he states he was never interviewed or subpoenaed by Silveri.

In Parra's December 2, 2020 statement to Mr. Davis Parra states:

I do not know of an attorney by the name Jon Silveri.
I was never contacted by Jon Silveri to testify at Virginia Blanco trial.
I was never interviewed by Jon Silveri.
I never met with Jon Silveri before Virginia Blanco's trial or during Virginia Blanco's trial or after Virginia Blanco's trial.
I never received a subpoena from Jon Silveri.
 If Jon Silveri would have contacted me, I would have testified at Virginia Blanco's trial.

Private investigator Ken Davis was able to elect two signed statements from Parra. Mr. Davis is an African American male, who such as the agents does not speak Spanish.

Therefore, the Governments explanation of the superintendent did not speak English and neither of the agents speaks Spanish falls short.

Furthermore, the Government states:

Through mostly body motions, the agents showed the superintendent photos of both the defendant and Marte, at which point the superintendent indicated that he did not recognize either of the individuals.

In Parra February 28, 2019 statement to Mr. Davis Parra states: I don't know who he is. I told them that she lived with her son and dog.

In Parra's December 2, 2020 statement to Mr. Davis Parra states: The FBI showed me a picture of him and her. I told them I did not know the man in the picture. I told the FBI she lived with her son and dog.

In both statements made by Parra to Mr. Davis, Parra states he knows the lady in the picture and that she lived in the apartment with her son and dog. Parra's story stays the same and Parra story does not contradict itself.

In Parra December 2, 2020 statement to Mr. Davis Parra states:

I am signing a picture of the lady and her son that lived in the apartment.
I am signing a picture of the lady that lived in the apartment dog.
I am signing a picture of the male that I told the FBI the following. I did not know. I never seen him open the front door to the building. I never seen him open the door to the apartment. I never saw him in the area and did not live with her.

The Government alleges the superintendent indicated that he did not recognize either of the individuals. The Government cannot produce any 3500 material to prove this interaction took place as they are alleging. Ms. Blanco on the other hand has two sworn notarized statements from Parra proving he did recognize Ms. Blanco just not by name.

Government Claim Two:

Knowing that the apartment building has many units, and that the superintendent may not have been working there 5 years earlier (when Marte testified that he and the defendant lived there), the agents did not pursue the matter further.

Mr. Parra was in fact the superintendent of the building five (5) years prior. In Parra December 2, 2020 statement to Mr. Davis Parra states:

I am the Super of 3521 Dekalb Avenue.
I was the super when the woman in the picture lived in the apartment with her son and dog.
I was the super of the building before she moved into the apartment.
I am still the super of the building.

The Governments assumption on why the agents did not pursue the matter further is not supported by any proof or facts.

Government Claim Three:

Evidence allegedly linking Marte to the Apartment Building:

(i) cell site data of Marte's phone pinging right near the Apartment Building (GX75)

Police and prosecutors have used cell tower data for years to claim that they can determine a defendant's location because a cell phone was connected to a certain tower at the time. This argument is based on a common misconception of how cell towers work. First, proximity is not the only factor that determines which cell tower your call will go through. The following can also determine the tower your phone used:

- Atmospheric conditions
- Signal strength
- Tower maintenance schedules
- Topography
- Tower capacity

You could make several calls from the same location in a highly populated area and connect through any one of several different towers. Therefore, your call going through a specific tower is not a necessarily a true indication that you were closer to that tower than any other.
In addition, towers can serve areas that span several square miles in an urban area to several hundred square miles in more remote areas. There is no way to pinpoint an individual's precise location simply by knowing what tower facilitated a call.

Cell site evidence showing both of their phones (NEAR) the Bronx apartment on the day of the robbery (GX-75).

The mother of Marte's son Nathaniel Marte lives miles away from were Ms. Blanco's apartment was at in the Bronx.

Virginia Blanco
3521 Dekalb Ave.
Bronx, NY 10467

Yezidel Moronta
1535 Undercliff Ave.
Apt 104
Bronx, NY 10453
D.O.B - 07/1990
Cell Phone 1-646-706-3144

Also, cell tower, maximum Distance.

A typical cellphone has enough power to reach a cell tower up to 45 miles away. Depending on the technology of the cellphone network, the maximum distance may be as low as 22 miles because the signal otherwise takes too long for the highly accurate timing of the cellphone protocol to work reliably. Usually cellphone signals don't reach anywhere near these maximum distances. Typical cell size outside of urban areas means cellphone signals may have to travel up to several miles.

It is hard to believe the Government had another expert witness testify and have only partial information to testify to. First the Governments expert witness for the Aruba trip had all documents except for method of payment and now the Government's cell cite tower expert has all paperwork expect Marte's sons' mothers address.

(ii) Marte's parking tickets outside the Apartment Building, including tickets received at early morning hours (GX 53-A)

The Government cannot establish that Marte was the registered owner or the operator of the vehicle that received the parking tickets.

Q. What car was that?
A. The license plate is FPJ 6311, and it's registered to a 2002 Nissan color blue, four-door.
Q. And Special Agent Sullivan, what can you us about who this car was registered to?
A. The vehicle registration comes back to an Ana Marte.
(Page 302 lines 5-13 Doc 144).

The Governments speculation that Marte was the driver of the vehicle that received the parking tickets is not supported by any proof or solid evidence.
While on direct Marte insinuates he had more than one apartment in the Bronx.

Q. Where did you keep that gun?
A. In one of my apartments in the Bronx.
(Page 120 lines 18-19 Doc 142).

(iii) Marte's testimony regarding his detailed knowledge of the neighborhood (Tr.143:10-145:1; GX 50)

Marte's knowledge of the neighborhood could have been rebutted two ways.

Marte's sons mother lived a short distance in miles away from Ms. Blanco's apartment giving Marte detailed knowledge of the neighborhood.

Yezidel Moronta
1535 Undercliff Ave.
Apt 104
Bronx, NY 10453

Marte's testimony that he had more than one apartment in Bronx would have gave him detailed knowledge of the neighborhood.

Q. Where did you keep that gun?
A. In one of my apartments in the Bronx.
(Page 120 lines 18-19 Doc 142).

The fact that Marte did not have a bank account at the time of the robbery would explain how he could have paid for another apartment with a money order and lived under the radar.

Marte alleges he lived with Ms. Blanco in the Dekalb apartment. However not one family member of Marte's can corroborate Marte living in the Dekalb apartment.

Government meetings with Marte's mother and two siblings Jonah and Sadieli prove they did not know the location nor did they visit the apartment.

They lived together - 2012, he told me lived in Yonkers. Less than 2 years. Oct 2014 end of relationship. (Marilyn Marte)

Lived together, never visited, think Yonkers.
(Sadieli Marte)

VB & Gio started dating - lived together at some point in the Bronx never visited. (3508-C Jonah Marte)

Both siblings Jonah and Sadieli Marte never visited their brother therefore their knowledge of Ms. Blanco and Marte living together has no credibility. Marte's mother and sister state Marte lived in Yonkers not in the Bronx apartment.

Marte's mother states her son and Ms. Blanco's relationship ended in Oct 2014. Marte testified to breaking up with Ms. Blanco in December of 13 After the Aruba trip. Marte's mother states Marte told her he lived in Yonkers not 3521 Dekalb Avenue in the Bronx. Marte testified to himself and Ms. Blanco breaking up in 2013, Marte testified that he lived with his mother for a few weeks after the break up until he got his own apartment.

Marte's mother said Marte and Ms. Blanco broke up in 2014 but Marte testified to breaking up with Ms. Blanco in Dec of 2013 after the Aruba trip and staying with his mom for a week after the break up. Both Marte and his Mother's stories contradict each other. Marte also testified to keeping a firearm in one of his apartments in the Bronx. Marte's testimony was insinuating that he had more then one apartment in the Bronx.

Q. Once you broke up, did you continue to live in your shared apartment on Dekalb Avenue?
A. No. I left, and she stood there with her son.
Q. Where did you go to live?
A. I lived with my mom for a few weeks until I got my own apartment.
Page 201. Doc 142 lines 11-25. Page 202 Doc 142 line 1.

Q. So I guess you broke up with her in December of 13, right?
A. Yes after the trip from Aruba.
Page 241 Doc 142 lines 8-10

While testifying Marte was asked where he kept a particular firearm he responded In one of my apartments in the Bronx. This testimony from Marte indicates he had more than one apartment in the Bronx.

Q. Where did you keep that gun?
A. In one of my apartments in the Bronx.
(Page 120 lines 18-19 Doc 142).

The Government cannot prove Marte provided Ms. Blanco with any monies for a Jeep Grand Cherokee. All the Government has is the alleged word of Marte's. Ms. Blanco on the other hand has and will do so again provided proof where the money for the Jeep Grand Cherokee came from.

At trial Marte testified he gave me a total of $17,000.00. Gave her $7,000 because her car got messed up... and then a few weeks later I gave her $10,000 more. (Document 142; Transcript p. 193, lines 19-24; p. 194, lines 15-18).

In Marte's proffer to the government on January 18, 2017, Marte reported that approximately one month after the robbery he gave me a total of $10,000.00 which I then used to buy a Jeep Grand Cherokee (3502-N p.5).
One month after the robbery would have been November 29, 2013. My Bill of Sale was dated January 31, 2014. This timeline falls completely short of being believable.

Marte testified to breaking up with me in December of 2013. My truck was purchased in January of 2014.

At trial Marte testified:

Q. So I guess you broke up with her in December of 13, right?
A. Yes. After the trip from Aruba.
Page 241-line 8-10 Doc 142.

The bank robbery occurred on October 29, 2013. Approximately one (1) month after the robbery would have been around November 29, 2013. My Bill of Sale was dated January 31, 2014. Approximately one (1) month falls short of being believable. It is more along the time frame of Three (3) months. This is another incomplete time line put together by Marte.

Furthermore, Marte's proffer notes (3502-U) report:

We looked for it together. I left her the money.

Q. So I guess you broke up with her in December of 13, right?
A. Yes. After the trip from Aruba.
(TT 241 Doc. 142)

It's hard to believe that Marte testified at trial that he gave me $7,000.00 because my car got messed up. In Marte's proffer he claims he gave me $10,000.00 which I then used to buy a Jeep Grand Cherokee. In Marte's proffer notes he claims that his self and I looked for the car together but that false short because Marte testified that he and myself broke up in December of 13 after the Aruba trip.

When Marte was asked at trial If he saw me buy the car Marte's testimony was.

Q. Did you actually ever see her buy the car?
A. No.
Q. So all you know is that you gave her the $7,000 for a car?
A. Yes
(TT 193,194 Doc. 142.)

The trial testimony inconsistencies that took place showed that Marte was untrue about giving me proceeds from the robbery to purchase a car.

The different amounts of monies he claims he gave me or left me falls short of being credible. When asked if he ever saw me actually buy the car, Marte answered no. Here Marte testified that he gave me $7,000. In his proffer he gave me $10,000. He testified to not seeing me buy the car. But in his proffer notes he shopped around with me. Marte also testified that he and myself had broken up in December of 2013.

The car was purchased January of 2014. Well after the time Marte testified to. Another set of events took place, after he gave me the $10,000 I then used it to buy a Jeep Grand Cherokee. Marte testified that he actually never saw me buy the car so how would Marte know that I used that $10,000 to buy the Jeep Grand Cherokee?
To sum this whole inconsistency up. Both the government and Silveri had my Bill of Sale ($7,549.37) dated January 31, 2014 (Blanco-000147), the same day my car insurance became effective (Government Ex.55).

Blanco has supporting evidence to support were the funds came from to buy the car. Marte does not have one shred of evidence to support his statements or testimony.

GX 54-A and GX 54-B Con Edison check for the sum of $4,131.76 supports Blanco's defense of were the money actually came from.
Both the government and Silveri had Blanco's Bill of Sale ($7,549.37) dated January 31, 2014 (Blanco-000147), the same day Blanco's car insurance became effective (Government Ex.55) (GX 54-A and GX 54-B) Con Edison check for the sum of $4,131.76.

This is another argument by the Government that fails to move the needle.

The Government argues that the "insider" is proven by the fact the robbers knew the location of the cash vault and that a manager was needed to open it. An employee of Wells Fargo Saad Khalil who worked during the robbery whom Ms. Blanco asked her trial attorney Jon Silveri to subpoena and interview but Silveri didn't write a signed notarized statement contradicting the Government's theory as well as Marte's of Ms. Blanco being the inside person.

It wasn't Marte's nerves and adrenaline that had him confused on the day of the robbery, it was Marte's lack of knowledge of the layout and procedures of the bank. These are things Marte and the Government allege Ms. Blanco provide.

On October 29, 2013, the day of the robbery, bank manager Indhira Maldonado was interviewed:

FBI: Maldonado believes that UM's had to have been in the bank previously because they went straight to the vault. From the teller counter, customers could see the room that houses the vault and see employees going in and out to get money. (3514-A p. 5).

Marte and Martinez both confirmed they had been in the bank on multiple occasions, the "scouting" Cruz spoke of in his videotaped interview that was never shown to Ms. Blanco by Silveri.

Marte went into the bank and changed out $20 for quarters to look around. (Marte3502-N)

On a separate day, Marte and Martinez traveled to the bank and Martinez entered the bank and changed out quarters to look around the inside of the bank and feel comfortable. (Marte3502-N)

Martinez went inside to change some quarters at the teller counter and to check out the inside. (Martinez3503-V)

Both Marte and Martinez went into the bank to exchange quarters to look around. (See 3502-V & 3502-N). As Maldonado statement states (See Maldonado Fd-302). UM had to have been in the bank before. As well Maldonado (Fd-302) statement states from the teller counter, customers could see the room that houses the vault and see employees going in and out to get money.

Marte's only inside knowledge was when he himself was inside the bank to exchange $20 for quarters and he saw employees exiting a room with and without money.

Marte enters the bank and jumps the teller counter and goes to the room adjacent to the vault. Not inside. All Marte could see from the teller line was the door adjacent to the vault, not the vault itself.

Marte claims Ms. Blanco told him the location of the vault, how to access the vault and what the manager looks like.

Saad Khalil's statement contradicts and discredits Marte's testimony and proffer notes of Ms. Blanco providing inside information.

Marte Testimony:

Q. And where did you go next?
A. Three of the people working there ran into the vault room. I ran after them. Took two of them out, sent them to Jeff, and I throw one of the women that was working there.
(Page 183 lines 17-20 Doc 142.)

Saad Khalil: I observed a male jump over the teller counter. The male had a revolver in his hand. He then told me and my coworkers to stop what we were doing. He pointed the revolver at me and told me to take him to the vault.

Q. What happened?
A. I knew we weren't going to be able to open it because Virginia told me we needed a manager, but I was so nervous, my adrenaline was going so fast, but then once I came back to my senses, I walked towards the door, towards the entrance of the room to make sure I will get the manager, but Jeff already knew how he looked like because I told him, so Jeff had him in his possession, and he was walking my way.
(Page 184 lines 5-11 Doc 142.)

Saad Khalil: I explained to him, I do not have access to the vault. To open the vault a key and a combination is needed. A coworker told him he had the keys to the vault, but he needed the combination from a manager to open the vault. He then pushed me out of the vault and told me to get a manager. I remember screaming for a manager. I told one of the other robbers that was in the lobby that I needed Mark the manager. Mark was walked from the lobby to the back counter and Mark walked towards the vault.

Q. Mr. Marte, you testified that the defendant told you about the manager of the bank, and you said somethings about him. If you can once again tell us what she told you about the manager?
A. She told me he was a nice guy. He's dark skinned, a little muscular; that he wasn't someone that was going to try to play hero.
(Page 165 lines 4-10 Doc 142.)

Q. Who, if anyone, did you see in the bank?
A. The manager that she described to me, and a few co-workers that she described to me.
Q. How did the manager appear to you?
A. The description that she told me. He was a little dark-skinned, a little muscular. He was a nice guy.
(Page 169. Lines 6-11 Doc. 142.)

Q. What, if anything, did you observe about the layout of the bank during that visit?
A. I saw where the vault room that she told me was at, everything that she told me - - was there was pretty accurate to what she had told me.
(Page 169. Lines 17-21 Doc. 142.)
Q. Sure. You mentioned that when you visited the bank you went inside the bank, that you were able to see the room where the vault was. What did you actually see?
A. It was an old - - it was just a room and the door was open, but I didn't know the vault was in there only because - - I only knew it was there because Virginia had told me.
(Page 171 lines 14-19 Doc. 142.)

Q. What's the first thing you did when you got into the bank?
A. I jumped over the teller drawer.
Q. Right after you jumped over the counter, did you turn in any specific direction?
A. Yes.
Q. Which direction?
A. Left.
Q. Why did you turn in that direction?
A. Because that's where Virginia told me where the vault room was at, where the vault was at.
(Page 183 lines 6-16 Doc 142.)

Marte's Proffer notes differ from his testimony:

Blanco told Marte the manager can open the vault with a key and a code so the robbery should occur when the manager is there to ensure Marte could get in the vault. 3502-N, during conversations regarding the planning of the robbery, Blanco drew a diagram of the bank for Marte to include exits and the locations of the vault. 3502-N, Marte's job was to jump the counter and get the manager to open the vault. 3502-N, Marte then began looking for the manager who Blanco had described to Marte as a dark-skinned bald guy and saw him. 3502-N, Blanco had told Marte the safe was easy and quick to open and the manager only needed to insert a key and press three numbers. 3502-N, In a room, go to left, on the wall an employee puts a key in it and then he has the combo, he has a key too, employees can't w/o manager just the manager had code. 3502-U, not to tall but than me, not fat/skinny; she said dark skinned cool guy; he'll be quick to open vault. 3502-U, He volunteered to open it - dark skinned, regular guy not skinny/fat. 3502-U, I don't think I asked for a manager. 3502-U, Manager was in the bank on the day Marte changed quarters. 3502-W.

Marte's proffer notes discredits his testimony of Ms. Blanco giving inside information. Silveri failed to expose these inconsistencies to the court.

Marte's proffer notes differ from his testimony. Ms. Blanco supposedly informed Marte who the Manger was and what he looked like however Marte did not utilize any of that alleged information. Marte claims his nerves and adrenaline got the best of his thoughts.

Saad Khalil's notarized statement also reads:

- I do not know of an attorney by the name of Jon Silveri.
- I was never contacted by Jon Silveri to testify at Virginia Blanco's trial.
- I was never interviewed by Jon Silveri
- I never met with Jon Silveri before Virginia Blanco's trial or during Virginia Blanco's trial or after Virginia Blanco's trial.
- I never received a subpoena from Jon Silveri.
- If Jon Silveri would have contacted me, I would have testified at Virginia Blanco's trial.

On September 26, 2018, The Honorable Cathy Seibel stated at a court conference the following:
But it is troubling if, as Ms. Blanco claims, Mr. Silveri didn't make any effort to speak to witnesses or determine if there were any ultimate suspects who might have been worth bringing up at the trial. But whether it's true that Mr. Silveri did nothing to prepare and didn't do any investigation will have to await another stage of the case. (Transcript, 09/26/18 Court Conference, p11 lines 10-15) Court.

Saad Khalil statement proves Ms. Blanco's attorney Jon Silveri did not interview witnesses named to him by his client Virginia Blanco. These witnesses were ready and willing and able to testify.

The Government now back peddles away from Maldonado's inconsistencies and claims they were arguing the following:

THE ARGUMENT:

The schedule of cash deliveries was available to bank tellers.

Either way the Government's argument has no value and Ms. Blanco stands on higher ground.

Trial testimony from Urena proving Ms. Blanco did not have knowledge of a cash shipment.

Ms. Urena would log into her computer and into the iCom system to be able to ship out and order money. Ms. Urena testified she had her own code for that and no one else had codes to do this. Once the order was completed Urena did not announce to the tellers she placed an order. Urena testified to never seeing Ms. Blanco looking over her shoulder or in the book.

Furthermore, testimony from Urena states a teller would know when money is being delivered because they would see the Garda truck delivering cash. Ms. Blanco did not work the day of the delivery therefore that leaves Ms. Blanco without knowledge.

Q. Do tellers know when an actual delivery of cash has been made to the bank?
A. Yes.
Q. How would they know that?
A. They will see our - - the Garda delivering the cash.
(TT 142 p. 71,72.)

The fact proven that Blanco was not scheduled to work the day the armed truck came on October 28, 2013 will show that she was not eligible to see the Garda truck delivering the cash. Therefore, Blanco would not have knowledge of the delivery.

Urena/Maldonado's trial testimony inconsistencies are exposed again from notes during a phone call on March 27, 2018.

Q. What, if anything, did you hear the robbers say?
A. They said it was a robbery. The one that stayed in the lobby instructed us to get on the floor and stay on the floor, and the other two that were behind, I couldn't hear much of what they were saying, but the one that was in the lobby kept rushing the other two robbers telling them to hurry up because he was going to kill one of us, and that they were going to get caught by the police.
Doc142. P.51 lines 16-23.

The Government's witness Indhira Maldonado on March 27, 2018, on a phone call with Brendan Kenney, Jay McMahon, Sam Adelsberg and Jamie Bagliebter stated she heard:

3 men w/ masks, being on the floor and requesting who the managers were.

Q. Do you recall who was asking for a manager?
A. No.
Doc. 142. Page 52. Lines 6-7

AUSA's Jay McMahon, Sam Adelsberg and Jamie Bagliebter were aware that Maldonado did hear the robbers ask who the manager was as well the AUSA's were aware of Maldonado knowing it was the robbers asking for a manager but allowed Maldonado to answer untruthfully.

Maldonado as heard:

The tellers in the back told him that need the manager.

After the verdict, Ms. Blanco learned from Mr. Lewis that the Government provided Mr. Silveri with a disc of immense discovery materials on May 3, 2018. This was after Mr. Burke had left and Silveri had filled his notice of appearance on May 1, 2018. The first time Ms. Blanco ever saw those materials was when Mr. Lewis showed them to her at the Westchester County Jail. Maldonado's March 27, 2018 phone interview was on that disc.

1.The Government argues the truthfulness of Jeffrey Martinez testimony. Multiple examples prove his testimony to be untruthful.

On direct Jeffery Martinez was asked by Ms. Bagliebter the following:

Q. Have you ever been arrested?
A. Yes.
Q. How many times?
A. Once.
Q. When?
A. 2015.
Doc 144. Page. 327.

Jeffery Martinez 3503-B, proves Martinez was arrested ten times.

On page one (1) of Jeffrey Martinez personal history of defendant form (USM-312) the AUSA assigned is Zolkind. On page four (4) Jefferey Martinez prior arrests: NYPD 03/13/15 CPW 4, NYPD 03/11/10 TO3 and NYPD 04/03/10 Burglary.

2. Jeffrey Martinez testimony inconsistencies about the return of the firearms used for the robbery. Martinez co - conspirator Andres Cruz stating Martinez sold the firearm in Brooklyn. Jeffrey Martinez never testified to selling a firearm and never disclosed it in his proffer meetings.

Martinez returned both guns that were used in the robbery. He gave the 9mm back to his cousin Fernandez with $500 for letting him use it. He also gave the revolver back to Metra, but found out later that it was sold. (Martinez 3502-V).

On June 14, 2016 in a FD-302 statement Cruz stated:

Approximately one to three days after the robbery, Martinez brought the revolver used in the bank robbery to Cruz' house. Martinez said he was scared to keep the gun at Martinez' house in case he was identified because Martinez, unlike Cruz, had entered the bank during the robbery. Cruz kept the gun for a few days then Martinez took the gun back and said he was going to sell the gun. Martinez later told Cruz he sold the gun in Brooklyn. Martinez never said anything to Cruz about the second gun used in the robbery. (June 14, 2016 FD-302 Cruz)

3. Jeffrey Martinez told a confidential informant about a home invasion he did on the evening of March 20, 2016 in New Jersey. Martinez did not testify about the home invasion nor did Martinez disclose it during his proffer meetings.

Q. Have you ever stolen money from someone other than a drug customer?
A. No
Q. When you would steal money - - sorry. Other than the bank robbery, have you ever stolen money from someone other than a drug customer?
A. No.
Lines 3-9 doc144. Page 325.

3503-DDD Jeffrey Martinez told CHS that Martinez committed a home invasion robbery on the evening of March 20, 2016 in New Jersey. Martinez stole the money that was owed to him and additional money.

4. When asked about the recruitment of Andres Cruz Jefferey Martinez testified he only tried to recruit him on the day of the robbery. Marte's Proffer and testimony as well as Cruz's June 15, 2016 FD-302 prove Martinez testimony was false.

Q. Okay. So, did you ever try to recruit Andres Cruz?
A. The day of the robbery.
Q. So, the first time you guys tried to get Andres Cruz to join the robbery was the day of the robbery?
A. Yes.
(TT 144 P. 115) Martinez

On January 18, 2017 Giovanny Marte's proffer 3502-N. Marte wanted to recruit three to five others in total to commit the robbery to include a driver and others to watch the exits and the offices in the bank while Marte dealt with the bank employees and the vault. Approximately four to six weeks before the robbery, Marte asked Martinez to find someone and Martinez recruited Andres aka 50 (known to the FBI as Andres Cruz and hereinafter referred to as Cruz). Martinez said Cruz agreed to drive. Martinez told Cruz it was a robbery of a cashier, not a bank.

Q. Other than Jeff, who was originally recruited to rob the bank?
A. Some guy named Tito and Fifty.
(TT 142 P. 174) Marte.
Q. And at that point who was driving the car?
A. Fifty
(TT 142. P. 181)

On the day before the bank robbery, Cruz received a telephone call from Jeffrey Martinez. Martinez asked Cruz where he was located and arranged to meet Cruz. Cruz then met Gio (known to the FBI as Giovanny Marte) and Martinez on the street in Washington Heights. Marte and Martinez were in a Nissan, the same car that was used during the robbery the following day, and asked Cruz to get in the car. Marte was driving the car. Marte and Martinez told Cruz they wanted Cruz they wanted Cruz to drive for a bank robbery. Marte and Martinez said they had another person who was supposed to act as the driver but that person backed out.

Talked to 50 before the robbery - said he was going to do it 50 offered to be driver before. Page 1. 3503-FFF.

On March 29, 2016, Jeffrey Martinez was arrested and interviewed by the FBI. Jeffery Martinez was advised of his rights and voluntary declined council to be present during this interview and willingly signed a Miranda waiver. (See Fed-395 form 3503-T)

During this interview Jeffrey Martinez was shown a photo array of suspects. Martinez I'd and noted photo 23 out of 35 being Gio. Martinez I'd and noted photo 12 out of 35 being Cruz, 50, Andres. Martinez id photo 31 out of 35 looks like Trouble. (see 3503-U)

Jeffrey Martinez "DID NOT" identify photo 6 out of 35 as Virginia Blanco or acknowledge the fact that he knew her from Ellwood or being Gio's girl.

Ten (10) days later, On April 8, 2016 Jeffrey Martinez states #2 is the girl from Ellwood, known to be Gio's girl. (See 3503-W)

POINT 1.

Mr. Adelsberg on direct with Giovanni Marte.

Q. When you spoke to Jeff about the robbery, what, if any, information did you give him about the bank?
A. I told him most of the information that I knew, but I told that my boy, my friend was the manager inside the bank. I didn't tell him that it was Virginia giving me all of the information, and that she was working there.
Q. Did you actually know the manager of the bank?
A. No.
Q. So why did you tell him that?
A. So that he could feel safer and more comfortable, and they knew Virginia. He knew Virginia so at the time I was dating her. I didn't want to expose her or have her - - or for her to be suspicious, for them to be suspicious about anything, and I just wanted to protect her.
Q. So you didn't tell him the defendant gave you the information about the bank?
A. No. I told him that was my boy that was the manager at the bank.
Q. How does Jeff know the defendant?
A. We all grew up in the same neighborhood.
(Doc 142. P.172 lines 6-25)

(and they knew Virginia. He knew Virginia so at the time I was dating her. We all grew up in the same neighborhood).

Q. And what did you and Jeff do to prepare for the robbery?

A. We spoke about it a few times I did the same thing that I did with Virginia. I drove in my car. I waited for him in the parking lot. He went in, got $20 in quarters, and got a view of how the bank looks in the inside.

Q. And when did you do the visit?

A. A few weeks before the robbery.

Q. And was there a reason why you chose that day?

A. Yes.

Q. What was the reason?

A. Because Virginia either came out of work early that day or didn't work at all that day.

Q. And why did you go at a time when you knew the defendant wouldn't be there?

A. Because I know that Jeff knows Virginia. I didn't want him to - - he would have recognized her. I didn't want to expose her.

(Doc.142 p. 173 lines 5-23)

(Because I know that Jeff knows Virginia. I didn't want him to - - he would have recognized her).

Q. Why did you tell them that a manager gave you the information?

A. So they could feel better and safer about the robbery, and I didn't want to tell them it was Virginia because they all knew her.

(Doc. 142 p.175 lines 3-7)

(and I didn't want to tell them it was Virginia because they all knew her).

Q. Why didn't you want the defendant to be there during the robbery?

A. Because I was dating her at the time, and I didn't want to expose her and could have been pretty dangerous.

Q. So you wanted to protect her?

A. Yes.

(Doc 142. P. 176 lines 6-11)

Mr. Silveri on cross examination with Giovanni Marte.

Q. And I think you told us also that you told the other guys involved in the robbery that you had an inside man, correct?

A. I told them that my friend, a guy was the manager in the bank.

Q. And you did that to protect Ms. Blanco?

A. Yes.

Q. And you were the one that decided that Ms. Blanco shouldn't be in the bank when this happened?

A. No. We both decided it because it could have been pretty dangerous, and the guy that did the robbery with us knew her, so I didn't want to expose her or.

(Doc 142. P.245 lines 11-22)

(and the guy that did the robbery with us knew her).

Ms. Bagliebter on direct with Jeffery Martinez

Q. How do you know the defendant?
A. I have seen her around in my neighborhood.
Q. How long have you known her?
A. I have known her for a few years.
Q. What, if anything, do you know about her family?
A. I know - - I know her step - - her baby father is. I see her son around a lot, and I - - Giovanny used to - - was her boyfriend.
Q. Do you know her baby's father's name?
A. I know him as his alias name.
Q. What is that?
A. Smiley.
Q. You testified that you knew that the defendant was Gio's girlfriend. How do you know that?
A. I used to see him a lot around her son. I used to see her with the same kid, so I automatically assumed that was like they were going out, boyfriend and girlfriend.
Q. Just one moment. Where did you see Gio and the defendant's son together?
A. My neighborhood, parks, I see him walking around, barber shops.
(Doc.144 p.98 lines 13-25. P.99 lines 1-9)

(I have seen her around in my neighborhood, I have known her for a few years, I know - - I know her step - - her baby father is. I see her son around a lot, and I - - Giovanny used to - - was her boyfriend, I know him as his alias name, Smiley, I used to see him a lot around her son. I used to see her with the same kid, so I automatically assumed that was like they were going out, boyfriend and girlfriend, my neighborhood, parks, I see him walking around, barber shops.)

The Government does not comprehend. In layman's terms Ms. Blanco is arguing the fact that Jeffrey Martinez not being credible.

Ms. Bagliebter and Mr. Adelsberg knew Martinez testimony was based on occasions prior to the bank robbery that he allegedly remembered however Martinez could not pick out Ms. Blanco in the lineup but could remember detailed things pertaining to Ms. Blanco's personal life.

Number five of Jon Silveri affirmation:

I reviewed the discovery carefully.

That is hard to believe, giving Silveri the benefit of the doubt he would have been able to pick up on inconsistencies that took place. Silveri shows how incompetent he is too many times here.

In a proffer meeting with Andres Cruz, Cruz does not remember meeting her and never saw VB & GM together.

Therefore, that contradicts the Government's assumption of Ms. Blanco associating with another gang member, drug dealer and bank robber.

While discussing the robbery with Cruz, Marte and Martinez stated:

On June 15, 2016 Cruz FD-302:

Martinez and the fourth person were supposed to take care of the guard and lock both doors while Marte stole the money.

On July 1, 2016 FD-302 Cruz:

When Gio was explaining what everyone's job was during the robbery he told Jefferey Martinez to "take the guard down."

Q. Did the Odell branch have in - person security guards in October of 2013?
A. No.
Doc. 142 page 70, lines 9-11. (Maldonado)

There weren't any security guards.
Doc. 142 page162, Line 8 (Marte)

Marte alleges Ms. Blanco told him there was no security guard at the bank. However, during an interview with Cruz he says Marte told himself and Martinez that Martinez and a fourth guys job was to take out the guard.

This was verbally communicated to Cruz twice by Marte in front of Martinez. Testimony from Urena/Maldonado and Marte himself state there wasn't a security guard working.

Another discredit in Marte's allegations of Ms. Blanco to be a person of the insider and shows Marte to be untruthful.

In a recorded conversation with the FBI Cruz states Marte knew where the guard was:

On May 11, 2016 relevant portions of the FBI interview with Cruz after his Arrest in West Virginia reveal the following:

9:32:14 a.m.

Cruz: He explained it to us and broke it down.

FBI: (Special Agent Kenny): What did he say?

Cruz: He had been scouting the place for about a year or so and he knew like where the guard was and what not and it had been robbed before because the highway is right there, so it makes it an easy target. So, he had told me he scouted the place all around and he knew where all the cameras were and I just had to pop this U-turn up the hill and wait for him in front of the bank.

FBI: How did he know when the guard was working and all that stuff?

Cruz: He said he was scouting, ah, scouting it for a year.

The Government was well aware that the bank did not have a guard prior to Marte's testimony. However, the Government still allowed Marte to testify in front of the court as if he learned this inside information from Ms. Blanco. This left an impression on the jury that Ms. Blanco in fact did provide Marte with this misinterpreted information.

On June 15, 2016 Cruz FD-302 Page 3:

Cruz could hear someone telling Marte they did not have the combination and Cruz then heard a gunshot.

Over a phone conversation with Marte during the robbery Cruz could hear Saad Khalil explaining to Marte that he did not have the combination to the safe.

The importance to call Saad Khalil as a witness for the defense was a must. However, despite his clients request Silveri took no action and built no defense.

Saad Khalil explained to the bank robber he did not have access to the vault a key and a combination is needed.

Something that Marte said Ms. Blanco allegedly informed him of.

On page 30, footnote 5 of the Government's 2255 reply the Government stated they are unclear on a different Wells Fargo robbery and how it is an ineffective assistance of council claim. Ms. Blanco is not alleging it is an ineffective assistance of council claim.

Giovanni Marte informed Jeffrey Martinez and Andres Cruz how the bank was robbed a year prior. Both Martinez and Cruz give a similar pattern from the other bank robbery to the Odell Avenue one. Then on August 2, 2018, in Rowy Vazquez FD-302 he tells a confidential informant that he robbed three additional banks and never got caught.

In an interview with Cruz at 10:00:21 a.m., Cruz explains why G aka Giovanni Marte picked that bank to rob.

FBI: Did G, Did G, say why he picked that bank?

Cruz: Just because it had been robbed before, the highway was right there so all we had to do is get on the highway and soon as we get out of Yonkers it's no longer their jurisdiction.

In a recording by a confidential informant provided to the FBI, Martinez was recorded describing the bank robbery Martinez speaks on the same robbery:

CHS: Hey, how you guys got into that? Y'all just guessed it? Or you had somebody inside?

JM: Nah, so my mans was the one, that, he, he was, he had somebody in there. He was just lying to the other two niggas. Talking about how he, how he had like somebody still working there. We just had somebody who worked there before. You know and she was there when it got robbed once. Last time they robbed it bro, the nigga, the nigga, started (U/I) and all he did was pass a note to the lady.

This was the same way the Lockwood robbery took place.

On April 4, 2018. Marte 3502 -V:

Marte also admitted to the bank being robbed a few years before.

Robbery there a few years before.

However, the Wells Fargo Odell Avenue Bank was not robbed a few years before. The branch on Lockwood Avenue was.

Georgette Rabadi's 3504-B: 13 years ago, same bank been through before. See the attached Yonkers Police Department Incident Report number 55986 robbery date May 12, 2000. Exactly thirteen (13) years.

What Wells Fargo bank was robbed and fits the time line and the pattern described by Cruz and Martinez is the Wells Fargo bank located on Lockwood Avenue in Yonkers.

The pattern description giving by Marte to his codefendants matches the same way the Odell Avenue bank was robbed.

At a September 26, 2018 court conference Judge Seibel stated:

But it is troubling if, as Ms. Blanco claims, Mr. Silveri didn't make any effort to speak to witnesses or determine if there were any ultimate suspects who might have been worth bringing up at the trial. But whether it's true that Mr. Silveri did nothing to prepare and didn't do any investigation will have to await another stage of the case. (Transcript, 09/26/18 Court Conference, p11 lines 10-15) Court.

Not one of the witnesses below Carlos Raposo, Saad Khalil, Antonio Parra, Kristian Quindongo, Ellianne Gallardo, Bryant Martinez were subpoenaed or interviewed by trial council, Jon Silveri. The witnesses' names were provided to the district court to be read to the jury on the first day of jury selection. Trial council, Jon Silveri provided an affirmation to the government in support of their opposition to Ms. Blanco's claim of deficient representation. Most salient to that affirmation is Jon Silveri does not contest that he never subpoenaed or even interviewed witnesses named to him by Ms. Blanco.

Ms. Blanco however has proven through several notarized statements Ms. Blanco's trial attorney Jon Silveri did not make any effort to speak to witnesses or determine if there were any ultimate suspects who might have been worth bringing up at the trial.

This proven fact that Mr. Silveri didn't do anything to prepare and didn't do anything to investigation witnesses asked by Ms. Blanco's should not have to await another stage of the case.
While trial counsel is entitled to make strategic decisions not to call witnesses, to do so without knowing what they could testify to demonstrate not strategy but deficient representation.

In conclusion, for the reasons stated above, defendant respectfully requests to be heard on these arguments and that this Court vacate her sentence and schedule a resentencing hearing.

VB 01/17/22