Hon. Cathy Seibel
United States District Court Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Virginia Blanco 79564-054
33 1/2 Pembroke Rd
Danbury, CT 06811

January 18, 2022

Re: U.S.A v. Blanco
16 Cr. 408 (CS)
28 U.S.C. § 2255

Dear Judge Seibel,

Virginia Blanco, pursuant to Rule 7 of the Federal Rules Governing Section 2255 Proceedings,
respectfully requests that the record herein be expanded to include each item of authenticated
evidence set forth in Ms. Blanco's reply to the Governments response.

GIOVANNI MARTE:
On several occasions in the Government's reply the Government revers to Marte's testimony as
inconsistencies. What the Government alleges are inconsistencies Ms. Blanco can prove are
subornation of perjury.

The claims are instances when Assistant United States Attorney's Samuel S. Adelsberg and Jamie E.
Bagliebter allowed two cooperating Government witnesses Giovanni Marte and Jeffrey Martinez to
commit subornation of Perjury; (2) instances when Assistant United States Attorney's Samuel S.
Adelsberg, Jamie E. Bagliebter and Douglas Zolkind were present during Giovanni Marte proffer
meetings; (3) instances when Assistant United States Attorney Douglas Zolkind were present during
Jeffrey Martinez proffer meeting;(4) instances when Assistant United States Attorney's Samuel S.
Adelsberg, Jamie E. Bagliebter and Douglas Zolkind had prior knowledge of proffered materiel; (5)
instances when Assistant United States Attorney's Samuel S. Adelsberg, Jamie E. Bagliebter and
Douglas Zolkind used perjured testimony in the Governments rule 29 and rule 32 motions; (6)
instances when Assistant United States Attorney's Samuel S. Adelsberg, Jamie E. Bagliebter and
Douglas Zolkind used perjured testimony in the Governments appeal; (7) instances when United
States Attorney Geoffrey S. Berman signed and dated and submitted the Governments rule 29 and
rule 32 motion with perjured testimony arguments for Government grounds; (8) instances when
Assistant United States Attorney's Samuel S. Adelsberg and Jamie E. Bagliebter used perjured
testimony in the Governments 28 U.S.C. § 2255 reply.

The Government was aware or should have been aware or should have known of Marte and
Martinez testimony was perjured due to the fact they were present in the majority of both their
proffer meetings and through 3500 materiel.

Furthermore, the Government claims Marte testified at length about his involvement in drug dealing, shootouts and gun possession. Ms. Blanco also wishes to expand the record to prove the Governments claim to be false.

The Claim of shootouts is untruthful:

On June 29, 2018, during Marte's 3502-PP witness prep:

The initials S.A and J.B in the top right corner are abbreviations for AUSA Sam Adelsberg and AUSA Jamie Bagliebter. Proving both AUSA's Adelsberg and Bagliebter were present during this meeting.

In this prep meeting Marte alleges:

Committed a shootout w/ Smiley B/C they broke his car window. (see attachment 3502 -PP. page 1)

However, while testifying Marte states:

Q. You testified earlier that you were involved in three shootouts. When were these shootouts?
A. One was in 2008. One was in 2009. The last one was in 2013.
Q. And who was involved in these shootouts?
A. Just the Tito and some other guys that I grew up with.
A. Did you ever have a shootout against anyone other than the Trinitarios gang?
A. No
Lines 11-19 page 123 Doc.142.

On June 5, 2018, during Marte's 3502-MM witness prep the initials S.A and J.B in the top right corner are abbreviations for AUSA Sam Adelsberg and AUSA Jamie Bagliebter. Proving both AUSA's Adelsberg and Bagliebter were present during this meeting.

Marte admits in the meeting to only being in:

3 shootouts w/ Trinitarios.
3502-MM

The claim of gun possession is untruthful:

Q. Did you ever try to sell a gun for $850?
A. Can you repeat that?
Q. Did you ever try to sell any guns?
A. I don't sell guns.
Lines 17-20 page 246 Doc 142.

On August 12, 2015, a FD-302 interview with a confidential informant states:

Gio (known to the FBI as Giovanny Marte) offered to sell (redacted) a firearm for $850.

The Claim of drug dealing is untruthful:
The Government could not establish a solid timeline or produce any evidence or a single witness to corroborate Marte's alleged drug operation outside of 90 Ellwood with Carlos Raposo.

Everyone that was implicate by Marte in that alleged drug operation and who Marte allegedly split proceeds with in the alleged drug operation was arrested except Marte. (See 3502-pp spot got raided so they shut it down) (See 3502-pp first fight over a spot Ellwood & 96).

It has been established that the Government nor Ms. Blanco's attorney Jon Silveri interviewed Carlos Raposo or anyone else to corroborate or discredited Marte's allegations.

In Marte's 3502-R proffer on Page five (5) Marte alleges he had another drug operation in the year of 2014 until 2016:

Worked with Jonathan Santos from 2014-16 ish.
Shared product- pills, coke, weed.
Shared customers.
Ivan Brea AkA Tito - also part of partner.
Everyone had own business, but helped e/o out.
Had weed spot on Ellwood
also pills, coke.
Had spot about 2014-16.
Hundreds of customers.

However, Marte's 3502-PP proffer notes states: "Only spot that GM had."

The only spot referring to the spot with Raposo. Now another drug spot with Jonathan Santos and Ivan Brea.

In that time frame both Jonathan Santos and Ivan Brea were arrested for narcotics except Marte.

New York City Police Department Police Reports for Jonathan Santos states he was arrested On February 3, 2016 for PL 220.16 01 criminal possession of a controlled substance with intent to sell 3rd degree, 2221.20 criminal possession of marijuana -3rd: 8oz.
(See attachment)

Department of Corrections and Community Supervision show. Jonathan Santos D.O.B 06/16/86 AKA Bodie with a Department Identification Number 16-R-2725.
(See attachment)

In a June 25, 2021 letter from the Government to the sentencing Judge regarding Ivan Brea AKA Tito:

In 2014, Brea was was convicted of criminal sale of a controlled substance in the third degree and sentenced to 18 months' imprisonment. PSR 41. He violated his parole a second time in 2016.
(See attachment)

Department of Corrections and Community Supervision show. Ivan Brea D.O.B 02/13/91 AKA Tito was incarcerated at Hale Creek Asactc. Department Identification Number 14-R-1707. With a CDR to parole 06/19/15.
(See attachment)

To reiterate Ms. Blanco's argument, of Marte claiming he was in a drug distribution with Raposo, but wasn't arrested with others as he named, is the same uncorroborated allegation here.

Department of Corrections and Community Supervision Records for Carlos Raposo shows that Carlos Raposo had a DIN # (Department Identification Number) of 12–A-3783 and Anthony DeLeon had a 11-R-3508 DIN number.

Trial testimony inconsistencies from Marte on his drug dealing in the years of 2014-2016 stating he did not work with anyone in that time frame.

Q. And by the way, did you have anybody working for you in 2014 or were an independent?
A. No. I was always independent.
Page 212 lines 8-10 Doc 142.

Q. And you weren't working for anyone either, correct?
A. Which drug?
Q. Cocaine
A. No
Q. And you had no one working for you either, right?
A. No.
Page 212,213 lines 19-25, line 1 Doc 142

Q. Before you were arrested in May of 2016, while you were doing the Herbal Life you were still selling drugs, correct?
A. Yes, but not as much.
Q. And that drug at the time in 2016 was?
A. Cocaine, pills, marijuana.
Page 223 lines 8-13 Doc 142.

The question remains the same and unanswered by the government an Mr. Adelsberg:

On July 3, 2018 at final Pretrial what research was Mr. Adelsberg referring to?

Ms. Blanco has provided proof that discredits Marte and the Government's allegations. Marte nor the Government can produce one single piece of evidence or any witness to corroborate what Marte is alleging.

In conclusion the Government argues photos of Ms. Blanco and Marte and there children as evidence. The Government claims these photos were taken during the time of the robbery. However, the Government fails to show a date or time on the photos to be able to come to that conclusion or who actually provided the photos to the Government.

Inconsistencies on how the Government obtained the pictures of Ms. Blanco and Marte and their children is a un answered question. Who provided the pictures to the Government was it Jonah Marte or Marylin Marte? Furthermore, the Government argues without a time stamp or a date stamp on the pictures that the pictures were during the time of the robbery. The only alleged authentic time frame comes from Marte himself during his testimony. Moreover Marte's mother Marilyn Marte provided private investigator Kenny Davis a Dominican republic identification card with another name besides hers (see attached) listed on it during a interview stating she gave the pictures to Marte's lawyer. On April 23, 2018 (See attached 3502-BB) in a proffer meeting Giovanni Marte states: There was a room with the files. On April 19, 2018 (see attached 3508-D) in a meeting with the Government Jonah Marte states: photo strip #1 Marte, VB, Adrian, Marte's son, #2 VB, Marte and #3 VB, Adrian, Nathaniel.

The Government must be able to provide a time frame when the pictures were taken, as well the Government has to make clear who provided the pictures to them.

Furthermore, another allegation by Marte that was uncorroborated was how Ms. Blanco has a niece when Ms. Blanco's only sister Yokasta Blanco does not have children. Again Mr. Adelsberg what research did you do?

Marte's April 16, 2018 3502-Y proffer note states:
GM gave VB gun in '09 to have her keep it at Ellwood after nieces birthday party.

Ms. Blanco's sister Yokasta Blanco does not have a daughter. In fact, Yokasta Blanco does not have any kids at all. Therefore, Marte's alleged allegations that he gave Ms. Blanco a gun in 2009 and she kept a gun on Ellwood after her niece's birthday party falls short.

On January 10, 2015 and January 19, 2015, Giovanni Marte was arrested for two separate charges of AVO 3rd. (See 3502-S on page three Douglas Zolkind was present)

Please see attached letters dated: October 6, 2021, November 2, 2021 and January 11, 2021.

Marte never disclosed the two arrests to the court.

JEFFREY MARTINEZ:
The Government argues the truthfulness of Jeffrey Martinez testimony. Multiple examples prove his testimony to be untruthful.

1. On direct Jeffery Martinez was asked by Ms. Bagliebter the following:
Q. Have you ever been arrested?
A. Yes.
Q. How many times?
A. Once.
Q. When?
A. 2015.
Doc 144. Page. 327.
Jeffrey Martinez 3503-B, proves Martinez was arrested ten times.

On page one (1) of Jeffrey Martinez personal history of defendant form (USM-312) the AUSA assigned is Zolkind. On page four (4) Jefferey Martinez prior arrests: NYPD 03/13/15 CPW 4, NYPD 03/11/10 TO3 and NYPD 04/03/10 Burglary.

2. Jeffrey Martinez testimony inconsistencies about the return of the firearms used for the robbery. Martinez co - conspirator Andres Cruz stating Martinez sold the firearm in Brooklyn. Jeffrey Martinez never testified to selling a firearm and never disclosed it in his proffer meetings.

Martinez returned both guns that were used in the robbery. He gave the 9mm back to his cousin Fernandez with $500 for letting him use it. He also gave the revolver back to Metra, but found out later that it was sold. (Martinez 3502-V).

On June 14, 2016 in a FD-302 statement Cruz stated:
Approximately one to three days after the robbery, Martinez brought the revolver used in the bank robbery to Cruz' house. Martinez said he was scared to keep the gun at Martinez' house in case he was identified because Martinez, unlike Cruz, had entered the bank during the robbery. Cruz kept the gun for a few days then Martinez took the gun back and said he was going to sell the gun. Martinez later told Cruz he sold the gun in Brooklyn. Martinez never said anything to Cruz about the second gun used in the robbery. (June 14, 2016 FD-302 Cruz)

3. Jeffrey Martinez told a confidential informant about a home invasion he did on the evening of March 20, 2016 in New Jersey. Martinez did not testify about the home invasion nor did Martinez disclose it during his proffer meetings.

Q. Have you ever stolen money from someone other than a drug customer?
A. No
Q. When you would steal money - - sorry. Other than the bank robbery, have you ever stolen money from someone other than a drug customer?
A. No.
Lines 3-9 doc144. Page 325.

3503-DDD Jeffrey Martinez told CHS that Martinez committed a home invasion robbery on the evening of March 20, 2016 in New Jersey. Martinez stole the money that was owed to him and additional money.

4.When asked about the recruitment of Andres Cruz Jefferey Martinez testified he only tried to recruit him on the day of the robbery. Marte's Proffer and testimony as well as Cruz's June 15, 2016 FD-302 prove Martinez testimony was false.

Q. Okay. So, did you ever try to recruit Andres Cruz?
A. The day of the robbery.
Q. So the first time you guys tried to get Andres Cruz to join the robbery was the day of the robbery?
A. Yes.
(TT 144 P. 115) Martinez

On January 18, 2017 Giovanny Marte's proffer 3502-N. Marte wanted to recruit three to five others in total to commit the robbery to include a driver and others to watch the exits and the offices in the bank while Marte dealt with the bank employees and the vault. Approximately four to six weeks before the robbery, Marte asked Martinez to find someone and Martinez recruited Andres aka 50 (known to the FBI as Andres Cruz and hereinafter referred to as Cruz). Martinez said Cruz agreed to drive. Martinez told Cruz it was a robbery of a cashier, not a bank.

Q. Other than Jeff, who was originally recruited to rob the bank?
A. Some guy named Tito and Fifty.
(TT 142 P. 174) Marte.
Q. And at that point who was driving the car?
A. Fifty
(TT 142. P. 181)

On the day before the bank robbery, Cruz received a telephone call from Jeffrey Martinez. Martinez asked Cruz where he was located and arranged to meet Cruz. Cruz then met Gio (known to the FBI as Giovanny Marte) and Martinez on the street in Washington Heights. Marte and Martinez were in a Nissan, the same car that was used during the robbery the following day, and asked Cruz to get in the car. Marte was driving the car. Marte and Martinez told Cruz they wanted Cruz they wanted Cruz to drive for a bank robbery. Marte and Martinez said they had another person who was supposed to act as the driver but that person backed out.

Talked to 50 before the robbery - said he was going to do it 50 offered to be driver before. Page 1. 3503-FFF.

The exhibits attached support perjury claims brought forth in Ms. Blanco's 28 U.S.C. § 2255 reply motion. This is in clear violation of Ms. Blanco's sixth and fourteenth amendment rights. Most salient to Ms. Blanco's argument the Government was aware or knew or should have been aware of the perjury. Besides Ms. Blanco's supported perjury claim, Ms. Blanco brings forth an abundance more.

Ms. Blanco respectfully requests the court appoints council and grants this motion and holds a hearing on the above matters.

Respectfully Submitted,

Virginia Blanco

VB 01/17/22

I, Ken Davis, initiated the below investigations, as a private investigator. The following interviewees included Marilyn Marte (Mother of Geovanni Marte, aka GEO) and Bentez Marte (Mother of Marilyn Marte).

**February 19, 2019** At approximately 1300 hours, I responded to 1 Bogardus Place, apt 4L, New York, NY 10040. While there, I showed Marilyn Marte three governmental photographs (#31, #32 and #33). M. Marte related that she obtained these photographs from within her apartment and gave these photos to her son's lawyer (Name unknown at this time/a Cuban Guy). She signed and dated these photographs as additional proof. Note: her identification card (DR-Election) does have a true picture of her, but the name on this identification card is Paula Perez, Hiciano. I included a photo-copy of the DR-Election, along with the signed governmental photographs (#31, #32, and #33).

**March 7, 2019** At approximately 0935 hours; At the request of my client of interest, I sent two emails to Attorney Steven Lewis (slewis@sbrllaw.com). The first email included an attachment of my Curriculum Vitae (CV), The second email included a copy of my NYS private investigator's license (ID# 11000198703).

At approximately 1215 hours; My client of interest advised me to respond to 1 Bogardus Place to re-interview Marilyn Marte at apt 4L. This time I responded with a Hispanic translator (Carmen Lopez). Her duties were just to translate. While there we met with Bentez Marte, the mother of M. Marte. She related that M. Marte will not be back until 6PM. At 19:45 hours, on this same day, we (C. Lopez and I) responded back to the above location. A woman answered at the door after our continuous knocking. She did not open it and asked who is it. We were not sure if it was Marilyn Marte (Mother of Geovanni Marte, aka GEO) or Bentez Marte (Mother of Marilyn Marte). After identifying ourselves, the television was turn off. In response to this suspicious activity, I eventually called this number (1.347.630.6115) and left a message. We, C. Lopez and I, waited at this door (apt 4L) for approximately 5-10 minutes. In which still, no one answered the door. So, we left.

SUBSCRIBED & SWORN BEFORE ME
27 DAY OF _____ 20 __

_____
NOTARY PUBLIC SIGNATURE

Mark Hynes
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HY6264530
Qualified in Westchester County
Commission Expires    October 17, 2024



GOVERNMENT
EXHIBIT
31
16 Cr. 408 (CS)

PP 2/19/19 1.16 pm









**GOVERNMENT
EXHIBIT
32**
16 Cr. 408 (CS)

PP 2/19/19 1/16 pm









**GOVERNMENT EXHIBIT**

**33**

16 Cr. 408 (CS)

PP 2/19/19 116 pm



3502-Y

BK
Jm
SA

Meeting Morse   2/16

- GM gave VB gun in '09 to have her
  keep it at Ellwood after niece's birthday party
- Night of robbery Mark & VB went to
  apt & celebrated together (beer, sex, etc)

**3502-BB**

JM  BK  SA

Meeting w/ Marie  4/23/18
- First time GM just told Johan
  that he robbed the bank
- Second time, a few days later
  GM told Johan that VB was involved
- There was a room with the files
- Remember his name w/ gun
- Told Gov about more than 20
  other criminals

Shannon Becker
Samuel Adelsberg
Jamie Bagliebter
Jay McMahon

Meeting w/ Johan___                                  4/19/18

Gio would take care of VB's son
   the sons were close

Photo Strip #1 → Marte, VB, Adnan, Marte's son
        #2 → VB + Marte
        #3 → VB, Adnan, Nathaniel

First talk w/ Gio → bank robbery, Johan pulling it out
Later told me VB worked at Bank
     put it together and asked
       ↳ probably w/in a month

Knew he was into crim activity but surprised he did this

Knew Jeffrey + 50

Found out about VB couple months later

2nd mtg → who else was involved

**3508-D**

*J.M.   4-19-18*

 9:07

‹ Search                    Edit



# Giovanny Marte

                            

message        call        WhatsApp                        pay

**mobile**
(347) 734-6780

Send Message

Share Contact

Add to Favorites

3508-D



BLANCO - 03029

91A-NY-3502105 Serial 65

-1 of 2-

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    02/11/2016

On February 4, 2016, Special Agent Kenney, TFO Brian Menton and TFO James Menton were present at Transit District 3 in Manhattan to meet with ████████████████████████████████ After being advised of the identities of those present and the nature of the interview, ████ provided the following information:

████████████████████████JEFFERY MARTINEZ in Manhattan.

MARTINEZ has had conversations with ████ regarding MARTINEZ' involvement with firearms.  On one occasion, MARTINEZ brought a firearm ████████████.  MARTINEZ has also been offered to sell firearms to ████.  MARTINEZ identified one seller of firearms as 50 (known to the FBI as ANDRES CRUZ).  Another dealer was from White Plains, New York and a third dealer was from Brooklyn. ████████████████████████ from MARTINEZ to date.

MARTINEZ told ████ that MARTINEZ has committed robberies of drug stash houses and asked ████ if ████ knew the location of any drug stash houses.

MARTINEZ also told ████████████ was involved in a robbery of a Wells Fargo Bank in Yonkers, New York.  MARTINEZ said 50 served as the driver for the robbery but did not identify anyone else involved.  MARTINEZ said they had been watching the bank and were timing the robbery with an armored car delivery.  MARTINEZ said they missed the delivery by a day and did not get as much as they expected.  MARTINEZ said they had guns.  MARTINEZ said he personally received $100,000 from the robbery.

MARTINEZ told ████ that there was a video on YouTube of the robbery.  MARTINEZ said he did not want to look up the video on MARTINEZ' phone in case the authorities were tracking who viewed the video.  MARTINEZ directed ████ where and how to view the video.  ████ then viewed the video and subsequently spoke to MARTINEZ after viewing the video.  MARTINEZ told ████ that MARTINEZ was the first robber to enter the bank.

████ has represented to MARTINEZ that ████ may be interested in committing a robbery of a bank or check cashing location.  MARTINEZ

---

Investigation on   02/04/2016   at New York, New York; United States (In Person)

File #   91A-NY-3502105                                      Date drafted   02/11/2016

by   KENNEY BRENDAN M, MENTON BRIAN PATRICK

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

91A-NY-3502105 Serial 65

FD-302a (Rev. 05-08-10)

91A-NY-3502105

Continuation of FD-302 of  Interview of NYPD CI █████ _____ , On  02/04/2016 , Page  2 of 2

suggested that █████ rob the same bank branch because it was easy.  MARTINEZ
offered to accompany █████ to the Wells Fargo Bank in Yonkers, New York to
show █████ how to successfully rob the bank.

3503-JJJ

Brian Menton          Sam Adelsberg
Jamie Bagliebter
Perry Carbone
Karma Smith
Jeffrey Martinez

Martinez Prep                                      7/5/18

✗ Gio said that one time someone did a robbery of the bank w/ the note.

See 003898 Rowy

US Department of Justice
US Marshals Service- Southern District of New York

Personal History of Defendant
Form USM-312

| Taken into Federal custody by the following: | Street Arrest (including arrest from LE office or court system) ☑ |
| | Safekeeper: MCC ☐   MDC ☐   Provide number to right           Register #:_____ |
| | Obtained from a correctional/ detention facility: ☐ Provide writ, discharge papers, prisoner receipt, medical summary |
| | Writ/ federal writ used: N ☐ Y ☐  Provide writ          Prior federal arrest: N ☐  Y ☐ Provide number above |

| Last Name | MARTINEZ | First Name | JEFFREY | Middle Name | |
|---|---|---|---|---|---|

| Sex | M ☑ F ☐ | Race | W-White/ White Hispanic ☑ | B-Black/ Black Hispanic ☐ | A-Asian/ Pacific Islander ☐ |
| | Transgender ☐ | | I-American Indian/ Alaskan ☐ | U-Unknown ☐ | |

| Hair | BLACK | Eyes | BROWN | Height | 6 1 | Weight | 210 | Date of birth | ▉▉▉▉ |
|---|---|---|---|---|---|---|---|---|---|

| City of birth | NY | State/ Country of birth | NY | Citizenship | USPER |
|---|---|---|---|---|---|

| FBI # | ▉▉▉▉ | State ID # | ▉▉▉▉ | Alien # | | SSN | 057 - 78 - 2234 |
|---|---|---|---|---|---|---|---|

| Resident address City, ST, Zip code | ▉▉▉▉ |
|---|---|

| Home phone | 212 - 304 - 8693 | Cell phone | 347 - 822 - 3543 | Marital status | |
|---|---|---|---|---|---|

| Agency | FBI | Place/ facility of arrest | ▉▉▉▉ | Arrest date | 03/29/16 | Arrest time | 0600 |
|---|---|---|---|---|---|---|---|

| NCIC code | | Charge description | BANK ROBBERY | Title & code | 18 USC 2113 |
|---|---|---|---|---|---|
| NCIC code | | Charge description | DISCHARGE FIREARM | Title & code | 18 USC 924c |

| AUSA(s) assigned | ZOLKIND / BEIDEL | Court Docket # | 16 MAG or CR 2018 |
|---|---|---|---|

| Defendant's counsel | Federal Defenders ☐ (Has defendant seen defender? Y ☐ N ☐)   CJA panel ☑   retained ☐ |
|---|---|

| Known detainers/ warrants | N ☑ |
| | Y ☐ and agency:_____ |

| Long term medical conditions | N ☑ |
| | Y ☐ and specify:_____ |

| Psychiatric/ emotionally disturbed | N ☑ |
| | Y ☐ and specify:_____ |

| Injuries/ medical ailments/ post-op recovery | N ☑ |
| | Y ☐ and specify:_____ |

| The above conditions require: | Medical attention? Y ☐ |
| | N ☐ |
| | Medication? Y ☐  (Is one day's dosage in agent possession? Y ☐ N ☐ ) |
| | N ☐ |

| Medical clearance and fit for confinement document from healthcare professional | Y ☐ N ☐ |
|---|---|

| Drug addiction/ alcoholism (extreme) | N ☑ |
| | Y ☐ Type _____  Date/ time of last use _____ |
| | Special treatment program in use _____ |

Page 1 of 4

| Security Cautions  Select any applicable | Current or former military ☐  Current or former LE/ corrections ☐  Current or former intelligence ☐  SAM subject or candidate ☐  Assault on LE/ corrections ☐ | Leadership role ☐  Separation needs ☐ Describe  CI ☐ Describe  Threat to witness ☐ Describe  Other ☐ Describe | Description, continue on Page 4 as necessary |
|---|---|---|---|

| Alias 1 | Last | MARTINEZ | | First, MI | JEFFERY | Remark | |
|---|---|---|---|---|---|---|---|
| Date of birth | | | SSN | | State Driver's License | | |

| Alias 2 | Last | | | First, MI | SURICA | Remark | |
|---|---|---|---|---|---|---|---|
| Date of birth | | | SSN | | State Driver's License | | |

| Criminal organization name(s) | | | | Type | |
|---|---|---|---|---|---|

| Associate/ co-defendant 1 | | Last | | First, MI | | Register # | |
|---|---|---|---|---|---|---|---|
| Resident address City, ST, Zip code | | | | Phone | | | |

| Associate/ co-defendant 2 | | Last | | First, MI | | Register # | |
|---|---|---|---|---|---|---|---|
| Resident address City, ST, Zip code | | | | Phone | | | |

| Frequented location address, City, ST, Zip code | | | Phone | | |
|---|---|---|---|---|---|

| Remarks | |
|---|---|

| Scar☐ Mark ☐ Tattoo ☒ | Location | RT ARM | Description | |
|---|---|---|---|---|
| Scar☐ Mark ☐ Tattoo ☐ | Location | | Description | |
| Scar☐ Mark ☐ Tattoo ☐ | Location | | Description | |
| Scar☐ Mark ☐ Tattoo ☐ | Location | | Description | |
| Scar☐ Mark ☐ Tattoo ☐ | Location | | Description | |
| Scar☐ Mark ☐ Tattoo ☐ | Location | | Description | |

| Internet source | E-mail ☐  Website ☐ | Social network ☐  Blog ☐ | Address or Site & User Name | |
|---|---|---|---|---|
| Internet source | E-mail ☐  Website ☐ | Social network ☐  Blog ☐ | Address or Site & User Name | |

| Languages | English: Yes ☒ No ☐  Limited ☐ | Other Language | No ☐  Yes ☒ describe. SPANISH |
|---|---|---|---|
| Speech characteristics | Normal ☒   Accent ☐  Slurred ☐  Stutter ☐  Other ☐ describe: | | |

| Military service | Y ☐ N ☐ | Country | | | Branch | | | Entry date | | | Discharge date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rank | | | Discharge type | | | | Military occupation | | | | |

| Other number | | | Type | | | Issuing State/ Country | |
|---|---|---|---|---|---|---|---|
| Other number | | | Type | | | Issuing State/ Country | |
| Other number | | | Type | | | Issuing State/ Country | |
| Other number | | | Type | | | Issuing State/ Country | |

| Occupation | SECURITY GUARD | | Company/ employer name | GIA SECURITY |
|---|---|---|---|---|
| Employment address City, ST, Zip code | 736 W 187 ST  NY  NY | | Phone number | |
| Start date | 2014 | End date | PRESENT | Point of contact | JOHN |

| Bank name | BANK OF AMERICA | Account type | Check ☑ Saving ☑ | Loan ☐ Credit card ☐ | Account number | |
|---|---|---|---|---|---|---|
| Branch address | DYCKMAN | BROADWAY | | | | |
| Bank name | | Account type | Check ☐ Saving ☐ | Loan ☐ Credit card ☐ | Account number | |
| Branch address | | | | | | |

| 1: Relative name (Last, First, MI) | ███████████ | Relation Mother | Mother | Date of birth | ████ |
|---|---|---|---|---|---|
| Resident address City, ST, Zip code | | Available phone numbers (note type) | | | ████████ |
| 2: Relative name (Last, First, MI) | | Relation | Grandmother | Date of birth | ████ |
| Resident address City, ST, Zip code | | Available phone numbers (note type) NY | | | ███████████ |
| 3: Relative name (Last, First, MI) | | Relation | Sister | Date of birth | ████ |
| Resident address City, ST, Zip code | | Available phone numbers (note type) | | | |
| 4: Relative name (Last, First, MI) | | Relation | Step brother | Date of birth | |
| Resident address City, ST, Zip code | | Available phone numbers (note type) | | | |
| 5: Relative name (Last, First, MI) | | Relation | | Date of birth | |
| Resident address City, ST, Zip code | | Available phone numbers (note type) | | | |

| Specialized skill/ knowledge | | Source & remarks | |
|---|---|---|---|

| Vehicle year | | Make | | | Model | | | Color(s) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Vehicle style | | | State and plate # | | | | | Registration date | | |
| VIN | | | | | | | | | | |

| Vehicle year | | Make | | | Model | | | Color(s) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Vehicle style | | | State and plate # | | | | | Registration date | | |
| VIN | | | | | | | | | | |

| Prior Arrest | Federal ☐ State ☑ | Agency | nyo | Date | 3/13/15 | Charge | cPw 1° | Rap sheet attached ☐ |
|---|---|---|---|---|---|---|---|---|
| Prior Arrest | Federal ☐ State ☑ | Agency | nypo | Date | 6/1/16 | Charge | TO> | Rap sheet attached ☐ |
| Prior Arrest | Federal ☐ State ☑ | Agency | nypo | Date | 4/3/16 | Charge | Burglary | Rap sheet attached ☐ |

Additional Information/ Remarks/ Continuation

**NOTICE TO ARRESTING AGENTS:** The USMS provides the COURTESY of holding and producing the arrestee prior to their Magistrate Court appearance. The arrestee is not a USMS prisoner until the US Magistrate Judge REMANDS them to USMS custody. The arresting agent is the responsible party and **must be available at all times** to respond to all matters concerning their arrestee. Meals are not provided to new arrestees and are the responsibility of the arresting agent to provide.

**ARRESTEE PROCESSING CHECKLIST- For arresting agent and USMS personnel use**

| | | | |
|---|---|---|---|
| USMS 312, prepared as completely as possible | | USM-552 Prisoner Medical Records Release Form | |
| Arrestee photo | | Medical clearance and fit for confinement document from healthcare professional, if necessary | |
| 2 fingerprint cards | | | |
| BOP 9 | | Strip search of arrestee | |
| WHCAP/ T or federal writ, if applicable | | Removal of property from arrestee | |
| Correctional facility discharge papers, if applicable | | USM-18 reflecting No or any Property (USMS use only) | |
| Correctional facility prisoner receipt, if applicable | | Copy of one or any combination of arrest warrant, complaint, or indictment (not necessary on writ) | |
| Correctional facility medical summary, if applicable | | | |
| Prepared by: | Name/ agency | | Cell phone | | Date | |
| Reviewed by: | Name | | | | Date | |

United States Marshals Service (USMS)
# PRISONER MEDICAL RECORDS RELEASE FORM

INSTRUCTIONS: Section I is to be completed by the USMS Intake Officer. Sections II & III are to be completed by the prisoner. Section II may be completed by the USMS Intake Officer if the prisoner is unable or unwilling, but Section III must be signed by the prisoner. If prisoner refuses to sign, note that in the signature block. All refusals should be immediately reported to the Office of Interagency Medical Services, Prisoner Services Division. The completed USM form 552 is to be retained in the prisoner's files.

## Section I - USMS Prisoner Information

| 1. Prisoner Name (Last, First, MI) | 2. USMS Prisoner Registration Number: | |
|---|---|---|
| MARTINEZ, JEFFREY | | |

| 3. District Name: | 4. District # | 5. Custody Date (Mo/Day/Yr) |
|---|---|---|
| EASTERN DISTRICT NEW YORK | ~~053~~ | |
| SOUTHERN | 054 | 3/29/16 |

## Section II - Prisoner Personal Data And Medical Information

| 6. Date Of Birth (Mo/Day/Yr) | 7. Social Security No. |
|---|---|
| 05/02/1990 | ██████████ |

8. Medical Insurance Information

| A) Insurance Company Name | B) Policy Number | C) Medicare /Medicaid Coverage? |
|---|---|---|
| UNITED HEALTHCARE | | ☐ Yes   ☐ No |

| 9. Name Of Your Physician | 10. Phone Number |
|---|---|
| DR CHAVEZ | (   ) |

## Section III - Medical Consent And Records Release

I certify that the information I have provided above is true to the best of my knowledge.

I hereby authorize the United States Marshals Service to request, review, and have access to all medical records of care provided to me during the time that I am in the custody of that agency, and to all other medical records deemed necessary for the purposes of providing me with appropriate medical care, adjudicating medical bills for health care services provided to me while in the custody of the United States Marshals Service, and for infectious disease clearances.

| Signature of Prisoner | Date |
|---|---|
| Jeffrey Martinez | 03/29/16 |
| Signature of USMS Intake Officer | Date |
| | |

Original--Prisoner File
Copy to District File
Copy Upon Transfer

Form USM-552
Est. 6/98
Automated 08/01



## UNITED STATES DEPARTMENT OF JUSTICE
### UNITED STATES MARSHALS SERVICE
SOUTHERN DISTRICT OF NEW YORK

### ARRESTEE INFORMATION

Before any arrestee can be processed by the USMS any and all medical problems/conditions must be declared. This form must be completed for each arrestee and given to the responding USMS personnel before the arrestee will be received for processing.

Arrestee name: JEFFREY MARTINEZ

Does arrestee have a prior federal arrest? Circle:   YES   NO

    If yes, please list the arrestee's USMS number. _____

    If you cannot identify USMS number, please provide arrest information (IE: date, arresting agency, location)

_____

Arrestee's representation for this days proceeding: (Circle)   Legal Aid   CJA   retained

    If legal aid, has arrestee met with counsel? Circle:   YES   NO

Does the arrestee have any current detainers? Circle:   YES   NO

    If yes, please list: _____

Does arrestee have any long term medical condition or conditions (to include: heart problems diabetes, asthma, tuberculosis, HIV, AIDS, hepatitis etc.)? Circle:   YES   NO

    Does arrestee require medication/medical attention for this condition? Circle:   YES   NO

    Do you, as the arresting agent, currently possess at least one days dosage of the arrestee's medication?

        Circle:   YES   NO

Explain: _____ N/A _____

Does arrestee have/display/complain of any other medical ailments(IE: broken bones, open wounds etc.)?

        Circle:   YES   NO

    Does arrestee require medication/medical attention for this condition? Circle:   YES   NO

    Do you, as the arresting agent, currently possess at least one days dosage of the arrestee's medication?

        Circle:   YES   NO

Explain: _____

Is the arrestee a drug addict/user? Circle:   YES   NO

    If yes, does this require any special medical program (IE: methadone treatment)? Explain: _____

Do you, as the arresting agent, if applicable, possess a medical clearance/fit for confinement letter from a healthcare professional? Circle:   YES   NO   (Please attach)

### ARRESTEE PROCESSING CHECKLIST

*Please check when completed*

    1. Have you completed any and all USMS paperwork.

        To include: USMS 312 (Please fill out all forms as completely as possible)

    2. Attached a photo of arrestee to paperwork.

    3. Fingerprint cards

        *1 for USMS file

        *1 for the FBI for FPC classification

    4. Filled out and attached the BOP-9

    5. Strip searched arrestee.

    6. Taken any and all property from the arrestee.

ARRESTING AGENT:   BRENDAN KENNEY

AGENCY:   FBI

CONTACT # WHILE IN THIS BUILDING: ▓▓▓▓▓▓

#### *****NOTE TO ALL ARRESTING AGENTS*****

Be advised, the USMS provides the COURTESY of holding and producing arrestee prior to the arrestee's magistrate court appearance. However, the arrestee is not considered a USMS prisoner until a U.S. Magistrate Judge REMANDS said arrestee to USMS custody. This means that as the arresting agent, you must be available at all times to respond to any and all matters concerning your arrestee, as you are the responsible party.

*United States Marshals Service Policy and Procedures Manual 5.1-1 (a)*

**3503-V**

FD-302a (Rev. 05-08-10)

91A-NY-3502105

Continuation of FD-302 of  (U) JEFFREY MARTINEZ                                      , On  04/08/2016 , Page  4 of 5

MARTINEZ returned both guns that were used in the robbery.  He gave the
9mm back to his cousin FERNANDEZ with $500 for letting him use it.  He also
gave the revolver back to METRA, but found out later that it was sold.

MARTINEZ saw TROUBLE a few days after the robbery.  TROUBLE said he got
paid between $6,000 and $8,000.  MARTINEZ told TROUBLE how much he got paid
and TROUBLE said he was going to ask GIO for more money.  Sometime later,
MARTINEZ talked to GIO and told him what TROUBLE said.  GIO said he would
pay TROUBLE more money.

After the robbery, TITO was arrested for a parole violation.  TITO told
MARTINEZ that he heard that GIO got $700,000 from the bank robbery and took
a trip to Dubai.  He also said that GIO "broke" the girl who was the person
inside the bank.  Even though TITO didn't participate in the robbery he
still wanted a cut of the "take."  MARTINEZ asked GIO about the trip.  GIO
asked how MARTINEZ found out about the trip.

MARTINEZ spent his cut of the money on girls and partying.  CRUZ spent
his money on drugs, friends and jewelry.  GIO took a trip and opened a
beauty salon.  The salon is closed now but was located near 207th Street
and Sherman Avenue.  GIO bought it for his girlfriend.  His cousin, JOEL
LNU, also worked  there.  GIO also sold the Nissan to his sister or another
family member.  He currently drives a black Town Car and/or a Gray Nissan
SUV.

After MARTINEZ was arrested by the FBI he was shown several
photographs.  At the time he had no information about the female shown in
photograph number 2 (**VIRGINIA BLANCO**).  MARTINEZ now recognizes her as a
friend of GIO's.  He has seen GIO babysitting #2's son and he has seen #2
with her son.  He has never seen them together but believes that they were
in some kind of intimate relationship.  The boy's father's name is FNU LNU,
a.k.a. "Smiley."  GIO and SMILEY don't get along.  MARTINEZ cannot remember
her name but she knows his name and will greet him when they meet in the
street.

GIO told MARTINEZ that the police arrested someone for the bank robbery.



MARTINEZ was discussing a drug dealer robbery with an individual who
turned out to be an FBI informant.  MARTINEZ told GIO about the robbery and

**3503-DDD**

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---|---|

### HEADER

**Source ID:** ▓▓▓▓▓▓

**Date:** 03/28/2016

**Case Agent Name:** KENNEY, BRENDAN

**Field Office/Division:** New York

**Squad:** C26

### SOURCE REPORTING

**Date of Contact:** 03/18/2016

**List all present including yourself (do not include the CHS):**
TFO James Menton

**Type of Contact:** Telephonic

**Date of Report:** 03/28/2016

**Substantive Case File Number**

91A-NY-3502105

**Check here if additional reporting is in Echo**
No

**Source Reporting:**

On 03/18/2016, CHS reported the following to TFO James Menton:


JEFFERY MARTINEZ told CHS that MARTINEZ committed a home invasion robbery on the evening of March 20, 2016 in New Jersey. MARTINEZ stole the money that was owed to him and additional money.

The victim's brother is now looking for MARTINEZ to exact revenge.

### SIGNATURE

| | | |
|---|---|---|
| Submitted By | BKENNEY (Brendan Kenney) | Thu, 31 Mar 2016 15:33:13 -0400 |
| First Level Approved By | dpmckenna (DANIEL MCKENNA) | Thu, 31 Mar 2016 16:28:54 -0400 |

| FD-1023 | Page 1 of 1 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|---------------------------------|

UNCLASSIFIED

91A-NY-3502105 Serial 139

-1 of 5-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry     06/20/2016

 

On June 15, 2016, ANDRES CRUZ was interviewed pursuant to a proffer agreement at the United States Attorney's Office for the Southern District of New York in White Plains, New York. CRUZ was accompanied by his attorney, CALVIN GARBER. The following law enforcement personnel participated in the interview: AUSA Douglas Zolkind and Special Agents John Sullivan and Brendan Kenney. Prior to the interview, AUSA Zolkind explained the terms of the proffer agreement to CRUZ. After reviewing and executing the proffer agreement with his attorney, CRUZ provided the following information:

On the day before the bank robbery, CRUZ received a telephone call from JEFFREY MARTINEZ. MARTINEZ asked CRUZ where he was located and arranged to meet CRUZ. CRUZ then met GIO (known to the FBI as GIOVANNY MARTE) and MARTINEZ on the street in Washington Heights. MARTE and MARTINEZ were in a Nissan, the same car that was used during the robbery the following day, and asked CRUZ to get in the car. MARTE was driving the car. MARTE and MARTINEZ told CRUZ they wanted CRUZ to drive for a bank robbery. MARTE and MARTINEZ said they had another person who was supposed to act as the driver but that person backed out. MARTE said he had been planning the robbery and scouting the bank for approximately a year and MARTINEZ had been involved in the planning for the previous six months. MARTE said the bank had been robbed before because it was close to the highway and close to the border of the city where the bank is located so they just had to get out of that city. MARTE said he had looked for cameras in the area. MARTE said CRUZ would get at least $20,000 to act as the driver. MARTE said he knew the robbery would be successful because MARTE knew a female employee on the inside of the bank.

At this point in the interview, CRUZ advised he was not truthful during his post-arrest interview and recognized SMILEY's girlfriend from one of the photographs shown to CRUZ. CRUZ told the interviewing agents he did not recognize the photograph of SMILEY's girlfriend when he in fact knew the female as SMILEY's girlfriend.

During the meeting with MARTE and MARTINEZ the day before the robbery, CRUZ agreed to act as the driver. MARTE and MARTINEZ told CRUZ that a third person would also be going into the bank with MARTE and MARTINEZ.

---

Investigation on   06/14/2016   at   White Plains, New York, United States (In Person)

File #   91A-NY-3502105                                               Date drafted   06/15/2016

by   KENNEY BRENDAN M, SULLIVAN JOHN D

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

91A-NY-3502105 Serial 139

FD-302a (Rev. 05-08-10)

91A-NY-3502105

Continuation of FD-302 of   (U) 06/15/2016 Proffer of ANDRES CRUZ   , On   06/14/2016 , Page   2 of 5

MARTE and CRUZ exchanged telephone numbers and MARTE said he would call CRUZ tomorrow.  MARTE and MARTINEZ dropped CRUZ off.

The next day, MARTE called CRUZ and told CRUZ to come down to the street.  MARTE and MARTINEZ were in the Nissan.  CRUZ entered the car and MARTE went over the plan.  MARTE and MARTINEZ told CRUZ they would each have guns.  MARTINEZ and the fourth person were supposed to take care of the guard and lock both doors while MARTE stole the money.  MARTE and MARTINEZ did not show the guns to CRUZ but CRUZ knew it would not be hard for them to get guns.  MARTE was calling the fourth person who was supposed to participate in the robbery but could not reach the person.  After failing to reach the fourth person, MARTE and MARTINEZ dropped CRUZ off and decided to call off the robbery because the plan required three robbers to enter the bank so both doors could be locked while MARTE stole the money.

Approximately an hour after CRUZ was dropped off, MARTE called CRUZ and said he had found a different person to act as the fourth person.  MARTE told CRUZ to meet MARTE and MARTINEZ.  CRUZ met MARTE and MARTINEZ in the Nissan and entered the driver's seat.  The fourth person (known to the FBI as ROWY VAZQUEZ) then entered the car.  CRUZ had seen VAZQUEZ around before but did not know him.  MARTE was in the front passenger's seat and VAZQUEZ and MARTINEZ were in the back seat.

MARTE told VAZQUEZ that MARTE and MARTINEZ had guns.  VAZQUEZ also wanted a gun.  MARTINEZ tried calling people to obtain a gun for VAZQUEZ but was unable to locate a gun so they traveled to the hardware store on Dyckman Avenue.  Someone from the vehicle, CRUZ is unsure which person, went into the hardware store and bought a saw.  After the saw was purchased, MARTE explained the plan to VAZQUEZ.  MARTE told VAZQUEZ to close the doors, get everyone on the floor and make sure no one left the bank.  MARTE told VAZQUEZ that CRUZ would be paid at least $20,000 and VAZQUEZ would get paid at least $30,000 or $35,000.  MARTE and MARTINEZ did not say how much they would each get paid.  MARTE said he knew from the person on the inside that they were going to get a lot of money so those amount were the least they would be paid.  The person on the inside was supposed to be off on the day of the robbery.

MARTE directed CRUZ where to drive.  After getting to the bank, MARTE told CRUZ to drive up the road past the bank and make a u-turn and drive down past the bank again.  MARTE then directed CRUZ to make another u-turn and go up past the bank, make another u-turn and come down to the bank where MARTE, VAZQUEZ and MARTINEZ exited the vehicle.  CRUZ then made a u-turn and waited up the hill from the bank.

During the robbery, CRUZ and MARTE were talking through earpieces over the phone.  CRUZ could hear commotion over the call and people being told

FD-302a (Rev. 05-08-10)                    91A-NY-3502105 Serial 139

91A-NY-3502105

Continuation of FD-302 of  (U) 06/15/2016 Proffer of ANDRES CRUZ          , On  06/14/2016 , Page  3 of 5

to get down.  CRUZ could hear MARTE telling a person to open it.  CRUZ
could hear someone telling MARTE they did not have the combination and CRUZ
then heard a gunshot.  CRUZ was telling MARTE to forget it and leave.  CRUZ
then heard a woman telling MARTE to relax and the person opening the vault
was nervous.  CRUZ then heard a second gunshot.  CRUZ heard MARTE say the
person did have the combination and told CRUZ to relax.   MARTE then told
CRUZ to come down and CRUZ pulled the car outside the bank.

CRUZ then saw MARTE, VAZQUEZ and MARTINEZ struggling with the door.
MARTE, VAZQUEZ and MARTINEZ then exited the bank and entered the car.  CRUZ
drove away but missed the turn.  MARTE told CRUZ he missed the turn so CRUZ
put the car in reverse and made the turn.  CRUZ then encountered traffic.
Police cars were heading towards the bank.  MARTE said the police were
looking for 3 or 4 people so he told VAZQUEZ and MARTINEZ to get down.
After the police cars passed, CRUZ entered the opposing lane of traffic and
ran a red light before entering the highway.  CRUZ saw police cars on the
highway.  MARTE told CRUZ to drive faster and CRUZ and MARTE began arguing
about CRUZ' driving.

CRUZ drove to a parking garage in the Bronx.  MARTE stayed in the car
and MARTINEZ, CRUZ and VAZQUEZ exited the car.  MARTE gave money for a cab
to MARTINEZ, CRUZ and VAZQUEZ out of the string bookbag that contained the
robbery proceeds.  MARTE then drove off.  MARTINEZ, CRUZ and VAZQUEZ walked
to find a cab.  After finding a cab, MARTINEZ, CRUZ and VAZQUEZ took a cab
to Dyckman Avenue before splitting up.

Later that evening, CRUZ met up with MARTINEZ and went to the house of a
friend, LUIS JUAREZ and DAVID.  CRUZ then left and went to the house of
another friend, DIANA.

Approximately six hours after the robbery, CRUZ met with MARTE and
MARTINEZ in a park.  CRUZ expressed worry that the bills stolen during the
robbery may have been marked.  MARTE and MARTINEZ said CRUZ did not have to
worry about marked bills because the person on the inside was SMILEY's
girlfriend.  MARTE confirmed the person on the inside was SMILEY's
girlfriend by nodding.

Later that night, MARTINEZ called and told CRUZ he was going to meet
MARTE to pick up money.  CRUZ asked MARTINEZ to pick up CRUZ' money and
MARTINEZ agreed.  Later, MARTINEZ called CRUZ and told CRUZ he had CRUZ'
money.  CRUZ and MARTINEZ then met on Dyckman Avenue and MARTINEZ gave CRUZ
a bag with $10,000.  MARTINEZ did not tell CRUZ what MARTINEZ was paid.

A day or two after the robbery, CRUZ ran into VAZQUEZ.  VAZQUEZ asked
CRUZ if CRUZ had spoken to MARTE or MARTINEZ because VAZQUEZ was only paid
$5,000.  CRUZ provided VAZQUEZ with MARTE's telephone number but MARTE had

FD-302a (Rev. 05-08-10)

91A-NY-3502105

Continuation of FD-302 of  (U) 06/15/2016 Proffer of ANDRES CRUZ ,On 06/14/2016 ,Page 4 of 5

already changed his phone number.  In later conversations with VAZQUEZ, VAZQUEZ told CRUZ he was looking to break into MARTE's apartment and tie up MARTE to get more money but CRUZ said he was not interested.

CRUZ never asked MARTE for more money.

After the robbery, MARTE bought a sports utility vehicle and a nail salon on Sherman Avenue and 207th Street.

CRUZ was then showed a series of photographs and provided the following information:

> Photo # 9 - CRUZ did not recognize the individual
>
> Photo # 12 - CRUZ did not recognize the individual
>
> Photo # 13 - CRUZ did not recognize the individual
>
> Photo # 2 - CRUZ identified the individual as SMILEY's girlfriend (known to the FBI as VIRGINIA BLANCO)
>
> Photo # 7 - CRUZ did not recognize the individual

Approximately one to three days after the robbery, MARTINEZ brought the revolver used in the bank robbery to CRUZ' house.  MARTINEZ said he was scared to keep the gun at MARTINEZ' house in case he was identified because MARTINEZ, unlike CRUZ, had entered the bank during the robbery.  CRUZ kept the gun for a few days then MARTINEZ took the gun back and said he was going to sell the gun.  MARTINEZ later told CRUZ he sold the gun in Brooklyn.  MARTINEZ never said anything to CRUZ about the second gun used in the robbery.

MARTINEZ told CRUZ he never counted his take of the money so he does not know what he was paid, but CRUZ thought he was lying.

Approximately two years before the bank robbery, MARTE asked CRUZ to travel to the Dominican Republic, swallow drugs and transport the drugs back to the United States.  MARTE told CRUZ that MARTE's people would pay for the tickets.  MARTE said people had transported drugs for MARTE in the past and they had people in the airport to help CRUZ make sure he was successful.  MARTE told CRUZ he would be paid $5,000 and CRUZ agreed. MARTE took a picture of CRUZ and told CRUZ the picture would be given to people working at the airport that would look out for CRUZ.

CRUZ traveled to the Dominican Republic and stayed with EVANDER LNU. CRUZ was supposed to swallow 50 containers of cocaine but became ill after ingesting 10.  CRUZ then passed the 10 containers of cocaine in the

FD-302a (Rev. 05-08-10)

91A-NY-3502105 Serial 139

91A-NY-3502105

Continuation of FD-302 of  (U) 06/15/2016 Proffer of ANDRES CRUZ  , On  06/14/2016  , Page  5 of 5

Dominican Republic before traveling.  CRUZ traveled back to the United
States but was stopped by federal agents.  CRUZ was questioned and lied to
the agents by stating he was in the Dominican Republic for his aunt's
funeral.  After the federal agents called CRUZ' mother, who did not
corroborate CRUZ' story, CRUZ was x-rayed.  After no drugs were found in
CRUZ' body, CRUZ was released.

91A-NY-3502105 Serial 148

-1 of 3-

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___08/24/2016___

On July 1, 2016, ANDRES CRUZ was interviewed pursuant to a proffer
agreement at the United States Attorney's Office for the Southern District
of New York in White Plains, New York.  CRUZ was accompanied by his
attorney, CALVIN GARBER.  The following law enforcement personnel
participated in the interview: AUSA Douglas Zolkind and Special Agent John
Sullivan.  After being advised of the identities of the government
attorney, the interviewing Agent and the nature of the interview CRUZ
provided the following:

Before CRUZ met with GIO (**GIOVANNI MARTE**) and JEFFREY MARTINEZ
(MARTINEZ) together, CRUZ met MARTINEZ near the projects down the block to
smoke some marijuana.  MARTINEZ told him that he and GIO went to a bank
that had been robbed before and that it was close to the highway.

At a different meeting, CRUZ expressed his concern that the money they
were taking from the bank would have "marked bills" or dye packs.  GIO
explained that the money that they were going to take was the money that
the customers gave to the bank so it wouldn't have any "marked bills" or
dye packs.

When GIO was explaining what everyone's job was during the robbery he
told JEFFREY MARTINEZ to "take the guard down."

As they were pulling up to the bank, just before they went inside,
MARTINEZ, GIO and the little guy (**ROWY VASQUEZ**) put on gloves.  CRUZ did
not wear gloves.

When MARTINEZ, GIO and the little guy were exiting the bank, CRUZ almost
drove away before GIO was able to get in the car. CRUZ stopped, let GIO and
then drove away.

After the robbery, that same day, CRUZ threw away the clothes that he
wore.  He threw them away down the street from where he lived.  MARTINEZ
told CRUZ that he also threw away the clothes he wore during the robbery.

When GIO met MARTINEZ and CRUZ in the park after the robbery he gave
them both $1,000.  He said he left the rest of the money in the car which

Investigation on ___07/01/2016___ at White Plains, New York, United States (In Person)

File # 91A-NY-3502105          Date drafted 07/21/2016

by SULLIVAN JOHN D

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

91A-NY-3502105 Serial 148

91A-NY-3502105

Continuation of FD-302 of (U) 07/01/2016 Proffer of ANDRES CRUZ_____ , On  07/01/2016 , Page   2 of 3

was parked and that he would give them the rest of their share later.  At
the park GIO told them that inside the bank, during the robbery, he fired
one shot in the air and a second one near a guy's leg because the guy said
he didn't know the combination.  GIO knew the employee knew the combination
because the information that he had previously gotten from the employee who
worked there, the "inside person."

During CRUZ' last court appearance, DAVID JUAREZ (DAVID) was in the back
of the court room.  DAVID knows CRUZ and MARTINEZ.  DAVID owes MARTINEZ
money, approximately $1,000, from a past deal.  MARTINEZ ended up in jail
before DAVID was able to repay him.  DAVID thought that MARTINEZ was going
to shoot him over the money.  DAVID sells weed to make money.  He got
stopped in his car by the cops with weed.  The cops impounded the car.  He
borrowed the money from MARTINEZ to get the car out of the impound lot so
he could continue to sell weed.

CRUZ came back to the New York area around April 16, 2016, to fix his
taxes.  DAVID and his brother LUIS JUAREZ (LUIS) knew that MARTINEZ had been
arrested.

When CRUZ was in West Virginia he got a call from DAVID.  DAVID was
scared.  He told CRUZ that he was worried that MARTINEZ might think that he
"ratted" him out and that's why MARTINEZ was arrested.

CRUZ called DAVID after he was arrested.  DAVID wanted to make sure that
CRUZ knew he didn't "rat" him out.  CRUZ talked to DAVID about doing the
Wells Fargo robbery.  CRUZ may have told DAVID that GIO forced him to do
the robbery.  CRUZ also talked about the robbery with DAVID when he lived
in Ohio.

LUIS and his cousin bought a house in Los Angeles.  Each of them owned
1/2 of the house.  The were going to open up a hat store.

DAVID had received a lump sum of money at age 18 from a lawsuit that he
won from an accident.

DAVID and LUIS knew about the bank robbery before it happened.
MARTINEZ, CRUZ, DAVID and LUIS used to get together.  When they did they
talked about the robbery.  They also talked about it after the robbery.
They discussed the facts that CRUZ drove, that an employee of the bank
didn't want to open the safe, that GIO fired two shots inside the bank.
They also discussed the fact that sometime after the robbery, MARTINEZ gave
CRUZ a revolver to hold at his house.  MARTINEZ didn't want to be caught
with it and believed, that since CRUZ didn't go inside the bank, it would
be safer with him.

FD-302a (Rev. 05-08-10)

91A-NY-3502105 Serial 148

91A-NY-3502105

Continuation of FD-302 of  (U) 07/01/2016 Proffer of ANDRES CRUZ     , On  07/01/2016 , Page  3 of 3

    CRUZ gave some of the $1,000 he received from GIO in the park to DAVID and LUIS.  DAVID got approximately $500 and LUIS got approximately $200.  CRUZ also gave some of his share of the robbery money to his girlfriend so she could fix a tattoo.  He also spent money on clothes.

    Regarding a previous proffer, CRUZ does not remember GIO nodding when discussing SMILEY's girlfriend being the bank employee who was providing information.  CRUZ and MARTINEZ had a conversation shortly after the robbery where they talked about the person inside of the bank being SMILEY's girlfriend.

    LOUIS was the individual who bought the plane ticket for CRUZ when he had previously flown to the Dominican Republic.

Tom Marello
Brian Menton
Jay McMahon
Sam Adelsberg
Jamie Bagliebter

Meeting w/ Cruz                                                    4/3

Aware Blanco was arrested

Geo & Jeffrey approached me in car to discuss robbery. They were in car together

Gio scouting the place for a year he said; Martinez said planning for 6 mnths

917 658 - 7315 = Cruz's phone number during that time
stable phone

They were going after $ in a specific place. I asked about ~~that~~ marked bills but they said not to worry about that because they had someone on the inside

On the call heard
  - Gio getting annoyed at guy     - telling to open vault  - telling can't get it
  - the shots fired
  - a woman saying don't hurt him

Told in advance I'd get $20, I got $20

Vasquez didn't get the amt he expected
  Jeff told me that Gio dropped her phone

Stuck around after shots fired because he was loyal to Jeffrey

Virginia mother of Smiley's kid (Raposo)   - Yaniris
  don't remember meeting her
  Found out VB was insider by Jeffrey after robbery, probably couple days
  Then I felt better about spending the $, it was a bunch of $10
    said it was customer's $ that was being deposited that day
$ - some looked new, some looked a littles worn
all the $ was in $10 bills

gave friends mom $1k they were going to get kicked out

moved to Ohio 2014
Came back to NY, heard Martinez arrested & house was raided so
went back to Ohio.

Never saw VB & GM together
   Think Gio lived in the Bronx at time of robbery. not sure

Gio called day of in the morning
   & then called again later after Vasquez found
Jeffrey's # should be on phone, dont know about Gio
     ↳ probably just a G



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*300 Quarropas Street*
*White Plains, New York 10601*

April 26, 2018

**BY EMAIL**

Michael Burke, Esq.
Burke, Miele & Golden, LLP
40 Matthews Street, Suite 209
Goshen, New York 10924

      Re:    ***United States* v. *Virginia Blanco*, S4 16 Cr. 408 (CS)**

Dear Mr. Burke:

This seventh letter regarding discovery provides discovery pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure and seeks reciprocal discovery. It supplements our earlier letters regarding discovery dated September 29, 2017, October 6, 2017, January 3, 2018, April 4, 2018, April 16, 2018, and April 23, 2018.

**Disclosure by the Government**

In the same message as this letter, please find an attachment that contains various documents bearing control numbers BLANCO-03081 – BLANCO-03203:

- #3204 - #3251    Code of Ethics 2013
- #3252 - #3314    Protecting Wells Fargo Information 2013
- #3315 - #3345    Robbery Procedures July 2013
- #3346 - #3350    Cash Delivery Records

Please be advised that Andres Cruz made the following statements during discussions with the Government:

- That Cruz received a telephone call from Jeffrey Martinez the day before the robbery during which Martinez asked Cruz where he was located and arranged to meet Cruz. Cruz met Giovanny Marte and Martinez in Washington Heights to discuss the robbery. During that conversation, Marte said he had been planning the robbery and scouting the bank for approximately a year and Martinez had been involved in the planning for the previous six months. Cruz agreed to be the driver for the robbery during this conversation. In a later conversation with the Government, Cruz again said that Marte

Michael Burke, Esq.
April 26, 2018
Page 2 of 3

said he was scouting the place for a year and Martinez said he was planning for six months.

- The day after Cruz's conversation with Martinez and Marte, Marte called Cruz and told Cruz to come down to the street.

- In a post-arrest interview, Cruz claimed that he did not know if there was an insider at the bank. Later, Cruz noted that Marte and Martinez said the person on the inside was Smiley's girlfriend. Marte confirmed the person on the inside was Smiley's girlfriend by nodding. In a later discussion with the Government, Cruz said he did not remember Marte nodding when discussing Smiley's girlfriend being the bank employee who was providing information. Cruz and Martinez had a conversation shortly after the robbery where they talked about the person inside of the bank being Smiley's girlfriend. He said this conversation may have taken place a couple days after the robbery.

- Approximately two years before the bank robbery, Marte asked Cruz to travel to the Dominican Republic, swallow drugs and transport the drugs back to the United States.

- When Marte was explaining everyone's job during the robbery, he told Martinez to "take the guard down."

**Disclosure by the Defendant**

In light of your prior request for the foregoing discovery, the Government hereby requests again reciprocal discovery under Fed. R. Crim. P. 16(b). Specifically, we request that you allow inspection and copying of: (1) any books, or copies or portions thereof, and which are in the defendant's possession, custody or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial; and (2) any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in the defendant's possession or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom the defendant intends to call at trial.

Michael Burke, Esq.
April 26, 2018
Page 3 of 3

The Government also requests that the defendant disclose prior statements of the witnesses she will call to testify. *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975). We request that such material be provided on the same basis upon which we agree to supply the defendants with 3500 material relating to Government witnesses.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Samuel Adelsberg
Jamie Bagliebter
James McMahon
Assistant United States Attorneys
(914) 993-1936

3502-PP

JB MA
SA JM

Wik Prep w/ Maate 6/29
- VB knew that I was dealing drug since 69
  - kept drugs and gun in her got on Ellwood
X - GM was partners w/ Smiley → Smiley would
  X give him Marijuana and ectasy pills
     on consignment                     from 09
- GM & Smiley → dealing together until early 2011
- committed a shoot out w/ Smiley b/c they
   broke his car window
- Smiley & VB lived together for part of the
   time btwn 08-11
XX [ Fight w/ Smiley about drugs - 2011
       - Smiley wasn't being consistent
       - Fist fight over a spot → Ellwood & C96
       - Smiley lost
   - GM & Smiley owned the spot → 3  8 hr shifts
       - lookouts & piteless & managers worked for GM
X - Only spot that GM had
   - VB told GM that ~~got~~ ~~out~~ by taking Smiley's spot
      I cant feed my son at
   - Only sold weed ~~at~~ spot → only
   had "employees" for weed sales
   - VB would ~~still only~~ give drugs to Smiley's
      customers ~~even if~~ Smiley was busy
   - ~~GM &~~ Smiley kept lbs of weed in VB's house
      - GM had only ounces
   - Wouldn't go to VB's house alone
   - Drug customers would give VB $ & VB would
   give drugs
   - Never really spoke w/ Smiley after fight
X - Spot got raided so they shut it down.
   - After return to DR got back into drug selling
      but didn't really communicate w/ Smiley again
   - Summary: VB held drugs for Smiley & GM
      also   and   met customers on Smiley's behalf
   - VB brought them customers sometimes
   - Sometimes he's with VB & Smiley calls to tell
      her to meet w/ customers
   - ⑩ GM & Smiley would give her $ for holding
      & helping w/ the drugs → few $100 dollars

**1 of 3**

3502-PP

- Post DR
    - marijuana, pills, & coke
    - would keep drugs @ Tito's apt or Dekalb
    - Drugs in safe box
- Felix-Pena → VB father + Felix mother were sibs
    - VB's cousin - lives on 5th Fl in Ellwood
    - GM knew he was selling pills
    - GM first bought pills from him during summer
    - GM was buying thousands of pills/month from September 2012 - 2016
    - Cost from $5-10 a pill (percoset)
    - Felix would communicate w/ GM then thru VB → They would deal in front of her @ 1-2/week
    - Felix would give her pills to give to GM more than 20 times → Sept 2012 - Spring 2013
    ( - Prices went up and they stopped dealing w/ him about half the times GM would give VB $ to give back to Felix
    - 2-3/week transactions btwn GM & Felix

Apt
    - privacy
    - didn't want to be in nice neighborhood where selling drugs

Venletta
    - Lived in 90 Ellwood
    - 2009 - 2013/2014 late/early
    - buying m30s & percosets
    - parties w/ GM → GM would give cash
    - Sept 2012 - Spring 2013
    - Gave drugs to VB to give to GM 5X & GM gave cash to VB to give to Venletta 12X
    - VB Transact in front of her → one every 2 weeks
    - Friends w/ Venletta

Smiley → purchased for him since at least 2006
    - late 2009 → shoe spot

- Grew up in the same neighborhood
- how her actions began
- she Im Depressed
- *was* she got living w/ → narcotics
- r-l*tp* got Smile    distribution
- Smiley →    spot

91A-NY-3502105 Serial 65

-1 of 2-

FD-302 (Rev. 5-8-10)

 **OFFICIAL RECORD**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/11/2016

On February 4, 2016, Special Agent Kenney, TFO Brian Menton and TFO James Menton were present at Transit District 3 in Manhattan to meet with ██████████████████████████████. After being advised of the identities of those present and the nature of the interview, ████ provided the following information:

████████████████████████ JEFFERY MARTINEZ in Manhattan.

MARTINEZ has had conversations with ████ regarding MARTINEZ' involvement with firearms. On one occasion, MARTINEZ brought a firearm ████████ ████████████████. MARTINEZ has also offered to sell firearms to ██. MARTINEZ identified one seller of firearms as 50 (known to the FBI as ANDRES CRUZ). Another dealer was from White Plains, New York and a third dealer was from Brooklyn. █████████████████████████ from MARTINEZ to date.

MARTINEZ told ████ that MARTINEZ has committed robberies of drug stash houses and asked ████ if ████ knew the location of any drug stash houses.

MARTINEZ also told ██████████ was involved in a robbery of a Wells Fargo Bank in Yonkers, New York. MARTINEZ said 50 served as the driver for the robbery but did not identify anyone else involved. MARTINEZ said they had been watching the bank and were timing the robbery with an armored car delivery. MARTINEZ said they missed the delivery by a day and did not get as much as they expected. MARTINEZ said they had guns. MARTINEZ said he personally received $100,000 from the robbery.

MARTINEZ told ████ that there was a video on YouTube of the robbery. MARTINEZ said he did not want to look up the video on MARTINEZ' phone in case the authorities were tracking who viewed the video. MARTINEZ directed ████ where and how to view the video. ████ then viewed the video and subsequently spoke to MARTINEZ after viewing the video. MARTINEZ told ████ that MARTINEZ was the first robber to enter the bank.

████ has represented to MARTINEZ that ████ may be interested in committing a robbery of a bank or check cashing location. MARTINEZ

---

Investigation on   02/04/2016   at   New York, New York, United States (In Person)

File #   91A-NY-3502105                                               Date drafted   02/11/2016

by   KENNEY BRENDAN M, MENTON BRIAN PATRICK

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

BLANCO - 003860

91A-NY-3502105 Serial 65

FD-302a (Rev. 05-08-10)

91A-NY-3502105

Continuation of FD-302 of  Interview of NYPD CI ▮▮▮▮ _____ , On  02/04/2016 , Page  2 of 2

    suggested that ▮▮▮▮ rob the same bank branch because it was easy.  MARTINEZ offered to accompany ▮▮▮▮ to the Wells Fargo Bank in Yonkers, New York to show ▮▮▮▮ how to successfully rob the bank.

91A-NY-3502105 Serial 147

-1 of 2-

FD-302 (Rev. 5-8-10)

 **OFFICIAL RECORD**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    08/23/2016

On August 2, 2016, ▮▮▮▮▮▮ was interviewed pursuant to a proffer agreement at the United States Attorney's Office for the Middle District of Florida in Orlando, Florida. ▮▮▮ was accompanied by his attorneys, LAWRENCE WALTERS and WHITNEY BOAN. The following law enforcement personnel participated in the interview: AUSA Illianis Rivera, Federal Bureau of Investigation (FBI) Special Agent Bryce Essary, and Homeland Security Investigation (HSI) Special Agent Brian DiPerna.  Prior to the interview, AUSA Rivera referenced the terms of a previous proffer agreement that ▮▮▮ conducted.  After reviewing the previous proffer agreement with his attorney, ▮▮▮ provided the following information:

Approximately two months prior to the date of the interview, possibly early June 2016, VASQUEZ confided in ▮▮▮ regarding a robbery that took place in New York.  VASQUEZ told ▮▮▮ that he and his friend, known only to ▮▮▮ as GIO, robbed a Wells Fargo Bank somewhere in New York.  VASQUEZ maintained a yellow folder in his jail cell, which contained paper work and a collection of photographs that appeared to be security camera footage. VASQUEZ showed ▮▮▮ the photographs of two separate individuals wearing what appeared to be concealing garments over their faces with sunglasses. One of the individuals was wearing a black jacket with what appeared to be a Nike swoosh, and the other individual was wearing a lighter colored jacket, or hoodie, with an orange or red hat.  VASQUEZ identified the individual wearing the black jacket with a Nike Swoosh as GIO.

VASQUEZ identified himself to ▮▮▮ as the individual wearing the hat with the lighter colored jacket, or hoodie.  A second photo revealed either a Toyota or Honda vehicle that was utilized as a getaway vehicle. ▮▮▮ was not certain of the type of vehicle, but believed it was either an Accord or a Corolla.

VASQUEZ told ▮▮▮ that GIO planned the entire robbery.  VASQUEZ and GIO conducted surveillance on the bank approximately two days prior to the robbery.

VASQUEZ told ▮▮▮ about another individual that was somehow involved in the robbery, SMILEY.  ▮▮▮ did not know what role SMILEY played in the robbery, but explained that VASQUEZ believed that SMILEY was snitching on

Investigation on  08/02/2016  at  Orlando, Florida, United States (In Person)

File #  91A-NY-3502105                              Date drafted  08/02/2016

by  Bryce Essary

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

BLANCO - 003898

91A-NY-3502105 Serial 147

FD-302a (Rev 05-08-10)

91A-NY-3502105

(U) 08/02/2016 Proffer Interview of ABDUAL
Continuation of FD-302 of HAMID _____ . On  08/02/2016 . Page  2 of 2

the entire crew.

VASQUEZ told ▨▨▨ that the crew stole approximately $300,000 from the
Wells Fargo robbery.  VASQUEZ was ripped off by GIO, and did not get as
much money as he was expecting for his participation in the robbery.
VASQUEZ and GIO disagreed on the way that the robbery was supposed to take
place.  VASQUEZ did not want to use guns, and argued in favor passing a
threatening note to the bank teller as opposed to the use of firearms.  GIO
ended up utilizing a gun during the Wells Fargo robbery, and shot the gun a
few times to scare people inside of the bank.

VASQUEZ told ▨▨▨ that he's not worried about the New York FBI case
against him, because it's just a bank robbery.  VASQUEZ explained to ▨▨▨
that the FBI does not know about an additional three banks that he robbed.
▨▨▨ did not ask what banks, or where they were robbed, but knew that the
amounts stolen were as follows:  $130,000; $95,000; and $56,000.



POLICE DEPARTMENT
LEGAL BUREAU
F.O.I.L Unit, Room 110C
One Police Plaza
New York, NY 10038

Daniel Sullivan                                    November 2, 2021
106 Valentine Lane
Apt 1E                                             FOIL Request #: FOIL-2021-056-16180
Yonkers, NY, 10705                                 Your File #:

Dear Sir or Madam:

This is in response to your request received by this office on November 2, 2021 in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

Your request has been assigned to Chinnock (646-610-6445) of this office. Before a determination can be rendered, further review is necessary to assess the potential applicability of exemptions set forth in FOIL, and whether the records can be located. I estimate that this review will be completed, and a determination issued within 90 business days of this letter.

This is not a denial of the records you requested. Should your request be denied in whole or in part, you will then be advised in writing of the reason for any denial, and the name and address of the Records Access Appeals Officer.

**Note: Due to issues caused by the COVID-19 pandemic there may be extensive delays, lasting up to one year, in determining your request.**

Very truly yours,

LT *[signature]*

Richard Mantellino
Lieutenant
New York City Police Department (NYPD)

Lt. Richard Mantellino
Legal Bureau – FOIL Unit
One Police Plaza, Room 110-C
New York, NY 10038

Daniel Sullivan
106 valentine Lane Apt 1E
Yonkers, Ny 10705

October 6, 2021

Dear Lt. Mantellino

Under the provisions of the New York Freedom of Information Law, Article 6 of the Public Officers Law, I
hereby request a copy of records or portions thereof pertaining to Giovanni Marte D.O.B October 31,
1991 with a arrest date of January 10, 2015 and January 19,2015.

I am respectfully requesting any police reports, supplementary reports and accusatory reports that is in
possession or control of the New York City Police Department, with the name Giovanni Marte D.O.B
October 31, 1991 with a arrest date of January 10, 2015 and January 19,2015.

Respectfully Submitted,



**POLICE DEPARTMENT**
**LEGAL BUREAU**
F.O.I.L Unit, Room 110C
One Police Plaza
New York, NY 10038

Daniel Sullivan
106 Valentine Lane
Apt 1E
Yonkers, NY, 10705

January 11, 2022

FOIL Request #: FOIL-2021-056-16180
Your File #:

Dear Sir or Madam:

This is in response to your request received by this office on November 2, 2021 in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

I must deny access to the records you requested on the basis of Public Officers Law Section 87(2)(a). These records are sealed under court order, pursuant to Criminal Procedure Law Section 160.50 and can only be requested by the arrested person or their representative.

In order to release these records, this unit must receive a notarized affidavit from the arrested person or their representative within thirty (30) days of the date of this letter, addressed to the attention of Chinnock (646-610-6445), who has been assigned to handle your case. Failure to do so will result in this file being CLOSED.

You must notify this unit of any changes to address. Failure to do so will render this unit unable to give you the document(s) you requested.

Very truly yours,

*LT M. M*

Richard Mantellino
Lieutenant
New York City Police Department (NYPD)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*1 Saint Andrew's Plaza*
*New York, New York 10007*

June 25, 2021

**BY ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:    *United States v. Ivan Brea*, 19-CR-821 (KMW)

Dear Judge Wood:

The Government respectfully submits this letter in connection with the sentencing of the defendant, Ivan Brea, which is scheduled for June 30, 2021. For the reasons set forth below, the Government submits that a sentence within the stipulated Guidelines range of 100 to 125 months' imprisonment would be fair and appropriate.

**A. Background**

From at least January 2016 through November 2019, Ivan Brea and others were members of a drug trafficking organization that conspired to distribute crack cocaine, cocaine, Oxycodone, Percocet, and marijuana. PSR ¶ 2. Members of the conspiracy sold drugs out of a small grocery store named "Lia's Deli Grocery." PSR ¶ 16. Brea held a managerial role in the conspiracy. PSR ¶ 18. He was responsible for overseeing and re-supplying the crack that was on hand for re-sale, and he managed the shifts during which members of the conspiracy sold drugs out of the store. PSR ¶ 18. During the conspiracy, some of Brea's co-conspirators possessed firearms in furtherance of the drug trafficking organization. PSR ¶ 17.

In November 2019, a Grand Jury charged Brea and others with conspiring to distribute 280 grams and more of crack cocaine, in violation of 21 U.S.C. § 841(b)(1)(A), conspiring to distribute a detectable amount of cocaine, Oxycodone, and Percocet, in violation of § 841(b)(1)(C), and conspiring to distribute marijuana, in violation of § 841(b)(1)(D). On December 18, 2020, Brea pled guilty to a lesser included offense, conspiring to distribute a quantity of crack cocaine, in violation of § 841(b)(1)(C). Brea has acknowledged that he conspired to distribute more than 280 grams of crack. PSR ¶ 8.

Under the plea agreement, the parties stipulated that the Guidelines range is 100 to 125 months' imprisonment. PSR ¶ 8. However, Probation calculates the Guidelines range as 140 to

Hon. Kimba M. Wood                                                              Page 2
June 25, 2021

175 months' imprisonment, based on its conclusion that—because Brea was on parole at the time
he committed this offense—he has ten criminal history points and is in criminal history category
V, not criminal history category IV (as stipulated in the plea agreement). *See* PSR ¶ 82.

## B. Discussion

For the reasons discussed below, a sentence within the stipulated Guidelines range of 100
to 125 months' imprisonment is necessary to reflect the seriousness of the offense, Brea's history
and characteristics, the need to adequately deter criminal conduct, and the need to protect the
public.

### 1. Applicable Law

As the Court is well aware, district courts must treat the Sentencing Guidelines as the
"starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552
U.S. 38, 46 (2007). After that calculation, the Court must consider the seven factors outlined in
18 U.S.C. § 3553, which include the nature and circumstances of the offense, the individual
characteristics of the defendant, the need to adequately deter criminal conduct and promote respect
for the law, and the need to protect the public from further crimes of the defendant. *Id.* at 50 &
n.6.

### 2. A Within-Guidelines Sentence Is Necessary

The Government respectfully submits that a sentence within the stipulated Guidelines
range of 100 to 125 months' imprisonment would be fair and appropriate. First, Brea committed
an incredibly serious crime. He sold more than 280 grams of crack, facilitating his customers'
addictions to a dangerous substance and placing them and his community at great risk. Some of
Brea's co-conspirators also possessed firearms in furtherance of the conspiracy, greatly increasing
the threat posed by the drug trafficking organization. PSR ¶ 17. And Brea was a major player in
the organization. He held a leadership role, overseeing and re-supplying the crack supply and
managing the shifts during which co-conspirators sold drugs out of the store. PSR ¶ 18. A within-
Guidelines sentence is therefore appropriate to reflect the seriousness of the offense, to promote
respect for the law, and to provide just punishment for the offense.

Second, Brea's history and characteristics justify a sentence within the stipulated
Guidelines range. This is Brea's fourth criminal conviction, and his third drug-related conviction.
In 2009, Brea was convicted of criminal possession of a narcotic drug in the fourth degree, and
sentenced to 1 to 3 years' imprisonment. PSR ¶ 39. Brea later violated the conditions of his parole.
PSR ¶ 39. In 2011, Brea was convicted of criminal possession of a weapon in the fourth degree
and sentenced to 6 months' imprisonment, in connection with an incident in which he possessed
brass knuckles and a gravity knife and in which he attempted to evade arrest. PSR ¶ 40. In 2014,
Brea was convicted of criminal sale of a controlled substance in the third degree and sentenced to
18 months' imprisonment. PSR ¶ 41. He violated his parole a second time in 2016. Then, from
2016 to 2019, Brea committed the instant offense, including while he was still on parole. *See* PSR

Hon. Kimba M. Wood                                                                                   Page 3
June 25, 2021

p. 21 ("Brea is a repeat offender who has failed to benefit from a prior term of imprisonment and
committed the instant offense while under parole supervision."). Following his arrest in this case,
Brea has twice been disciplined in prison, for possessing a dangerous weapon and for interfering
with a BOP staff member's official duties. PSR ¶¶ 11-12. In sum, Brea has repeatedly engaged
in criminal conduct (including drug trafficking and possession of weapons), has repeatedly
violated parole conditions, and has broken the rules in prison as well. A within-Guidelines
sentence is therefore necessary to reflect his history and characteristics.

        Third, the compelling need for both specific and general deterrence justifies a within-
Guidelines sentence. Brea's prior interactions with the criminal justice system were clearly
insufficient to deter him from committing new crimes. The Court should impose a sentence that,
unlike Brea's prior punishments, ensures that he—and others like him—do not make these types
of choices again.

        Fourth, a sentence within the stipulated Guidelines range is justified by the need to protect
the public. Brea's history of drug trafficking and weapon possession demonstrates his danger to
the community. There is a significant risk that, upon his release, Brea will once again return to
selling drugs and possessing weapons. A within-Guidelines sentence is therefore necessary to
protect the public.

**C. Conclusion**

        For the reasons set forth above, a sentence within the stipulated Guidelines range of 100 to
125 months' imprisonment would be fair and appropriate in this case.


                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York


                                 By: __/s/_____
                                        Jim Ligtenberg
                                        Assistant United States Attorney
                                        (914) 993-1953


cc:     James M. Roth, Esq. (by ECF)

Lt. Richard Mantellino
Legal Bureau – FOIL Unit
One Police Plaza, Room 110-C
New York, NY 10038

Daniel Sullivan
106 valentine Lane Apt 1E
Yonkers, Ny 10705

July 31, 2021

Dear Lt. Mantellino

Under the provisions of the New York Freedom of Information Law, Article 6 of the Public Officers Law, I hereby request a copy of records or portions thereof pertaining to Ivan Brea D.O.B 02/13/91 with arrest date's in the years of 2009 for criminal possession of narcotics, 2011 for criminal possession of a weapon and for criminal sale of a controlled substance.

I am respectfully requesting any police reports, supplementary reports and accusatory reports that is in possession or control of the New York City Police Department, with the name Ivan Brea D.O.B 02/13/91 with arrest date's in the years of 2009 for criminal possession of narcotics, 2011 for criminal possession of a weapon and for criminal sale of a controlled substance attached them.

Respectfully Submitted,



POLICE DEPARTMENT
LEGAL BUREAU
F.O.I.L Unit, Room 110C
One Police Plaza
New York, NY 10038

Daniel Sullivan
106 VALENTINE LANE
1E
YONKERS, NY, 10705

August 6, 2021

FOIL Request #: FOIL-2021-056-11872

Your File #: **IVAN BREA 02/13/1991**

Dear Sir or Madam:

    This is in response to your request received by this office on August 5, 2021 in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

    Your request has been assigned to Principal II Ellis (646-610-6436) of this office. Before a determination can be rendered, further review is necessary to assess the potential applicability of exemptions set forth in FOIL, and whether the records can be located. I estimate that this review will be completed, and a determination issued within 90 business days of this letter.

    This is not a denial of the records you requested. Should your request be denied in whole or in part, you will then be advised in writing of the reason for any denial, and the name and address of the Records Access Appeals Officer.

**Note: Due to issues caused by the COVID-19 pandemic there may be extensive delays, lasting up to one year, in determining your request.**

Very truly yours,

Richard Mantellino
Lieutenant
New York City Police Department (NYPD)



POLICE DEPARTMENT
LEGAL BUREAU
F.O.I.L Unit, Room 110C
One Police Plaza
New York, NY 10038

Daniel Sullivan
106 VALENTINE LANE
1E
YONKERS, NY, 10705

August 12, 2021

FOIL Request #: FOIL-2021-056-11872
Your File #:

Dear Sir or Madam:

    This is in response to your request received by this office on August 5, 2021 in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

    I must deny access to the records you requested on the basis of Public Officers Law Section 87(2)(a). These records are sealed under court order, pursuant to Criminal Procedure Law Section 160.50 and can only be requested by the arrested person or their representative.

    In order to release these records, this unit must receive a notarized affidavit from the arrested person or their representative within thirty (30) days of the date of this letter, addressed to the attention of Principal II Ellis (646-610-6436), who has been assigned to handle your case. Failure to do so will result in this file being CLOSED.

    You must notify this unit of any changes to address. Failure to do so will render this unit unable to give you the document(s) you requested.

Very truly yours,

Richard Mantellino
Lieutenant
New York City Police Department (NYPD)



Services   News   Government   Local

## Department of Corrections and Community Supervision

# Inmate Information

Inmate Information Data Definitions are provided for most of the elements listed below. When a detailed definition is available for a specific element, you may click on the element's label to view it.

### Identifying and Location Information
### As of 01/07/20

| DIN (Department Identification Number) | 14R1707 |
|---|---|
| Inmate Name | BREA, IVAN |
| Sex | MALE |
| Date of Birth | 02/13/1991 |
| Race / Ethnicity | HISPANIC |
| Custody Status | RELEASED |
| Housing / Releasing Facility | HALE CREEK ASACTC |
| Date Received (Original) | 06/20/2014 |
| Date Received (Current) | 06/20/2014 |
| Admission Type | |
| County of Commitment | NEW YORK |
| Latest Release Date / Type (Released Inmates Only) | 06/19/15 PAROLE - COND REL TO PAROLE |

### Crimes of Conviction
If all 4 crime fields contain data, there may
be additional crimes not shown here. In
this case, the crimes shown here are those
with the longest sentences.

As of 01/07/20

| Crime | Class |
|-------|-------|
| CRIM SALE CONTR SUBSTANCE 3RD | B |
|  |  |
|  |  |
|  |  |

Sentence Terms and Release Dates

Under certain circumstances, an inmate may be released prior to serving his or her minimum term and before the earliest release date shown for the inmate.

As of 01/07/20

| | |
|---|---|
| Aggregate Minimum Sentence | 0001 Years, 03 Months, 12 Days |
| Aggregate Maximum Sentence | 0001 Years, 06 Months, 00 Days |
| Earliest Release Date | |
| Earliest Release Type | |
| Parole Hearing Date | |
| Parole Hearing Type | FULL MAXIMUM |
| Parole Eligibility Date | 09/08/2014 |
| Conditional Release Date | NONE |
| Maximum Expiration Date | 07/23/2017 |
| Maximum Expiration Date for Parole Supervision | |
| Post Release Supervision Maximum Expiration Date | 07/23/2017 |
| Parole Board Discharge Date | 11/23/2016 |

**Department of Corrections and Community Supervision**

Lt. Richard Mantellino
Legal Bureau – FOIL Unit
One Police Plaza, Room 110-C
New York, NY 10038

Daniel Sullivan
106 valentine Lane Apt 1E
Yonkers, Ny 10705

RE: Foil Request

Dear Lt. Mantellino

Under the provisions of the New York Freedom of Information Law, Article 6 of the Public Officers Law, I
hereby request a copy of records or portions thereof pertaining to Jonathan Santos D.O.B June 16, 1986.

I am respectfully requesting any police reports, supplementary reports and accusatory reports that is in
possession or control of the New York City Police Department, with the name Jonathan Santos D.O.B
June 16, 1986 attached to them.

Respectfully Submitted,



POLICE DEPARTMENT
LEGAL BUREAU
F.O.I.L Unit, Room 110C
One Police Plaza
New York, NY 10038

Daniel Sullivan                                          September 24, 2020
106 Valentine Lane
Apt 1E                                                   FOIL Request #: FOIL-2020-056-14188
Yonkers, NY, 10705                                       Your File #: Jonathan Santos

Dear Sir or Madam:

This is in response to your request received by this office on September 21, 2020 in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

Your request has been assigned to Principal II Ellis (646-610-6436) of this office. Before a determination can be rendered, further review is necessary to assess the potential applicability of exemptions set forth in FOIL, and whether the records can be located. I estimate that this review will be completed, and a determination issued within 90 business days of this letter.

This is not a denial of the records you requested. Should your request be denied in whole or in part, you will then be advised in writing of the reason for any denial, and the name and address of the Records Access Appeals Officer.

**Note: Due to issues caused by the COVID-19 pandemic there may be extensive delays, lasting up to one year, in determining your request.**

Very truly yours,

Richard Mantellino
Lieutenant
New York City Police Department (NYPD)



POLICE DEPARTMENT
LEGAL BUREAU
F.O.I.L Unit, Room 110C
One Police Plaza
New York, NY 10038

Daniel Sullivan                                    October 23, 2020
106 Valentine Lane
Apt 1E                                             FOIL Request #: FOIL-2020-056-14188
Yonkers, NY, 10705                                 Your File #:

Dear Sir or Madam:

   This letter is in response to your request received by this office on September 21, 2020 in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

☑ Responsive to your request, the following document(s) have been accessed and photocopied:

*NYPD arrest reports*

☑ Redactions have been made to the document(s) in that the release of such information would represent an unwarranted invasion of person privacy and would endanger the life and safety of any person {§87.2 (b) and (f)}.
☐ For the following requested item(s), I must refer you to the appropriate agency/agencies or unit that may be in possession of such documents:

☑ In total, *9* page(s) have been copied. Please remit payment in the amount of $*No charge* within thirty (30) days. Failure to do so will result in this file being CLOSED.
☐ The case folder contained records that did not directly pertain to the accident. Such records are not included in the enclosed CD/DVD-ROM.
   ☑ The requested documents are enclosed with this letter.
   ☐ Upon receipt of payment, the requested documents will be mailed.

**PAYMENT PROCEDURE**

| Send check or money order (no cash) payable to the **"New York City Police Department"** Mail payment to: New York Police Department, F.O.I.L. Unit, Room 110C, One Police Plaza, New York, NY 10038 **Note: Please include the FOIL number on the check or money order** |
| --- |

**APPEAL PROCEDURE**

| Should you so desire, you may appeal this decision or any portion thereof. Such an appeal must be made in writing, within thirty (30) days of the date of this letter, and must be forwarded to: Sergeant Jordan S. Mazur, Records Appeals Officer, New York City Police Department, One Police Plaza, Room 1406, New York, NY 10038 Pl or emailed to foilappeals@nypd.orgease include copies of the FOIL request and this letter with your appeal. |
| --- |

Very truly yours,

Richard Mantellino
Lieutenant
New York City Police Department (NYPD)



Services   News   Government   Local

## Department of Corrections and Community Supervision

Visitors   ▶   *Inmate Lookup*

# Inmate Lookup

## Inmate Information

Inmate Information Data Definitions are provided for most of the elements listed below. When a detailed definition is available for a specific element, you may click on the element's label to view it.

| Identifying and Location Information As of 09/17/20 | |
|---|---|
| DIN (Department Identification Number) | 16R2725 |
| Inmate Name | SANTOS, JONATHAN |
| Sex | MALE |
| Date of Birth | 06/16/1986 |
| Race / Ethnicity | HISPANIC |
| Custody Status | RELEASED |
| Housing / Releasing Facility | QUEENSBORO |

| Date Received (Original) | 10/17/2016 |
|---|---|
| Date Received (Current) | 10/17/2016 |
| Admission Type | |
| County of Commitment | NEW YORK |
| Latest Release Date / Type (Released Inmates Only) | 05/24/18 PAROLE - COND REL TO PAROLE |

### Crimes of Conviction
If all **4 <u>crime</u>** fields contain data, there may be additional crimes not shown here. In this case, the crimes shown here are those with the longest sentences.
### As of 09/17/20

| Crime | Class |
|---|---|
| ASSAULT 2ND | D |
| CRIM POSS CONTR SUBSTANCE 3RD | B |
| | |
| | |

### Sentence Terms and Release Dates
Under certain circumstances, an inmate may be released prior to serving his or her minimum term and before the earliest release date shown for the inmate.
### As of 09/17/20

| Aggregate Minimum Sentence | 0000 Years, 00 Months, 00 Days |
|---|---|

| | |
|---|---|
| Aggregate Maximum Sentence | 0002 Years, 00 Months, 00 Days |
| Earliest Release Date | |
| Earliest Release Type | |
| Parole Hearing Date | 03/2018 |
| Parole Hearing Type | RELEASE CONDITIONS |
| Parole Eligibility Date | |
| Conditional Release Date | 05/24/2018 |
| Maximum Expiration Date | 09/08/2018 |
| Maximum Expiration Date for Parole Supervision | |
| Post Release Supervision Maximum Expiration Date | 05/24/2020 |
| Parole Board Discharge Date | |

# Department of Corrections and Community Supervision

**Accessibility**     **Contact Us**     **Disclaimer**     **Language Access**     **Privacy Policy**

f     𝕏     

Marte - Direct by Mr. Adelsberg

 127

```
 1   met up with him.  Tito waited for him in the building.  Tito --

 2   when I got to the ninth floor, Tito took out a gun on him, and

 3   we took the drugs, and we just left.

 4        Q.   Was anyone hurt during that robbery?

 5        A.   No.

 6        Q.   Turning now to the third robbery, when did that

 7   robbery occur?

 8        A.   2014.

 9        Q.   How much did you steal during that robbery?

10        A.   $10,000.

11        Q.   Who did you do it with?

12        A.   Some guy named Bodie.

13        Q.   Who is Bodie?

14        A.   Jonathan Santos.

15        Q.   How did you know Jonathan Santos?

16        A.   He is a guy -- a guy from the neighborhood that

17   Virginia and I grew up with.

18        Q.   What happened during this third robbery?

19        A.   I used to deal with some guy.  I used to buy kilos of

20   cocaine from him, and he used to buy from me sometimes.  One

21   time he told me he needed one, so I told him I was going to give

22   it -- sell it to him.  So I met up with him in a building.  When

23   he went in the building, the stairs, Bodie was waiting for him,

24   and we took the money he had on him, and we just left.

25        Q.   Was anyone hurt?
```

Marte – Direct by Mr. Adelsberg                              128

```
 1        A.    No.

 2        Q.    When did the fourth robbery occur?

 3        A.    2015.

 4        Q.    How much did you steal during that robbery?

 5        A.    A kilo of cocaine.

 6        Q.    What's the name of the person you did that robbery

 7   with?

 8        A.    Tito.

 9        Q.    What happened during the fourth robbery?

10        A.    A guy I used to buy drugs from told me, he was moving

11   to another country.  I knew I wasn't ever going to see him

12   again, so I was being selfish, so I told him I needed a kilo of

13   cocaine and met up with him in a building.  Tito waited for us

14   in the last floor, and when we got there, Tito took out a gun on

15   him and just took the kilo and left.

16        Q.    Was anyone hurt?

17        A.    No.

18        Q.    When did the fifth robbery occur?

19        A.    Around the same time, 2015.

20        Q.    How much did you steal during that robbery?

21        A.    Kilo of cocaine.

22        Q.    What's the name of the person you did that robbery

23   with?

24        A.    Bodie.

25        Q.    What happened during this robbery?
```

*(handwritten annotations:)* WASN'T HE INCARCERATED BY THIS TIME? — Jonathan Santos 06/16/1986 16-R-2725 — ID Nam Page 12 Line 14

DARBY GINSBERG, RPR (914) 390-4102

ARREST Report - M16608633                                             Page 1 of 3



## New York City Police Department
## Omniform System - Arrests

| | |
|---|---|
| *RECORD STATUS: NYSID ENTERED* | Arrest ID: M16608633 - P |
| **Arrest Location: FRONT OF 97 ELLWOOD STREET APT:** | Pct: 034 |

**Arrest Date: 02-03-2016**  Processing Type: ON LINE   Current Location of Perpetrator:

**Time: 10:20:00**  DCJS Fax Number: MO005516   Borough: Manhattan

Sector: C   Special Event Code: NO -   Type: ALL PD LOCATIONS

Strip Search Conducted: NO   DAT Number:   Location: 034 PRECINCT

Viper Initiated Arrest: NO   ICAD#

Stop And Frisk: NO   Return Date: 0000-00-00

Serial #: 0000-000-00000

---

**COMPLAINTS:**                                       Arrest #: M16608633

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2016-034-00660 | 2016-02-03 | Valid, Initial Arrests made 2016-02-03 | 09:50 |

---

**CHARGES:**                                          Arrest #: M16608633

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 220.16 01 | F | B | 1 | CPCS-3RD:NARC DRUG INT/SELL |
| #02 | No | PL 221.20 | F | E | 1 | CRIM POSS MARIHUANA-3RD: >8 OZ |

| How Arrest came about: | | # Injuries: 00 | # Fatalities: 00 | Test Given: | | Reason Vehicle Not Forfeit: | | |
|---|---|---|---|---|---|---|---|---|
| Blood Specimen Taken: | Blood Specimen Refused: | Urine Specimen Taken: | Urine Specimen Refused: | Oral Fluid Specimen Taken: | Oral Fluid Specimen Refused: | Breath Sample Refused: | Breath Sample Reading: | BrAC: |
| Role: IDTU Technician | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: | IDTU/Blood Case No: |
| Role: Point Person | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: |
| Role: Supv in Charge of Checkpoint | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: |

---

**DETAILS:**                                          Arrest #: M16608633

AT T/P/O SUBJECT WAS FOUND TO BE IN POSSESSION OF A QUANTITY OF COCAINE AND MARIJUANA.

---

**DEFENDANT: SANTOS, JONATHAN**      NYSID #:          Arrest #: M16608633

| | | Order Of Protection: NO |
|---|---|---|
| Nick/AKA/Maiden: | Height: 5FT 9IN | Issuing Court: |
| Sex: MALE | Weight: 216 | Docket #: |
| Race: WHITE HISPANIC | Eye Color: BROWN | Expiration Date: |
| Age: 29 | Hair Color: BLACK | Relation to Victim: STRANGER |
| Date Of Birth: 06/16/1986 | Hair Length: SHORT | Living together: NO |
| U.S. Citizen: YES | Hair Style: CAESAR | Can be Identified: YES |
| Place Of Birth: USA | Skin Tone: MEDIUM | |
| Is this person not Proficient in English?: NO | Complexion: CLEAR | |
| If Yes, Indicate Language: | | |
| Accent: NO | Soc.Security #: 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 | |
| | Occupation: NONE | Gang/Crew Affiliation: NO |

ARREST Report - M16608633

Page 2 of 3

| Identification ID: | Name: |
| Identification #: | Identifiers: |
| Physical Condition: **APPARENTLY NORMAL** | Lic/Permit Type: |
| Drug Used: **NONE** | Lic/Permit No: |

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|---|---|---|---|---|---|---|
| HOME-PERMANENT | 97 ELLWOOD STREET | MANHATTAN | NEW YORK | ████████ | | 034 |

Phone # and E-Mail Address:

N.Y.C.H.A. Resident: NO   N.Y.C. Housing Employee: NO   On Duty: NO
Development:         N.Y.C. Transit Employee: NO

Physical Force: **NONE**

Gun:
Weapon Used/Possessed: NONE          Make:          Recovered: NO
  **Non-Firearm Weapon:**          Color:   Serial Number Defaced:
Other Weapon Description:          Caliber:          Serial Number:
                  Type:
              Discharged: NO

Used Transit System: NO
Station Entered:
Time Entered:
Metro Card Type:
Metro Card Used/Poses:
Card #:

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | UNK |
| CLOTHING | ACCESSORIES - SWEAT / JOGGING CLOTHES - BLACK |
| CLOTHING | FOOTWEAR - SNEAKERS - BLACK |
| CLOTHING | OUTERWEAR - T-SHIRT OR TANK TOP - BLACK |
| CLOTHING | HEADGEAR - UNK - UNKNOWN COLOR |
| CHARACTERISTICS | BEARDED |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

| JUVENILE DATA: | Arrest #: M16608633 |
|---|---|

Relative Notified:   Personal Recog:
Number Of Priors: 0      Name:
School Attending:   Phone Called:
Mother's Maiden Name:   Time Notified:

| ASSOCIATED ARRESTS: | Arrest #: M16608633 |
|---|---|

ARREST ID   COMPLAINT #
████████████

| No Vehicles for Arrest # |
|---|

| DEFENDANTS CALLS: | Arrest #: M16608633 |
|---|---|

| CALL # | NUMBER DIALED | NAME - PROVIDED BY DEFENDANT | NAME AS LISTED IN CELL PHONE | RELATIONSHIP | CALL COMPLETED |
|---|---|---|---|---|---|
| 1 | - - | REFUSED,REFUSED | | | |

| INVOICES: | Arrest #: M16608633 |
|---|---|

ARREST Report - M16608633                                    Page 3 of 3

| INVOICE# | COMMAND | PROPERTY TYPE | VALUE |
|----------|---------|---------------|-------|
| 1000755872 | 034 | DRUGS/NARCOTICS | |
| 1000755873 | 034 | CURRENCY - US | |
| 1000755875 | 034 | MARIJUANA/HASHISH | |
| 1000755876 | 034 | TELEPHONE (SEIZURE) | |
| 1000755878 | 034 | NARCOTIC PARAPHENALIA | |

**ARREST RULES:**                                Arrest #: **M16608633**

**ARRESTING OFFICER: DT3 COREY GRESKO**      Arrest #: **M16608633**

| | |
|---|---|
| Tax Number: **932745**  On Duty: **YES** | **Force Used:** NO - No Force Used by any MOS |
| Other ID (non-NYPD): **0**  In Uniform: **NO** | Type: |
| Shield: **1660**  Squad: **NS** | Reason: |
| Department: **NYPD**  Chart: **08** | Officer Injured: **NO** |
| Command: **580**  Primary Assignment: **INVESTIGATIVE** | Officer Body Worn Camera: |
| | TRI Number: **0000-000-00000 Suffix: 0** |

| | Tax #: | Command: | Agency: |
|---|---|---|---|
| Arresting Officer Name:<br>**DT3 GRESKO, COREY** | **932745** | **580** | **NYPD** |
| Supervisor Approving:<br>**SGT DALY CHRISTOP** | Tax #:<br>**922204** | Command:<br>**580** | Agency:<br>**NYPD** |
| Report Entered by:<br>**DT3 GRESKO, COREY** | Tax #:<br>**932745** | Command:<br>**580** | Agency:<br>**NYPD** |

**END OF ARREST REPORT**
**M16608633**

Print this Report

ARREST Report - M16608634 Page 1 of 3



# New York City Police Department
## Omniform System – Arrests

**RECORD STATUS: NYSID ENTERED** | **Arrest ID: M16608634 - N**

**Arrest Location: INSIDE OF 4295 BROADWAY** | **Pct: 034**

| | | |
|---|---|---|
| **Arrest Date: 02-03-2016** | Processing Type: ON LINE | Current Location of Perpetrator: |
| **Time: 11:45:00** | DCJS Fax Number: MO005517 | Borough: Manhattan |
| Sector: B | Special Event Code: NO - | Type: ALL PD LOCATIONS |
| Strip Search Conducted: NO | DAT Number: | Location: 034 PRECINCT |
| Viper Initiated Arrest: NO | ICAD# | |
| Stop And Frisk: NO | Return Date: 0000-00-00 | |
| Serial #: 0000-000-00000 | | |

## COMPLAINTS: — Arrest #: M16608634

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2015-034-05151 | 2015-09-26 | Valid, Initial Arrests made | 2015-09-26 | 04:35 |

## CHARGES: — Arrest #: M16608634

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 120.06 | F | C | 1 | GANG ASSAULT 2ND DEGREE |

| How Arrest came about: | # Injuries: 00 | # Fatalities: 00 | Test Given: | | Reason Vehicle Not Forfeit: |
|---|---|---|---|---|---|

| Blood Specimen Taken: | Blood Specimen Refused: | Urine Specimen Taken: | Urine Specimen Refused: | Oral Fluid Specimen Taken: | Oral Fluid Specimen Refused: | Breath Sample Refused: | Breath Sample Reading: | BrAC: |
|---|---|---|---|---|---|---|---|---|

| Role: IDTU Technician | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: | IDTU/Blood Case No: |
|---|---|---|---|---|---|---|---|---|---|
| Role: Point Person | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: | |
| Role: Supv in Charge of Checkpoint | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: | |

## DETAILS: — Arrest #: M16608634

AT T/P/O DEFT DID STRIKE THE C/V WITH A METAL BAR, ALONG WITH APPROXIMATELY THREE UNIDENTIFIED OTHERS WHO ALSO TOOK PART IN THE ASSAULT, CAUSING THE C/V TO SUFFER A BROKEN RIGHT ARM.

## DEFENDANT: SANTOS, JONATHAN    NYSID #: ▓▓▓▓    Arrest #: M16608634

| | | |
|---|---|---|
| Nick/AKA/Maiden: NONE | Height: 5FT 10IN | Order Of Protection: NO |
| Sex: MALE | Weight: 216 | Issuing Court: |
| Race: WHITE HISPANIC | Eye Color: BROWN | Docket #: |
| Age: 29 | Hair Color: BLACK | Expiration Date: |
| Date Of Birth: 06/16/1986 | Hair Length: SHORT | Relation to Victim: UNKNOWN/NONE |
| U.S. Citizen: YES | Hair Style: CLOSE CUT | Living together: NO |
| Place Of Birth: USA | Skin Tone: MEDIUM | Can be identified: NO |
| Is this person not Proficient in English?: NO | Complexion: CLEAR | |
| If Yes, Indicate Language: | | |
| Accent: NO | Soc.Security #: 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 | |
| | Occupation: NONE | Gang/Crew Affiliation: NO |

ARREST Report - M16608634                                    Page 2 of 3

| Identification·ID: | NYS DMV Non-Driver Photo Identification | | Name: | |
| Identification | ▓▓▓▓▓▓▓ | | Identifiers: | |
| Physical Condition: | APPARENTLY NORMAL | Lic/Permit Type: | | |
| Drug Used: NONE | | Lic/Permit No: | | |

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|---|---|---|---|---|---|---|
| HOME-PERMANENT | 97 ELLWOOD STREET | MANHATTAN | NEW YORK | 10034▓ | | 034 |

Phone # and E-Mail Address:
Ce▓▓▓▓▓

N.Y.C.H.A. Resident: NO   N.Y.C. Housing Employee: NO   On Duty:
    Development:    N.Y.C. Transit Employee: NO

**Physical Force: NONE**

| Gun: | | | |
|---|---|---|---|
| Weapon Used/Possessed: USED/DISPLAYED | Make: | Recovered: NO | |
| Non-Firearm Weapon: | Color: | Serial Number Defaced: | |
| Other Weapon Description: | Caliber: | Serial Number: | |
| | Type: | | |
| | Discharged: NO | | |

| Used Transit System: NO |
|---|
| Station Entered: |
| Time Entered: |
| Metro Card Type: |
| Metro Card Used/Poses: |
| Card #: |

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | STRUCK WITH OBJECT |
| CLOTHING | ACCESSORIES - JEANS - BLACK |
| CLOTHING | FOOTWEAR - SNEAKERS - BLACK |
| CLOTHING | OUTERWEAR - T-SHIRT OR TANK TOP - BLACK |
| CLOTHING | HEADGEAR - UNK - UNKNOWN COLOR |
| CHARACTERISTICS | BEARDED |
| CHARACTERISTICS | MUSTACHE |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

| JUVENILE DATA: | Arrest #: M16608634 |
|---|---|

| | Relative Notified: Personal Recog· |
|---|---|
| Number Of Priors: 0 | Name: |
| School Attending: | Phone Called: |
| Mother's Maiden Name: | Time Notified: |

| ASSOCIATED ARRESTS: | Arrest #: M16608634 |
|---|---|

| ARREST ID COMPLAINT # |
|---|

## No Vehicles for Arrest #

| DEFENDANTS CALLS: | Arrest #: M16608634 |
|---|---|

| CALL # | NUMBER DIALED | NAME - PROVIDED BY DEFENDANT | NAME AS LISTED IN CELL PHONE | RELATIONSHIP | CALL COMPLETED |
|---|---|---|---|---|---|
| 1 | - - | REFUSED,REFUSED | | | |

ARREST Report - M16608634                                          Page 3 of 3

| INVOICES: | Arrest #: M16608634 |
|---|---|

**INVOICE#** **COMMAND** **PROPERTY TYPE** **VALUE**

| ARREST RULES: | Arrest #: M16608634 |
|---|---|

| ARRESTING OFFICER: DT3 JOHN SCOZZAFAVA | Arrest #: M16608634 |
|---|---|

| | Force Used: NO - No Force Used by any MOS |
|---|---|
| Tax Number: 923148    On Duty: YES | Type: |
| Other ID (non-NYPD): 0    In Uniform: NO | Reason: |
| Shield: 4231    Squad: B | Officer Injured: NO |
| Department: NYPD    Chart: 08 | Officer Body Worn Camera: |
| Command: 255    Primary Assignment: INVESTIGATIVE | TRI Number: 0000-000-00000 Suffix: 0 |

| Arresting Officer Name: DT3 SCOZZAFAVA, JOHN | Tax #. 923148 | Command: 255 | Agency: NYPD |
|---|---|---|---|
| Supervisor Approving: SGT BLACK THOMAS | Tax #: 923563 | Command: 255 | Agency: NYPD |
| Report Entered by: DT3 SCOZZAFAVA, JO | Tax #: 923148 | Command: 255 | Agency: NYPD |

| END OF ARREST REPORT M16608634 |
|---|

Print this Report

ARREST Report - M16608644                                           Page 1 of 3



# New York City Police Department
## Omniform System - Arrests

| | |
|---|---|
| **RECORD STATUS: NYSID ENTERED** | **Arrest ID: M16608644 - J** |
| **Arrest Location: INSIDE OF 4295 BROADWAY** | **Pct: 034** |

**Arrest Date: 02-03-2016**   Processing Type: **ON LINE**   Current Location of Perpetrator:

**Time: 11:45:00**   DCJS Fax Number: **MO005526**   Borough: **Manhattan**

Sector: **B**   Special Event Code: **NO -**   Type: **ALL PD LOCATIONS**

Strip Search Conducted: **NO**   DAT Number:   Location: **034 PRECINCT**

Viper Initiated Arrest: **NO**   ICAD#

Stop And Frisk: **NO**   Return Date: **0000-00-00**

Serial #: **0000-000-00000**

## COMPLAINTS:                                                   Arrest #: M16608644

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2013-034-01546 | 2013-03-30 | Valid, Initial Arrests made 2013-03-30 | 03:20 | |

## CHARGES:                                                     Arrest #: M16608644

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 160.10 02A | F | C | 1 | ROB-2ND:CAUSES PHYSICAL INJURY |
| #02 | No | PL 160.05 | F | D | 1 | ROBBERY-3RD |

| How Arrest came about: | | | # Injuries: 00 | # Fatalities: 00 | Test Given: | | | Reason Vehicle Not Forfeit: |
|---|---|---|---|---|---|---|---|---|
| Blood Specimen Taken: | Blood Specimen Refused: | Urine Specimen Taken: | Urine Specimen Refused: | Oral Fluid Specimen Taken: | Oral Fluid Specimen Refused: | Breath Sample Refused: | Breath Sample Reading: | BrAC: |
| Role: IDTU Technician | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: | IDTU/Blood Case No: |
| Role: Point Person | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: |
| Role: Supv in Charge of Checkpoint | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: | MI: |

## DETAILS:                                                     Arrest #: M16608644

THE ABOVE DEFENDANT WAS ARRESTED IN CONNECTION WITH A ROBBERY THAT OCCURRED ON 3/30/2013 INSIDE OF 200 DYCKMAN STREET. DET CASE #2013-417

| **DEFENDANT: SANTOS, JONATHAN** | NYSID # <span style="background:black">████████</span> | Arrest #: M16608644 |
|---|---|---|

| | | |
|---|---|---|
| Nick/AKA/Maiden: | Height: **5FT 10IN** | Order Of Protection: **NO** |
| Sex: **MALE** | Weight: **216** | Issuing Court: |
| Race: **WHITE HISPANIC** | Eye Color: **BROWN** | Docket #: |
| Age: **29** | Hair Color: **BLACK** | Expiration Date: |
| Date Of Birth: **06/16/1986** | Hair Length: **SHORT** | Relation to Victim: **BOYFRIEND** |
| U.S. Citizen: **YES** | Hair Style: **CLOSE CUT** | Living together: |
| Place Of Birth: **USA** | Skin Tone: **LIGHT** | Can be Identified: **YES** |
| Is this person not Proficient in English?: **NO** | Complexion: **CLEAR** | |
| If Yes, Indicate Language: | | |
| Accent: **NO** | Soc.Security #: | |

| | | Occupation: UNKNOWN | Gang/Crew Affiliation: NO |
|---|---|---|---|
| Identification ID: | NYS DMV Non-Driver Photo Identification | | Name: |
| Identification # | ▓▓▓▓▓▓ | | Identifiers: |
| Physical Condition: | APPARENTLY NORMAL | Lic/Permit Type: | |
| Drug Used: | NONE | Lic/Permit No: | |

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|---|---|---|---|---|---|---|
| HOME-PERMANENT | 97 ELLWOOD STREET | MANHATTAN | NEW YORK | ▓▓▓▓▓ | | 034 |

Phone # and E-Mail Address:
CELL: 347▓▓▓▓▓▓▓▓

| IMEI 9999999999999999 | Cell Phone # | Carrier | Other | Make | Model | Insured |
|---|---|---|---|---|---|---|
| | | | | | | |

N.Y.C.H.A. Resident: NO   N.Y.C. Housing Employee:   On Duty:
Development:           N.Y.C. Transit Employee:

**Physical Force: USED**

| | | | |
|---|---|---|---|
| Gun: | | | |
| Weapon Used/Possessed: NONE | Make: | Recovered: | |
| Non-Firearm Weapon: | Color: | Serial Number Defaced: | |
| Other Weapon Description: | Caliber: | Serial Number: | |
| | Type: | | |
| | Discharged: NO | | |

| | |
|---|---|
| Used Transit System: NO | |
| Station Entered: | |
| Time Entered: | |
| Metro Card Type: | |
| Metro Card Used/Poses: | |
| Card #: | |

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | PROPERTY SNATCHED FROM HAND |
| ACTIONS TOWARD VICTIM | INJURY USING PHYSICAL FORCE |
| CLOTHING | ACCESSORIES - JEANS - BLACK |
| CLOTHING | FOOTWEAR - SNEAKERS - BLACK |
| CLOTHING | OUTERWEAR - T-SHIRT OR TANK TOP - BLACK |
| CLOTHING | HEADGEAR - UNK - UNKNOWN COLOR |
| CHARACTERISTICS | BEARDED |
| CHARACTERISTICS | MUSTACHE |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

| JUVENILE DATA: | Arrest #: M16608644 |
|---|---|

| | Relative Notified:   Personal Recog: |
|---|---|
| Number Of Priors: 0 | Name: |
| School Attending: | Phone Called: |
| Mother's Maiden Name: | Time Notified: |

| ASSOCIATED ARRESTS: | Arrest #: M16608644 |
|---|---|

| ARREST ID   COMPLAINT # |
|---|

| No Vehicles for Arrest # |
|---|

| DEFENDANTS CALLS: | Arrest #: M16608644 |
|---|---|

| CALL # | NUMBER DIALED | NAME - PROVIDED BY DEFENDANT | NAME AS LISTED IN CELL PHONE | RELATIONSHIP | CALL COMPLETED |
|--------|---------------|------------------------------|------------------------------|--------------|----------------|
| 1 | - - | REFUSED,REFUSED | | | |

| INVOICES: | Arrest #: **M16608644** |
|-----------|-------------------------|

| INVOICE# COMMAND PROPERTY TYPE VALUE |
|---|

| ARREST RULES: | Arrest #: **M16608644** |
|---------------|-------------------------|

**ARRESTING OFFICER: DT3 PATRICK MCCLINTOCK**     Arrest #: **M16608644**

| | |
|---|---|
| Tax Number: **927170**     On Duty: **YES**<br>Other ID (non-NYPD): **0** ·<br>Shield. **4376**     In Uniform: **NO**<br>Squad: **A**<br>Department: **NYPD**     Chart: **08**<br>Command: **255**    Primary Assignment: **INVESTIGATIVE** | **Force Used:** NO - No Force Used by any MOS<br>Type:<br>Reason:<br>Officer Injured: **NO**<br>Officer Body Worn Camera:<br>TRI Number: 0000-000-00000 Suffix: 0 |

| | Tax #: | Command: | Agency: |
|---|--------|----------|---------|
| Arresting Officer Name:<br>**DT3 MCCLINTOCK, PATRICK** | **927170** | **255** | **NYPD** |
| Supervisor Approving:<br>**SGT BLACK THOMAS** | **923563** | **255** | **NYPD** |
| Report Entered by:<br>**DT3 MCCLINTOCK, PA** | **927170** | **255** | **NYPD** |

**END OF ARREST REPORT**
**M16608644**

Print this Report

**3502-MM**

SA   JS
SB   BK
MF

WITNESS PREP
v/ GIOVANNY MARTE
6/5/18

- VB told you which days of the week the cash delivery usually arrived
- VB told him a few days before - not the same or the day before
- Sometimes they did deliveries on random days but typically followed a set schedule
- Marte bought masks & gloves but some of the robbers already had ~~people's~~ masks & gloves
- GM went to graphics, communications, arts → photography school
- Left school bc felt like it wasn't for me & was selling weed
- worked in mother's furniture store at 12^nd →13-15
- '' '' Porter → 17-19 restaurant → 16-18
- 17 when son was born
- Construction ~~demolition~~ → 2015-20-6 mts - full time
- demolition → '' '' '' '' ''
- porter at an adult day care 20-23 mts
- working 7 days/week
- sold to users, buyers, suppliers
- mostly meetups
- BGM worked w/ Smiley & Sandy (Smiley's cousin) to robbed/smuggle into DR
- other drug dealers & the Trinitarios
- Never part of the gang
- 3 shootouts w/ Trinitarios
- In one fight, GM's friend was stabbed

- Met w/ Jeff ~10 times before robbery.
- Jeff and 2 others once were robbing a guy. Coming out of wash saw them. jumped the guy.
- I knew he was about that life
- Initially told him everything; dont remember in first convo if I said bank/cashier but made sure he knew the full story told him had insider, but not who it was
  - $7K → before vacation  $10K → after vacation
  - Moved to mother's house for a few weeks after break up
- Last contact → Feb 2014 & then another woman

**1 of 1**




# GIOVANNY MARTE
# RTCC SUMMARY

GM

| ACCIDENTS | | |
|---|---|---|
| Date | Role | Event Id |
| 01/10/2015 | Driver | 0035 |

| ARRESTS | | | | |
|---|---|---|---|---|
| Date | Law Code | Sealed or Voided | Precinct | Arrest Number (Includes Check Digit) |
| 01/19/2015 | AGGRAVATED UNLIC OPER/MV-3RD | NO | 034 | M15603787-L |
| 01/10/2015 | AGGRAVATED UNLIC OPER VEH-3RD MV LICENSE VIOL:NO LICENSE | Sealed | 034 | M15601404-R |
| 04/22/2009 | CSCS-3RD:NARCOTIC DRUG | Sealed | 034 | M09637114-H |
| 03/30/2008 | CRIM POSS WEAP-4TH:INT TO USE | Sealed | 034 | M08628618-P |

| CJA INTERVIEW | | |
|---|---|---|
| Date | Charge | Precinct Number |
| 04/22/2009 | CSCS-3 | 034 |
| 03/30/2008 | CRIM POS WEAP-4 | 034 |

| C SUMMONS | | |
|---|---|---|
| Date | Charge | Precinct Number |
| 06/07/2012 | OTHER VTL - 9999 | 034 |

| NYC MOVING VIOLATIONS | |
|---|---|
| Event Date | Ticket Number |
| 01/19/2015 | AAY5107804 |
| 03/07/2014 | AAX2404846 |
| 03/07/2014 | AAX2404850 |
| 03/07/2014 | AAX2404861 |
| 03/07/2014 | AAX2404824 |
| 02/20/2014 | AAX0563216 |
| 02/20/2014 | AAX0563220 |
| 06/07/2012 | AAS2088741 |

| WARRANTS | | | | |
|---|---|---|---|---|
| Event Date | Type | Charge | Status | Event ID |
| 03/04/2015 | ARREST WARRANT | VTL 0511001 | ACTIVE | 5740255 |
| 02/26/2015 | SUMMONS | VTL 0512000 | CLOSED | 5737295 |
| 02/02/2015 | SUMMONS | VTL 0512000 | CLOSED | 5724985 |

 

# GIOVANNY MARTE
# EVENT SUMMARY

| EVENT SUMMARY | |
| --- | --- |
| Data Source | Number of Events |
| Accidents | 1 |
| Aided | 0 |
| Arrests | 4 |
| CJA Interview | 2 |
| C-Summons | 1 |
| Complaints | 0 |
| Domestic Incident Report | 0 |
| I-Cards | 0 |
| Juvenile Report | 0 |
| Lawman (DMV) | 1 |
| Nitro/Kite | 0 |
| NYC Doc(City Corrections) | 0 |
| NYS Doc(State Corrections) | 0 |
| NYC Moving Violations | 8 |
| Parking Summons | 0 |
| Parole | 0 |
| Probation | 0 |
| Shootings and Murders | 0 |
| Sex Offender (SOMU) | 0 |
| Stop Question & Frisk | 0 |
| Tab Summons | 0 |
| Warrants | 6 |

**JEROLD R. RUDERMAN**
CHAIRPERSON

𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐
𝕲𝖗𝖎𝖊𝖛𝖆𝖓𝖈𝖊 𝕮𝖔𝖒𝖒𝖎𝖙𝖙𝖊𝖊 𝖋𝖔𝖗 𝖙𝖍𝖊
𝕹𝖎𝖓𝖙𝖍 𝕵𝖚𝖉𝖎𝖈𝖎𝖆𝖑 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙
CROSSWEST OFFICE CENTER
399 KNOLLWOOD ROAD - SUITE 200
WHITE PLAINS, N.Y. 10603
**914-824-5070**

**DIANA MAXFIELD KEARSE**
**CATHERINE A. SHERIDAN**
ACTING CHIEF COUNSEL

**SHARON GURSEN ADES**
ACTING DEPUTY CHIEF COUNSEL

FORREST STRAUSS
MATTHEW LEE-RENERT
ANTONIA P. CIPOLLONE
ANTHONY R. WYNNE
GLENN E. SIMPSON
MATTHEW C. TOAL
MICHAEL J. KEARSE
STAFF COUNSEL

PATRICK A. SMITH
INVESTIGATOR

CONFIDENTIAL

October 8, 2021

Virginia Blanco
79564-054
33 ½ Pembroke Road
Danbury, CT 06811

Re: File 35447/18

Dear Ms. Blanco

This office has received your recent correspondence. The Committee notes that the allegations presented arise out of the same criminal matter about which you previously filed a complaint. Your new submissions do not set forth any basis for this office to investigate. The issues concerning the attorney's conduct during the course of the criminal matter, are matters more appropriately addressed through motion practice or appellate review.

Sincerely,

*Antonia Cipollone/ET*

Antonia Cipollone
Staff Counsel

AC/et

cc: Daniel Sullivan

**3502-PP**

JB MF
SA JM

Wit Prep w/ Monte 6/29

- VB knew that I was dealing drug since '69
  - kept drugs and gun in her spot on Ellwood
- GM was partners w/ Smiley → Smiley would
  give him Marijuana and ectasy pills
  on consignment
- GM & Smiley → dealing together from '09 until early 2011
- committed a shoot out w/ Smiley b/c they
  broke his car window
- Smiley & VB lived together for part of the
  time btwn 08-11
- Fight w/ Smiley about drugs - 2011
  - Smiley wasn't being consistent
  - Fist fight over a spot → Ellwood & 196
  - Smiley lost
- GM & Smiley owned the spot → 3 8 hr shifts
  - lookouts & pitchers & managers worked for GM
✓ - Only spot that GM had
- VB told GM that by taking Smiley's spot
- Only sold weed at spot → only
  had employees for weed sales
- VB would give drugs to Smiley's
  customers if Smiley was busy
- Smiley kept lbs of weed in VB's house
  - GM had only ounces
- Wouldn't go to VB's house alone
- Drug customers would give VB $ & VB would
  give drugs
- Never really spoke w/ Smiley after fight
✓ - Spot got raided so they shut it down
- After return to DR got back in to drug selling
  but didn't really communicate w/ Smiley again
- Summary: VB held drugs for Smiley & Guy
- VB also and met customers on Smiley's behalf
- VB brought them customers sometimes
- Sometimes he's with VB & Smiley calls to tell
  her to meet w/ customers
- ① GM & Smiley would give her $ for holding
  & helping w/ the drugs → few $100 dollars

**1 of 3**

**3502-PP**

- Post DR
    - marijuana, pills, & coke
    - would keep drugs @ Tito's apt or Delalb
    - Drugs in safe box
- Felix + Peña → VB father + Felix mother were sibs
    - VB's cousin - lives on 5th Fl in Ellwood
    - GM knew he was selling pills
    - GM first bought pills from him during summer
    - GM was buying thousands of pills/month
      from September 2012 - 2016
    - Cost from $5-10 a pill (percoset)
    - Felix would communicate w/ GM thru
      VB → They would deal in front of her @ 1-2/week
    - Felix would give her pills to give to GM
      ( more than 20 times → Sept 2012 - Spring 2013
    ( - Prices went up and they stopped dealing w/ him
      About half the times GM would give VB
      $ to give back to Felix
    - 2-3/week transactions btwn GM & Felix

Apt

    - privacy
    - didn't want to be in the neighborhood where
                                                  selling
                                                    drugs

Vewleth

    - Lived in 90 Ellwood
    - 2009 - 2013/ late/early 2014
    - buying m30s & percosets
    - partners w/ GM → GM would give cash
    - Sept 2012 - SPring 2013
    - Gave drugs to VB to give to GM
      5X & GM gave cash to VB to give to GM
      Vewleth 1-2X
    - VB: Transact in front of her → Once every 2 weeks
    - Friends w/ Vewleth

Smiley → purchased for him since at least 2006
  → late 2009 → shoe sint

**2 of 3**

3502-PP

- Grew up in the same neighborhood
- how her actress began
- she Progressed
  in
  she was living w/
- the got w/ Smile
- Smiley →

→ narcotics
   distribution
   spot

91A-NY-3502105 Serial 59

-1 of 1-

**3502-JJ**



FD-302 (Rev. 5-8-10)

### FEDERAL BUREAU OF INVESTIGATION

Date of entry    08/31/2015

> On August 12, 2015, ███████████████████, date of birth ███████████, home address ███████████████, ███████████, cellular telephone number ███████████, was interviewed by SA Brendan Kenney and TFO Brian Menton in an FBI vehicle.  After being advised of the identities of the interviewing agents and the nature of the interview, POLANCO provided the following information:

> GIO (known to the FBI as GIOVANNY MARTE) offered to sell ████ a firearm for $850.

> ███████████████████████ saw 50 as recently as a few weeks ago.

> ████ was shown a single photograph of ANDRES CRUZ, date of birth ███████, NYSID ████████.  ████ reviewed the photograph and immediately identified the individual in the photograph as 50.

> A copy of the photograph of CRUZ shown to ████ is digitally attached.

*924ᶜ*
*SEE Page 246 DOC 142*

| | | |
|---|---|---|
| Investigation on | 08/12/2015 | at New York, New York, United States (In Person) |
| File # | 91A-NY-3502105 | Date drafted  08/13/2015 |
| by | KENNEY BRENDAN M, MENTON BRIAN PATRICK | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Sadieli Marte

Grew up in same neighborhood, since 2006
hang out outside of school

VB was dating my brother
Would see them picking up her child from home
son Adrian - would he bring him to mother
✗ Lived together, never visted,
✗ think maybe in Yonkers

Close friend of Yezidel Moranta
just hi + bye
Lived w/ ~~their~~ mom when they were dating
Often in neighboorhood together

Older brother got along w/ VB
Nathaniel is 8 or 9 yrs old

When they arrested Gio, Priscilla an ex-gf told me about it

Ana - older sister lives in CA - moved

Never seen Gio w/ gun

BLANCO - 003706

5/3/18
Discov Disc

Questions for Ms. Marte

Met VB in 2003
live in Washington Heights - Bogardas Place

Gio + VB knew
    boyfriend & girlfriend
    knowledge since 2011
* they lived together - ~2012; he told me lived in Yonkers
    less than 2 year
    ~ Oct 2014 end of relationship

Would see them in the streets in W.H., Not in my house
    Would

Had a little boy at that time - ~6-7 yrs old
    always saw Gio w/ boy - always
    would see them in the park + on the street

VB she came to my house;
    when I opened the door, she came in, sat down, she said
    I want to speak to you about something
Said
    tell your son that he owes me my cut of the $

    she said wouldn't tell me what they did bc I would be an
        something very big at federal level        accomplice.

    2014 - I remember because just came back from DR
    | In DR, March of 2013
    └→ no it was 2015 - around February
Just the two of them
    I begged her
    She said again that I would become an accomplice
    Called my son - asked him what he did - I told him VB came
    He came to house, to begged he told me to relax
I said you cause me harm

BLANCO - 003704

She didn't say how much $

Didn't tell him to pay VB. He didn't say anything about VB.

Said he would speak to VB.

Didn't tell anyone else about the conversation

Never seen Gio w/ a gun

*Photos – $ found the photos – Gio had them in his bedroom

I kept that photograph

Just those photos

Doesn't know when they were taken

↳ My sons son, + VB, Gio + Virgina

↳ Nathaniel Marte

brother died

Died Feb. 13, 2013



BLANCO - 003705

Sam Adelsberg
Jay McMahon
Jamie Bagliebter
Brendan Kenney

Call w/ Johan

Gio's numbers were in his cell
  - New numbers 1x/mnth or so
  - Didn't delete old ones, just added new ones
Don't know any other Giovanni

Grew up ~~close~~ in neighborhood w/ VB
When Gio + VB met - they were young
  - Went to 21B - VB a bit older than me -
  - 2 yrs older than Gio

Son's father was one of my best friends growing up
                                    ⌐ also close w/
VB + Gio started dating - lived together at some point    VB's sister
Gio very private                to in the Bronx -
                                    never visited

Saw Gio w/ his son Adrian

Herbalife Distributor - do free workout classes
  - Didn't even speak

Told me what happened - was private but told me what happened
  - told me VB gave him info, when best time, where [crossed out]
  - said ~~[crossed out]~~ over 300K
Remember seeing him very nervous on the day - afternoon

3508-D

Shannon Becker
& Samuel Adelsberg
Jamie Bagliebter
Jay McMahon

4/19/18

Meeting w/ Johan

Gio would take care of VB's son
- the sons were close

Photo Strip #1 → Maurie, VB, Adnan, Maurie's son
#2 → VB + Maurie
#3 → VB, Adnan, Nathaniel

First talk w/ Gio → bank robbery, Johan pulling it out
later told me VB worked at Earn
└→ put it together and asked
└→ probably w/in a month

Knew he was into comm. activity but surprised he did this

Knew Jeffrey + SO

Found out about VB couple months later

2nd mtg → who else was involved

1 of 3